# EXPERT REPORT

# OF

# DAVID SHINDEL, CPA



UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA – JACKSONVILLE DISTRICT

| | |
|---|---|
| LAVERANUES COLES, an Individual, and TROUBLE LIVIN LIFE, LLC, a Florida Limited Liability Company, )))) | |
| Plaintiffs, ) | |
| v. ) | Case No. 3-24-CV-575-WWB-MCR |
| ) | |
| KONICEK & DILLON, P.C., an Illinois Professional Corporation, and AMIR TAHMASSEBI, Esq. )))) | |
| Defendants, ) | |

## EXPERT REPORT OF SHINDEL, ROCK & ASSOCIATES, PC

David Shindel, CPA, CVA, MAFF is a senior partner at Shindel, Rock & Associates, P.C., a certified public accounting firm located in Novi, Michigan and Amanda Sayn, CPA/CFF is a senior manager at Shindel, Rock & Associates, P.C. We have been retained by Katzman Wasserman Bennardini & Rubinstein, P.A., counsel to Laveranues Coles to analyze and quantify the economic damages, if any, sustained by the Plaintiff as a result of the closure of Trouble Livin Life, LLC, a adult night club, located at 5800 Phillips Highway, Jacksonville, Florida in May 2014 due to the alleged wrongful acts of the Defendants.

David Shindel is a Certified Public Accountant, a Certified Valuation Analyst, and a Analyst in Financial Forensics with a background which includes over 40 years providing

client advisory work, forensic engagements, economic damages, employment labor laws, and adult clients. Mr. Shindel has represented adult businesses since 1981 and has provided a full range of tax and financial services to this industry. He has testified as both an expert and material witness in numerous adult-related audits and litigations, he has not testified in the last four years.

Mr. Shindel has also published numerous articles relating to the adult industry, conducted national seminars and co-chaired a national webinar teaching other forensic professionals on the operations and valuations of adult-related businesses.

Amanda Sayn is a Certified Public Accountant, and is Certified in Financial Forensic, with a background which includes over nine years of relevant financial, tax and analytical experience in the adult entertainment industry.

The curricula vitae for David Shindel and Amanda Sayn are attached hereto as Exhibit A. Our fees for this engagement range from $350 to $400 per hour, our Engagement Letter is attached hereto as Exhibit B.

<u>Documents and Information</u>

In preparing this report, we were provided with legal documents, financial data, and other information related to this matter. The following is a list of the documents and information we have considered and/or relied upon in forming our opinion:

a) Litigation *LAVERANUES COLES, an Individual, and TROUBLE LIVIN LIFE, LLC, a Florida Limited Liability Company vs. CITY OF JACKSONVILLE, a Florida Municipal Corporation, United States District Court, Middle District of Florida – Jacksonville District, Case No: 1:15-cv-1521, and LAVERANUES COLES, an Individual, and TROUBLE LIVIN LIFE, LLC, a Florida Limited Liability Company*

*vs. CITY OF JACKSONVILLE, a Florida Municipal Corporation, Fourth Judicial Circuit in and for Duval County, Florida 16-2017-ca-7868* including the original complaints, amended complaints, motions, responses and related exhibits.

b) Expert report from Robert Buchanan, expert rebuttal report from John W. Howard, and the surrebuttal report from Robert Buchanan

c) Zoning analysis prepared by Zach Miller for Amir Tahmassebi and Paul M. Harden on November 30, 2015 attached hereto as Exhibit C.

d) Depositions of Robert Buchanan.

e) Various discussions with Laveranues Coles.

f) Adult Industry data, including RCI Hospitality Holdings, Inc. ("Rick's")

g) A Scott Davis, A. H. (2024, September 3). The Financial Damages Model for Loss of Value. Retrieved from Lexology: https://www.lexology.com/library/detail.aspx?g=d5061adb-ddd4-488f-94ba-1601e5e47366

h) National Academies of Sciences, Engineering and Medicine. (2011). Retrieved March 30, 2025: https://doi.org/10.17226/13163

i) AICPA Forensic & Valuation Services Practice Aid; Discount Rates, Risk, and Uncertainty in Economic Damages Calculations, 2020

j) AICPA Forensic & Valuation Services Practice Aid; Attaining Reasonable Certainty in Economic Damages Calculations, Revenues, Costs, and Best Evidence, 2020

k) William Mitchelle Law Review, Volume 5 Issue 1, Article 10, 1979, Remedies – Damages for Lost Profits of an Unestablished Business, Leoni v. Bemis Co., Minn., 2

l)  Business Valuation Resources, Stripping Away the Mystery; Valuing Adult Cabaret Businesses, Rod Burkert, CPA/ABV, CVA, David Shindel, CPA, CVA, MAFF, February 6, 2020

m) Business Valuation Resources, BVWire, Issue #205-4, Some courts prefer back-of-the-envelope calculations, expert says, David Shindel, CPA, CVA, MAFF, October 23, 2019

n)  CP Food and Beverage, Inc. vs. Ryan Carlson et al., Eighth Judicial District Court Clark County, Nevada, Case No: A-14-709594-C Dept. XXI, attached as Exhibit D

o)  2009 Industry Sales Information, Exhibit E

p)  All documents produced in discovery from Konicek and Dillon, P.C.

q)  April 28, 2025 deposition of Amir Tahmassebi transcript and related exhibits.

r)  May 12, 2025 deposition of Paul M. Harden transcript and related exhibits.

s)  Various discussions with industry experts

<u>ANTICIPATED TESTIMONY</u>

If called as a witness at trial, we will testify in our professional opinion, to a reasonable certainty, that Mr. Coles sustained **$2,500,000** in economic damages.

<u>DISCUSSION</u>

<u>Background Information - Plaintiff</u>

The plaintiff, Laveranues Coles ("Mr. Coles") was a professional athlete. During his football career and after his retirement, Mr. Coles was a partner in Dream, a Miami nightclub. He was a partner for approximately 10 years. This ownership allowed Mr. Coles to gain expertise in nightclub operations. During this time Mr. Coles also managed two

other nightclubs in the South Florida area, XO and Goodfellows. His management expertise and advice significantly increased the revenues and profits of these nightclubs.

As a result of managing these clubs, Mr. Coles determined that there was a need for an adult nightclub in Jacksonville which would provide entertainment for a black-oriented clientele. There were no comparable venues in the area.

Mr. Coles identified a vacant building in Jacksonville, 5800 Phillips Hwy., that had previously operated as an adult entertainment establishment for over 40 years. The property occupied 2.82 acres of land and included a 16,416 square foot building. The interior would include a kitchen, a bar area and an open area with couches along the outside walls and a stage in the middle[1].

In order to operate as an adult night club[2] (also known as a bikini bar or a go-go club), including the sale of alcoholic beverages, various permits, licenses and zoning variances, exceptions and waivers are required from the City of Jacksonville (the "City").

Mr. Coles signed a lease for the building on November 20, 2013[3] for five years. After signing a lease, Mr. Coles started renovations on the building in order to open the Business. During renovations, Mr. Coles was also waiting for the City of Jacksonville to approve the licensing required to operate the Business. After renovations were complete

---

[1] K&D 003874

[2] An adult night club, or dancing entertainment establishment as defined in Jacksonville, Florida – Code of Ordinances/Title IV- Business, Trades and Occupations/Chapter 151 – Dancing Entertainment Establishment Code "Dancing entertainment establishment means any establishment where during its hours of operation any worker wearing sexually provocative attire dances erotically and accepts any consideration, tip, remuneration or compensation from or on behalf of a customer. A dancing entertainment establishment shall not include any nightclub or restaurant where dancing entertainment establishment activities do not occur, theater, concert hall, art center, museum, or similar establishment that is primarily devoted to the arts or theatrical performances as defined in Section 150.103 (Definitions), Ordinance Code. A dancing entertainment establishment does not include any establishment defined or regulated in Chapter 150 (Adult Entertainment and Services Code), Ordinance Code." – June 2014

[3] K&D 011643 – K&D 011659

and the various permits, licenses and zoning variances were still pending approval, Mr. Coles, opened a restaurant called Queen of Diamonds also known as Sharky's Oyster Bar and Lounge ("Sharky's")[4] in the building.

Sharky's was opened and operated during late 2013 through May 2014. The requested zoning variances, exceptions and waivers, understood by Mr. Coles to be pending and approvable, were not available and the business operations ceased. This unsuccessful applications for zoning exceptions and waivers resulted in litigation in both Federal and State courts seeking redress against the City of Jacksonville for damages. The Courts, both Federal and State, determined that the litigation was premature and that options were still available to correct this situation without litigation. As a result of these failed litigations the opportunity for the Business was lost. Our damages report is based on this lost business opportunity.

<u>Background Information – Industry</u>

When operating a club providing adult entertainment, there are three types of clubs: a full nude club, a topless club and an adult night club. Our various discussions with industry experts indicate that the three types of clubs all operate comparatively and are similar in profitability and values.

The decision on which type of club to operate is usually driven based upon zoning ordinances, restrictions on alcohol sales, the extent of nudity entertainment, and the operating hours along with the availability of entertainers. Local zoning ordinances can restrict alcohol sales, and they can impose restrictions related to the type of entertainment offered. Operating an adult nightclub would allow for a greater availability of entertainers.

---

[4] Documents available list both Queen of Diamonds and Sharky's Oyster Bar and Lounge as fictitious names used for 5800 Phillips Highway in 2013.

In particular some, of the high-grossing entertainers prefer establishments with no nudity. One downside is some customers prefer topless or full nude entertainment. The overall results is that there is no significant distinctions in revenues, profits or business values between adult night clubs, full nude clubs or topless clubs.

Based on Mr. Coles expertise, he decided to open an adult night club format.

The financial information that is available for the adult industry in the United States, involving approximately 3,500 clubs in 2014, is not generally available to the public. Club owners are very private and unwilling to share their financial data. This general lack of information presents a challenge to valuators and forensic damage experts. There is, however, data available that can be mined from various sources including litigation cases, online sites which lists clubs for sale[5,6], data provided by publicly owned clubs[7] and industry experience. From this information the values of clubs can be determined.

There are three distinct levels of adult entertainment club ownership. Each of these ownership levels have different operating costs that result in different profit margins. The different levels of ownership are as follows:

- A publicly traded company listed on the New York Stock Exchange, for example RCI Hospitality Holdings Inc. ("Rick's") which operated 44 clubs in 2014.

- Privately held businesses with a large national presence, such as Spearmint Rhino Consulting Worldwide, Inc. ("Spearmint Rhino"), Deja Vu Service, Inc[8]. ("Deja Vu"), and VCG Holding Corp ("VCG")[9].

---

[5] www.stipclubrealty.com/club-listings-2/
[6] Stripclubs4sale.com
[7] SEC.gov
[8] https://dejavu.com/locations/, reviewed on May 5, 2025
[9] Sold to Ricks February 2010, https://www.barrons.com/articles/BL-SWB-10122.

Page 7

- An owner-operated or privately held company with ownership in a single club.

Business Plan – Operations and Adult Industry Overview

Mr. Coles' business plan was to operate an adult dancing establishment. The dancing establishment would be provided by independent professional entertainers ("Entertainers") offering dances to customers while dressed in bikinis and provide an adult night club environment. The Entertainers would use the open area and the couches to perform "table dances." These entertainers would pay a per diem fee to the club, and would earn dance revenues and tips from customers of the Business.

The Business would also advertise and market towards specific events such as bachelor parties, graduation parties, sporting events and other special events.

There are entertainers in the industry who are nationally well known and have customers who would travel to watch their performances. There are also well-known entertainers, commonly known as "Features", who perform at clubs as part of a specified contract with specific terms and conditions bringing their fans, Mr. Coles anticipated that these entertainers would also generate higher customer counts, which in turn would generate both more dance revenue and tips for the Entertainers and additional revenue for the Business. Mr. Coles, as a prior professional athlete, had notoriety and relationships which would in turn result in more entertainers and thus bringing in additional customers.

The intention of the overall business plan, as envisioned by Mr. Coles, was to create a simple, yet profitable, business model that identified a specific market, in a specific geographic area, including a suitable building, which was simple and very efficient.

The Business would generate revenues from four sources:

Page 8

- Door entry fees paid to the Business by customers.

- Per diem fees charged to Entertainers by the Business.

- Sales of alcohol and beverages by the Business to customers.

- Sales of food by the Business to customers.

The hours of operation of the Business would be daily from 7:00pm to 2:00am.

Door Entry Fees: An entry fee would be charged to customers. The standard entry fee would be $10 and could be waived during slower business times and for VIP customers at the Business' discretion. The door fees could also be increased during high-demand occasions.

Based on industry standards and Rick's data, the revenue from these fees would be approximately 5.5% of total revenues.

Per Diem Fees: Daily fees would be charged to the Entertainers by the Business. The Entertainers would be independent contractors and would not be considered employees of the Business. As contracted non-employees, the Entertainers would pay the Business a flat per diem fee. This is a common practice in the adult entertainment industry. The amount of the per diem fee charged to the Entertainers would be on a sliding scale. During the week, with fewer customers, the Entertainers would pay a minimum fee of $150. On busier nights, weekends and holidays, Entertainers would pay a higher fee ranging from $200 to $500 depending on anticipated customer counts. Based on discussions with Mr. Coles, the planned model was for an average of 20 Entertainers per day. The model anticipated an average fee paid by an Entertainer would be $250 per diem. The Business would not charge any additional fees to the Entertainers.

Page 9

Based on industry standards and Rick's data, Entertainer revenues represent 40% of the total gross revenues of clubs.

Sales Revenues from Alcohol and Food

Revenues from the sale of alcoholic beverages and food, in adult clubs, are directly related to Entertainer revenues and customer counts.

Based on the data from Rick's, which operated 44 clubs, reports that for the year ended September 30, 2014, alcohol and beverage sales are 42.5%[10] of total revenues while food sales are 12%. These percentages are consistent with industry averages.

## Adult Industry Values of Clubs

The cost of club operations and profit margins are significantly different depending on levels of ownership: public company, large privately held businesses and owner-operated businesses. An owner-operated club will usually be much more profitable than a club owned as part of a public company with all of the attendant oversight and compliance costs. Investors and shareholders of a public company will also have less risk and therefore require a lower return on investment than would a private owner. Likewise, a national chain of clubs will have layers of management and still have greater compliance costs than single owner/operated clubs.

The industry performance data reflects these levels of ownership. Large chains, both public and private, will look at clubs on an overall basis, similar to a mutual fund. Some clubs, even if not very profitable, may continue to be owned by national chains to prevent local competition. The purchase price of acquiring clubs is the same for all three levels of ownership. During 2007 and 2008, Rick's purchased nine clubs from VCG.

---

[10] Based on Annual 10K filings on sec.gov

According to annual 10K filings, these clubs on average were purchased for 1.45 times revenue or 3.86 times profits (Earnings Before Interest, Taxes, Depreciation or Amortization ("EBITDA"). Attached, Exhibit E, was compiled using these annual filings.

The entry costs to open a club have significantly increased as the market has matured. When the industry first started, in its current form, in the 1980's, a club could be renovated and furnished for $200k to $300k. The cost has increased substantially over time and in 2014, a renovation including furnishing and equipping a club can now cost in excess of $3 million, depending on many variables, including the size and venue of the club.

Operating profits have also changed over time due to the increased costs of renovations and furnishings along with additional burdens of compliance and industry risks such as class-action litigations from Entertainers. The profit margins in the early stages of the adult entertainment industry, in the 1980s and 1990s would be approximately 40% of gross revenue. The profit margins in 2014 are approximately 15% to 25% of gross revenues. The current club re-sale values, reflect this dynamic.

Purchasers of adult clubs generally require a 3.5-year return on investment[11]. The "rule-of-thumb" values accepted in the industry and the courts reflect this overall standard. The market value of clubs is, therefore, based on profits and/or revenues generated. If a club generates 25% profit on revenue and a buyer requires a 3.5-year payback, equivalent to a 28.5%[12] capitalization rate, the indicated value would be 87.5% of gross revenue[13] or 3.5 x profits. This is consistent with overall industry averages.

---

[11] Exhibit F – Adult Cabaret Acquisitions – Public Company
[12] BV Wire article, Some courts prefer back-of-the-envelope calculation, expert says, Issue #205-4, October 23, 2019
[13] 25% /28.5% = 87.5%

The value of clubs, in 2014, is then based on two inter-related metrics:

- A rule-of-thumb for gross revenues

- Club profits capitalized for a return on investment of 28.5%

The information available to the public on club values and economic performance can be obtained but is challenging to locate and quantify. This data can be accessed from adult industry litigation, public data from Rick's, and national listings of clubs for sale. There are publicly available litigation cases utilizing these metrics. From this information, an objective database of operations and economic performance can be created. This information provides both rule-of-thumb and yardstick valuations, for the courts to determine economic damages, for succession planning, eminent domain proceedings, tax audits, purchases and sales, buy-sell agreements and insurance.

<u>Damages Approach</u>

Calculation of economic damages can be estimated using one or more of the following methods: Before-and-After Method, Yardstick Method and the Sales Projection Method.

The Before-and-After method compares the actual results of operations before a damaging event with the results during and after the damaging event. This method is usually appropriate when historical operations are stable, the company is mature, the company has since recovered and there is a finite period of damage. This method is not applicable to a new, unopened business.

The Sales Projection Method is a "But-For" approach which requires the creation of a microeconomic model of the subject company. The model reflects projected operations during the damage period without regard for any alleged acts or the results

Page 12

thereof. This method often utilizes management projections or forecasts and incorporates historical operations as well as industry and economic data. As such, this method is often considered a hybrid method as it also incorporates comparable industry data, an aspect of the Yardstick Method. This type of approach is not appropriate for start-up business damage valuations.

The Yardstick method compares the results of operations after the damaging event to comparable companies or the industry to indicate what the company's results would have been had the damaging event not taken place. This method is most appropriate when a comparable measurement can be located and a meaningful relationship can be shown to exist between the chosen comparable companies and/or other measurements and the damaged party's performance.

We have analyzed the various methods and after careful consideration of each method's underlying assumptions and procedures, we conclude that the Yardstick method is the most appropriate to quantify the damages.

<u>Calculation of Economic Damages</u>

For our yardstick damage calculation, we used various databases[14] available from StripClubs4Sale.com and the 10K filings for Ricks. These sources provide details such as gross revenue, square footages of clubs, the number of Entertainers working on a daily basis and different types of entertainment venues. This yardstick calculation of damages was prepared on a pre-tax basis.

The calculation of the amount of damages is a three step process:

Step 1: Determine the gross revenues of the Business.

---

[14] CP Food and Beverage, Inc. Exhibit D and BV Wire article, Some courts prefer back-of-the-envelope calculation, expert says, Issue #205-4, October 23, 2019

Step 2: Determine the profits resulting from this gross revenue.

Step 3: Calculate the value of the Business based on the determinations of

gross revenues and profits – the economic damage on a yardstick basis.

*Step 1: Determination of Gross Revenues*:

The gross revenues of adult businesses originate with Entertainers. Entertainers

attract customers. Customers then pay entry fees to come in, buy drinks and order food.

Our damage calculations start with entertainer counts and the per diem fees that they pay

to the Business.

Calculating Entertainer Revenues:

Based on the business model and in agreement with club statistics from listings

for sale, there will be an average of 20 Entertainers working at the Business every day.

The revenue generated by the Business from these entertainers will be an average

of $250 per Entertainer, per day. The Business will operate 360 days per year.

Annual Entertainer revenues will be approximately $1,800,000[15] annually.

Entertainer revenue represents 40% of total gross revenues for an adult club.

Calculating Door/Entry fees:

Door fees are based both on customer counts and the per customer door fee

charged. The fees will vary based on weekdays versus weekends and evenings versus

late nights. The per customer door fees will also be higher during sporting events and

concerts. If a Feature Entertainer is brought in the door fees will also be increased.

For purposes of our economic damage calculation, we have used an average of

5.5% of gross revenues for door/entry fees, which is approximately 1/8th of Entertainer

---

[15] 20 Entertainers x $250 per day x 360 days = $1,800,000

revenues. At times the door/entry fees will be waived for VIP customers, regular high-spending customers and on slow days. At other times the fees will be higher.

Door/entry fees will be $225,000[16] per year. This is consistent with industry averages for door revenues, which is 5.5% of total revenues.

<u>Calculating Beverage Revenues:</u>

Beverage revenues are slightly higher than Entertainer revenues at 42.5% of total gross revenues. The total for beverage revenues will total $1,912,000[17].

The total, along with Entertainer revenues, is consistent with Rick's annual reports.

<u>Calculating Food Sales Revenue:</u>

The sale of food at adult clubs would be 12% of total revenues, which is consistent with Rick's. This calculates to $540,000[18] per year.

<u>Total annual revenues are summarized as follows</u>:

|                       | Gross Revenues | % of Total Revenues |
|-----------------------|----------------|---------------------|
| Entertainer Fees      | $1,800,000     | 40.0%               |
| Door/Entry Fees       | 225,000        | 5.5                 |
| Beverage Revenues     | 1,912,000      | 42.5                |
| Food Sales            | 540,000        | 12.0                |
| Total Gross Revenues  | $4,477,000     | 100.0%              |

<u>*Step 2: Determine the profits resulting from this gross revenue.*</u>

The annual profits of an adult club will vary based on the type of ownership of the club.

- Rick's, a publicly held company have pre-tax profits of 12.2% of gross[19].

---

[16] $1,800,000 x 1/8 = $225,000
[17] ($1,800,000 x .425)/40 = $1,912,000
[18] ($1,890,000 x .12)/.40 = $540,000
[19] Rick's 10Ks publicly available on sec.gov

Page 15

- Deja Vu, a nationally branded chain of clubs, have pre-tax profits of 15.96%[20]

- Locally owned clubs, per rule-of-thumb cases have pre-tax profits of 25%.[21]

For the Business, our calculation of damages would use, as a conservative relevant yardstick, a pre-tax profit margin of 16%, based on the H.D.V. Greektown litigation.

The profits, based on the above, would be $714,000[22].

_Step 3: Calculate the value of the Business_

The industry standards are values based on a 3.5-year return on investment – a 28.5% capitalization rate. This standard is based on litigation case expert testimony, club listings for sale, and the multiples of profits paid by Rick's.

The economic damage incurred by Mr. Coles as a result of the loss in value of the Business, is $2,500,000[23].

## RESERVATION OF RIGHT TO AMEND

In the event additional documents, new data, and/or other discovery material is made available to us after the submission of this report, we respectfully reserve the right to amend this writing, as appropriate.

## REBUTTAL TESTIMONY

In addition to the substance of the foregoing discussion, our testimony may also include rebuttal testimony, as required.

---

[20] H.D.V. – Greektown, LLC et. al. v. City of Detroit, United States District Court for the Eastern District of Michigan Southern Division, Case No. 06-11282
[21] CP Food and Beverage, Inc. Exhibit D and BV Wire article, Some courts prefer back-of-the-envelope calculation, expert says, Issue #205-4, October 23, 2019
[22] $4,477,000 x 15.96% = $714,000
[23] $714,000 x 3.5 = $2,500,000

Page 16

## TRIAL EXHIBITS

Selected information from this report may be incorporated into demonstrative exhibits for purposes of trial testimony.

## PRIOR TESTIMONY

The attached curricula vitae disclose testimony by deposition and/or at trial given in the past four years.

## PUBLICATIONS

The attached curricula vitae disclose publications from the past ten years.

*Shindel Rock*

Shindel, Rock & Associates, PC

## DECLARATION OF DAVID SHINDEL

### [28 U.S.C. § 1746]

I, David Shindel, declare as follows:

1. I am over 18 years old and fully competent to make this Declaration. If called as a

    witness I could and would testify in accordance with this Report.

2. The statements and opinions in the above report are true and correct.

3. I declare under penalty of perjury under the laws of the United States of America

    that the foregoing is true and correct.

DATED: June 2, 2025

*David Shindel*

David Shindel, CPA, CVA, MAFF
Shindel, Rock and Associates P.C.
28100 Cabot Drive, Suite 102
Novi, Michigan 48377
(248) 855-8833
DShindel@ShindelRock.com

EXHIBIT A

CURRICULUM VITAE

## David H. Shindel, CPA, CVA, MAFF

Shindel, Rock and Associates, P.C.
28100 Cabot Drive, Ste 102
Novi, MI  48377
Tel:  248-855-8833
Fax:  248-855-4192
Email: dshindel@shindelrock.com

---

**POSITION**

Senior Partner with Shindel, Rock & Associates P.C.

**EDUCATION**

B.S. - Eastern Michigan University 1971
Graduate Courses (Walsh College) 1986 – 1995
Master of Taxation Program - various courses

**LICENSES AND CERTIFICATIONS**

Certified Public Accountant (CPA) - State of Michigan
Certified Valuation Analyst (CVA) - National Association of Certified Valuation Analysts
Master Analyst in Financial Forensics (MAFF) - National Association of Certified Valuation Analysts

**PROFESSIONAL ORGANIZATIONS**

Member – Michigan Association of Certified Public Accountants
Member – American Institute of Certified Public Accountants
Member – National Association of Certified Valuation Analysts
Oakland County Business Finance Company (SBA 504 Program):Past Chairman, Past President, and Past Vice-President

**LECTURES AND PUBLICATIONS**

Lecture - Level One Bank Loan Underwriting, Financial Statement and Tax Return Analysis (2015)
Guest Lecture – Walsh College Graduate Taxation Program (2015)
Lecture - SBA 504 Loan Underwriting, Financial Statement and Tax Return Analysis (2014)
Panelist/Industry Expert/Lecturer - National ACE Convention (2000–2012)
"Adult Nightclubs: Company-Specific Risk as the Extreme" Business Valuation Resources (April 2020) and related National webinar
"Valuers and Bankers: Benefits of Cross-Training Between the Professions", Business Valuation Resources (January 2020)
"Some courts prefer back-of-the-envelope calculations, expert says", Business Valuation Resources (October 2019)
"Michigan Policies Penalize Business", Freep.com, detnews.com, The Oakland Press, August/September 2010
"Valuation of Intangible Property Rights: Adult Use Zoning", The Value Examiner, March/April 2010
"Reopen or Not? A Method for Analyzing a COVID-19 Shuttered Firm" Business Valuation Resources (September 2020)
Walsh College, Troy, Michigan - Development of Masters Degree in Forensic (Accounting) – Five Graduate Courses – write outlines, syllabus, books to use for courses

**PROFESSIONAL EDUCATION COURSES**

2010 - 2015 AICPA National Forensic & Valuation Services Conference
Attended NACVA's CVA Training Center
Attended NACVA's CFFA Training, 2 sections
Ongoing courses to maintain certification of CPA, CVA, and MAFF designations

# Amanda S Sayn, CPA/CFF

Shindel, Rock and Associates, P.C.
28100 Cabot Drive, Ste 102
Novi, MI  48377
Tel:  248-855-8833
Fax:  248-855-4192
Email: ASayn@shindelrock.com

| | |
|---|---|
| **POSITION** | Senior Manager with Shindel, Rock & Associates, P.C. |
| **EDUCATION** | Bachelor of Business Administration in Accountancy    2011<br>Western Michigan University – Kalamazoo, Michigan<br>Master of Science in Forensic Accounting    2013<br>New England College – Henniker, New Hampshire |
| **LICENSES AND CERTIFICATIONS** | Certified Public Accountant (CPA) – State of Michigan<br>Certified in Financial Forensics (CFF) - AICPA |
| **PROFESSIONAL ORGANIZATIONS** | Member – Michigan Association of Certified Public Accountants<br>Member – American Institute of Certified Public Accountants |
| **PUBLICATIONS** | "Reopen or Not? A Method for Analyzing a COVID-19 Shuttered Firm" Business Valuation Resources (September 2020) |
| **PROFESSIONAL EDUCATION** | 2024 MICPA Forensic & Valuation Services Conference<br>2022 AICPA Forensic & Valuation Services Conference<br>2017 AICPA Forensic & Valuation Services Conference<br>2017 AICPA Certified Financial Forensics Exam<br>2016 AICPA Forensic Accounting Certificate<br>OTHER – Various ongoing training in financial, tax, valuation and litigation matters |

**Amanda S. Sayn, CPA/CFF**

**Summary of Deposition and Witness Testimony Within Past Four Years**

| Trial | Deposition | Case Name | Law Firm | Attorney | Case No. |
|---|---|---|---|---|---|
|  | X | Romantix-Fargo Inc. v. City of Fargo, North Dakota and Nicole Crutchfield, in her official capacity as the Director of Planning & Development | Shafer & Associates, PC | Matthew Hoffner | United States District Court of North Dakota, Case No. 3:22-cv-183, 2024 |
|  |  |  |  |  |  |

EXHIBIT B

SIGNED ENGAGEMENT LETTER

**Shindel**

| 28100 Cabot Drive<br>Suite 102 • Novi, MI 48377 | t 248.855.8833<br>f 248.855.4192 |
|---|---|

shindelrock.com

January 29, 2025

Katzman Wasserman Bennardini & Rubinstein, P.A
7900 Glades Road, Suite 140
Baco Raton, FL 33434
Attn: Charles J. Bennardini, Esq.

**Re:** *Laveranues Coles*

Thank you for retaining ShindelRock to assist you in this matter. By this agreement, Katzman Wasserman Bennardini & Rubinstein, P.A. (hereinafter referred to as "Counsel") Laveranues Coles ("Counsel's Client") and ShindelRock (hereinafter referred to as "Firm") outlines our understanding of the terms and objectives of the engagement.

**Services**

This letter agreement confirms that Counsel and Counsel's Client have retained Firm to assist them as it relates to client's case.

During the course of our engagement, it may be necessary for Firm to prepare verbal or written reports of our findings and conclusions. These reports are to be used only in conjunction with the above referenced case and may not be used by Counsel and Counsel's Client or any other person for any other purpose without our express written consent, which may be granted or withheld in our absolute discretion. We understand that in preparing this matter for trial, it may be necessary for Counsel to share with us your theories of the case, strategy considerations, mental impressions, conclusions, other thought processes, and communications with you. Consequently, we understand that the work performed by us will be confidential, constituting a portion of our work product. We further understand that if we are asked to testify, confidentiality may no longer apply.

Counsel and Counsel's Client authorize Firm, its employees, and agents to take whatever actions Counsel and Counsel's Client authorize the Firm to take with regards to this engagement. If information becomes known that would make our continued involvement in this engagement inappropriate, or if the attorney or parties involved change, we reserve the right to withdraw from this engagement. In addition, we will refuse to perform any requested act that we deem a violation of law, public policy, or our professional ethical standards, and may, as a result, withdraw from the engagement without penalty.

**Fees, Costs and Expenses**

Counsel's Client is solely responsible for payment to the Firm for fees, costs and expenses. As the engagement progresses, charges will be billed monthly on an ongoing basis, based on our current hourly rates for litigation services, plus out-of-pocket expenses. Our billings will be sent to Counsel to be forwarded to Counsel's Client. It is agreed that our fee is not contingent upon the results of the litigation. Payment is solely the responsibility of Counsel's Client and is due upon receipt of the invoices. If for any reason the engagement is terminated prior to its consummation and Firm is requested to terminate work, then Firm's fee shall not be less than Firm's total time and costs at the

*Laveranues Coles*
January 29, 2025
Page 2 of 4

standard rate for such engagements, plus out-of-pocket expenses. We reserve the right to defer rendering further services until payment is received on past due invoices. An initial retainer fee of $10,000, to be paid by Mr. Coles, to be applied towards the first bill, is due upon acceptance of this contract.

We will also charge Counsel's Client for out-of-pocket expenses incurred in the course of our engagement, including, among others (as applicable), computer database usage, industry research reports and materials, travel and living expenses (meals, lodging, etc.), fees to professionals for consultation regarding the damages or technical matters, messenger and delivery services, report preparation, copying, and other direct engagement expenses. We will also charge Counsel's Client for retaining other experts, if deemed necessary, but such experts will only be retained with Counsel's Client's prior approval.

In the event that Counsel or Counsel's Client should disagree with or question any amount due under an invoice, Counsel or Counsel's Client agree to communicate such disagreement to us in writing within ten (10) business days of the invoice date. Disagreement with any amount not made known to us in writing within that period is considered invalid.

As "Daubert challenges" (or similar challenges to the admissibility of an expert's testimony) have become an increasingly common means of contesting an opposing expert's opinions, Counsel's Client agrees to compensate us for any time or out-of-pocket expenses incurred in defending such challenges. Additionally, should a trier-of-fact determine that the testimony to be offered by a member of the Firm be excluded, Counsel's Client agrees to indemnify and hold harmless the Firm and its personnel from any claims, liabilities, costs and expenses arising from this exclusion, except to the extent it is finally determined that such exclusion resulted solely from Firm's gross negligence or willful misconduct.

### Duties of Counsel and Counsel's Client

Counsel and Counsel's Client shall provide us all documentation and information and make available key personnel within a reasonable period of time pursuant to our request. Failure to do so may result in extensions of time and increased costs that may jeopardize engagement deadlines. In such an event, you will not hold us responsible and all fees and expenses will be paid to us in accordance with the terms of this engagement.

Counsel and Counsel's Client's duties specifically include, but are not limited to:

    a. Providing Firm with copies of or access to all non-privileged, arguably relevant documents, evidence and other materials in the underlying legal matter.

    b. Notifying Firm of all parties and attorneys in the case so that Firm can check for conflicts of interest.

    c. Where circumstances reasonably allow, providing Firm with prompt notice of any *Daubert* motions, *Frye* motions, *Shreck* motions, motions in limine, or other pretrial motions made by other parties or persons to restrict, exclude or in any other way limit Firm's testimony or Firm's participation in the underlying legal matter.

*Laveranues Coles*
January 29, 2025
Page 3 of 4

    d.  Obtaining Firm's advance approval (for accuracy) of the relevant portions of any and all answers to interrogatories, motions, expert designation or other documents which summarize Firm's qualifications, methodology, opinion(s) and/or anticipated testimony.

    e.  Being available as reasonably requested to meet with Firm prior to anticipated deposition or testimony.

    f.  Promptly notifying Firm of when and where Firm may be requested to appear to testify.

    g.  Promptly notifying Firm of the settlement or final adjudication of the underlying legal matter.

**Professional standards and confidentiality**

Our engagement as a consultant will be based on the data we are able to obtain within a reasonable time, using our best efforts. We attempt to collect data from reliable sources but do not warrant the accuracy, completeness, or reliability of the data obtained. We will read and analyze, to the extent available and relevant, financial statements, income tax returns, contracts, agreements, budgets, job expenditures, licenses, certifications, training information, damages reports, asset schedules and other such records or other client or plaintiff documents or information we deem appropriate and that are made available to us. In addition, outside research sources and knowledgeable individuals will be consulted as necessary. Factual information provided will be relied upon as being true and correct. We will not perform an audit, review, or compilation of financial statements, forecasts, or any other financial data in the capacity of certified public accountants under the standards promulgated by the American Institute of Certified Public Accountants. Our engagement cannot be relied on to disclose errors, fraud, or other illegal acts that may exist, nor will we be responsible for the impact on our services of incomplete, missing, or withheld information, or mistaken or fraudulent data provided from any source or sources.

All information and materials of any form or description collected by us in the course of our engagement shall constitute our work files and will at all times, during and after completion of our engagement, remain in our exclusive possession. We shall have unlimited discretion to retain, discard, or dispose of our work files but will at all times maintain all information and materials provided by Client in strictest confidence.

We will use our best efforts to keep strictly confidential our findings and conclusions as well as the identity of Client and other identifying information. We will nevertheless have no liability to Client or any third party for information disclosed in, or pursuant to, any ruling, order, or proceeding of any court or other judicial or non-judicial forum or of any regulatory agency or similar instrumentality.

**Disputes; legally binding contract**

This letter agreement is a legally binding contract between Counsel and Counsel's Client and Firm and will be binding upon, and inure to the benefit of, their respective heirs, assigns, successors-in-interest, and legal representatives (as applicable). It may not be amended without the prior written consent of both parties.

*Laveranues Coles*
January 29, 2025
Page 4 of 4

It is agreed that any disputes that you may have regarding the services we provide or any claim you may have against this Firm that arise out of the professional services provided to you shall be resolved by submitting such matter or matters for binding arbitration to the American Arbitration Association ("AAA"), in accordance with the rules, then in effect, of the AAA. Any such proceedings shall be before an arbitrator jointly appointed and agreeable to both of us. If we cannot agree on the selection of an arbitrator mutually acceptable to each of us, then any such proceeding shall be before three arbitrators (one selected by you, one selected by us, and a third selected by the other two arbitrators). It is mutually understood and agreed that our liability, if any, arising from services performed under the terms of this engagement will not exceed the fees we have received for this engagement. Actions necessary to secure collection of past due balances are not subject to arbitration.

It is further understood and agreed that any dispute, concerning this letter agreement, deemed not to be subject to the AAA, discussed in the preceding paragraph, including the services provided by ShindelRock relating to this engagement, shall be governed in all respects by the laws of the state of Florida without regard to choice of law provisions, and shall be brought in the judicial district in which Client's Counsel is located. In any dispute brought to court, both parties agree to waive a jury trial.

In no event will our firm be liable for incidental or consequential damages resulting from our performance on this engagement, even if we have been advised of the possibility of such damages.

The obligations of Firm are solely corporate obligations, and no officer, principal, director, employee, agent, shareholder, or controller person shall be subjected to any personal liability whatsoever to any person or entity, nor will any such claim be asserted by or on behalf of any other party to this agreement or any person relying on our findings and/or conclusions.

Client acknowledges, having read this agreement in its entirety, has had full opportunity to consider its terms, has had full and satisfactory explanation of same, and fully understands and agrees to be bound by the terms of this agreement.

## Acceptance

Please indicate your understanding and acceptance of this agreement by executing this agreement in the space provided below where indicated and return it, along with a check in the amount of the retainer fee, to our office indicating your authorization for us to proceed on the above terms and conditions. Please retain a copy of this agreement for your files.

You may request that we perform additional services not contemplated by this engagement letter. If this occurs, we will communicate with you regarding the scope of the additional services and estimated fees. We may also issue a separate engagement letter covering additional services. In the absence of any other written communication from us documenting such additional services, our services will continue to be governed by the terms of this engagement.

ShindelRock

By: *David Shindel*
       David Shindel, Partner

*Laveranues Coles*
January 29, 2025
Page 5 of 4


The Undersigned agree to proceed on the above terms and conditions.


Accepted by:

Katzman Wasserman Bennardini & Rubinstein, P.A.


By: _____        Date _____
    Charles J. Bennardini, Esq.
    For the law firm of Katzman, Wasserman,
    Bennardini & Rubinstein, P.A.


_____
Laveranues Coles, Client

EXHIBIT C

ZONING ANALYSIS 11.30.2015 – PHILIPS HIGHWAY

To: Amir Tahmassebi and Paul M. Harden

From: Zach Miller

Date: 11/30/15

RE: "Grandfathering" of Dancing Establishment Use and On-Premises Consumption of Alcohol

**ATTORNEY CLIENT CONFIDENTIAL**

**Factual Background** – HI, LLC owns property at 5800 Philips Highway. My understanding is that prior to 2014 and prior to 2005 this property was used for a Dancing Establishment and On-Premises Consumption of Alcohol.

The property records provide that the property was sold by "Beach and University Shell, Inc." to "Charbel Investment Association, Inc." in April 2002. A certificate of title was issued for the property on November 5, 2013, confirming that HI, LLC bought the property from the mortgage company (SF Partners Mortgage LLC), likely as part of foreclosure action.

Sean Kelly, the Zoning Administrator for the Planning Department, provided in an email that "Trouble Livin Life, LLC" had applied for a COU for a "restaurant" and it was denied on May 23, 2014 because a large portion of the property would be used for a "Dancing Entertainment Establishment" which he ruled, "is not consistent with the code requirements..."

The owner and the tenant applied for a special exception to allow for the sale of alcohol on the premises and an administrative deviation for the amount of parking. The administrative deviation application was withdrawn. The planning department recommended approval of the special exception specifically finding that the proposed use would,

> "[B]e consistent with the definition of a zoning exception, and will meet the standards and criteria of the zoning classification in which such use is proposed to be located, **and all other requirements for such use set forth elsewhere in the Zoning Code**, or otherwise adopted by the Planning Commission." (emphasis added)

The Planning Commission denied the special exception. The denial is currently under appeal.

1

K&D 011661

**Legal Background** – While the Planning Department found that the special exception meets the zoning code criteria for the proposed use, Councilwoman Boyer (the property is located in her district) will not support the appeal because the distance limitations in the code.

Section 656.1103 provides that no "Adult Entertainment or Service Facility" shall be located on a site unless the site is more than:

i) 1000 feet from the boundary of another adult entertainment or services facility;
ii) 500 hundred feet from the boundary of a residential district;
iii) 1000 feet from an established school or church; or
iv) 500 feet from the boundary of any business which has an on-premises consumption beverage license.

SCORES, which is a Dancing Entertainment Establishment which serves alcohol for on-premises consumption, is approximately 570 feet away.

However, Mr. Coles is seeking to use of the property as a "Dancing Entertainment Establishment" not an "Adult Entertainment or Service Facility." The latter is defined "for the purposes of Part 11" as a:

> "Adult bookstore, nude massage parlor, adult motion picture theater or adult entertainment establishment, as defined in Chapter 150, Ordinance Code."

"Adult Entertainment Establishment" is defined in Chapter 150, Ordinance Code as,

> "150.103(c) Adult entertainment establishment means a commercial establishment where the owner, or an employee or agent of the owner, suffers, permits, allows, encourages, or pays any person to engage in nude entertainment on the premises. Adult entertainment establishment also includes any establishment which contains or operates an adult entertainment booth."

"Nude Entertainment" is defined as,

> "150.103(b) Nude entertainment means, while on the premises of a commercial establishment, the act of exposing or displaying specified anatomical areas, (1) for compensation or valuable consideration or for the opportunity to obtain compensation or valuable consideration, (2) to a person other than employee of the establishment or of the person operating or controlling the establishment."

2

K&D 011662

What Mr. Coles is attempting to operate is not an "Adult entertainment or service facility" but is a "Dancing Entertainment Establishment." Such establishments are governed by Chapter 151, not Chapter 150 and are defined as,

> "151.103 Dancing Entertainment Establishment means any establishment where during its hours of operation any worker wearing sexually provocative attire dances erotically and accepts any consideration, tip, remuneration or compensation from or on behalf of a customer. A Dancing Entertainment Establishment shall not include any nightclub or restaurant where Dancing Entertainment Establishment activities do not occur, theater, concert hall, art center, museum, or similar establishment that is primarily devoted to the arts or theatrical performances as defined in Section 150.103 (Definitions), Ordinance Code. **A Dancing Entertainment Establishment does not include any establishment defined or regulated in Chapter 150 (Adult Entertainment and Services Code), Ordinance Code.**" (emphasis added).

On March 25, 2014, in response to litigation, the City Council enacted 2014-164-E, which added the following language to Section 151.202 (which deals with the regulations of Dancing Entertainment Establishments),

> "(c) Each licensed premises shall comply with and be subject to the **placement and distance limitation requirements** set forth in Part II, Chapter 656, Ordinance Code. For purposes of these requirements, in every instance where the term 'adult entertainment or service facility' is used within Part 11, Chapter 656, it shall be replaced with and understood to mean, 'dancing entertainment establishment' as such term is set forth and defined in Section 151.102 (Definitions), Ordinance Code. (emphasis added).

I have requested a copy of the original Certificate of Use for the property and Sean Kelly has informed me that none exists. It appears the use of the property pre-dates the Certificate of Use requirement.

Section 656.151(a) provides,

> "Notwithstanding any ordinance to the contrary, and notwithstanding any prior legal status of any multi-family residence and business, any new multi-family residence or business or any changes in; use, **name**, ownership, expansion of square footage occupied, or the inclusion of additional uses after May 29, 2006, **will require a certificate of use.**" (emphasis added).

Section 656.110 (h) provides,

3

K&D 011663

"Certain Uses grandfathered. Notwithstanding anything in this Chapter to the contrary, **those persons holding approved zoning exceptions or any other form of <u>written</u> approval** from any person or entity authorized to grant such approval, as determined by the Planning and Development Department on a case-by-case basis, shall be authorized to continue their permitted use in accordance with the terms of their zoning exception or other form of written approval." (emphasis added)

Section 656.705 provides,

Where, on September 5, 1969, or the effective date of an amendment to the Zoning Code, an unlawful use of land exists which would not be permitted by the regulations imposed by the Zoning Code and where this use involves no individually, permanently fixed structure and land with minor structures only [for these purposes defined as a structure or structures whose just value does not exceed four thousand dollars], such use may be continued so long as it is not specifically made unlawful, impermissible or prohibited in the Zoning Code, the Charter or elsewhere in the Ordinance Code and there is stated an intent that such unlawful use shall be ceased by a date certain or upon the occurrence of some specified event; provided, however, that:

(a)The nonconforming use shall not be enlarged, increased, intensified or extended to occupy a greater area of land than was occupied on September 5, 1969, or the effective date of the amendment to the Zoning Code.

(b) The nonconforming use shall not be moved in whole or in part to a portion of the lot or parcel other than that occupied by the use on September 5, 1969, or on the effective date of the amendment to the Zoning Code.

(c) **If the nonconforming use ceases for any reason (except when governmental action impedes or denies access to the premises)** for a period of 12 consecutive months for any residential use **or six consecutive months for any nonresidential use, subsequent use of land shall conform to the regulations specified by the Zoning Code for the district in which the land is located.**

(d) No land in nonconforming use shall be divided so that more parcels of nonconforming lands are created nor shall a structure be added on the land except for purposes which are in conformity with the regulations of the district.

<u>Case Law</u>- There is case law in Florida which authorizes the continued use even if that use becomes prohibited by a change in the local zoning code.

In <u>Richbon v. Miami-Dade County</u>, 791 So.2d 505 (Fla. 3d DCA 2001) the plaintiff was cited by the local government for operating a nightclub and adult entertainment without a "certificate of

4

K&D 011664

use and occupancy. The plaintiff attempted to obtain such a certificate but was denied by the local government because, "[the] property does not allow its use as a nightclub with adult entertainment."

In 1962 the property had received a variance to allow it operate even though it was within the distance limitation of churches and schools. In 1976 an application was approved on appeal to the County Commission which allowed the continued use of the nightclub and on-premises service of alcoholic beverages.

The Plaintiff **added adult entertainment to its operation prior to the effective date of the County's ordinance regulating adult entertainment.** The Court explained,

> "As a consequence, all the right buttons had been pushed for the issuance of a grandfathered adult entertainment LVT certificate of use and occupancy....The County is (and was) estopped from denying the issuance of the permit as Richbon (the plaintiff) had successfully taken every step required of it to obtain the certificate, and at the time of the application there were not valid impediments to its issuance...Richbon cannot be fined or otherwise punished for Dade County's refusal to issue the certificate to which Richbon was legally entitled. Accordingly we issue our writ quashing the decision of the circuit court, and direct further proceedings consistent herewith." Id. at 507-508.

Hobbs v. DOT, 831 So. 2d 745 (Fla. 5th DCA 2002) concerned an advertising sign which became a non-conforming use when the property on which it was located was rezoned for residential use only. The lessee's sign permit was continually renewed until 1998 when the lessee asked DOT to cancel the sign permit and DOT agreed. No one notified the owner who later discovered the cancellation. The owner tried to get a new sign permit but was denied by the County because it was, "not in compliance with local ordinances, but is a legally existing as a non-conforming sign." The Plaintiff applied to DOT for a sign permit but was denied because the sign, "was not permittable under the land use designation of site."

On appeal of the administrative order denying the application, DOT argued that there is a distinction between "renewing" an existing permit and "issuing" a new permit. The District

5

K&D 011665

Court disagreed and cited to the First District Court opinion in <u>Lewis v. City of Atlantic Beach</u>, 467 So.2d 751 (Fla. 1st DCA 1985), which held,

> "It is clear that the concept of grandfathered nonconforming use relates to the property and the use thereof, not to the type of ownership or leasehold interest in the property." Id at 754.

<u>Lewis</u> concerned property in Atlantic Beach (Duval County) which was leased for use as a "liquor lounge." The operation of the liquor lounge pre-dated a City of Atlantic Beach ordinance which prohibited the use of an "alcoholic beverage establishment" which is within 1500 feet of another "alcoholic beverage establishment." Due to an investigation into the owner's liquor license, the liquor lounge was closed during which time the owner attempted to sell the business. <u>Id</u>. at 753. As part of the transfer of the liquor license, the owner had to get a statement from the City that the property was properly zoned for such a use. The owner applied to the City Commission, who denied his request for zoning approval. <u>Id</u>.

The owner filed a four count complaint, one of which was an action for declaratory judgment that the distance limitation did not apply to the property. <u>Id</u>. The City argued before the trial court and on appeal that because the property was closed prior to the appearance before the City Commission, the grandfather-exception was lost. <u>Id</u>. at 754.

The District Court reversed the trial court's decision and held that the grandfather-exception is only lost if the property owner discontinues the use either through attrition or abandonment. Id. at 755.

In explaining "attrition" and "abandonment" and why neither applied to the situation, the District Court held,

> "The general rule is that nonconforming uses may be eliminated by attrition (amortization), abandonment, and acts of God as speedily as is consistent with proper safeguards and the rights of those persons affected. The property was not, of course, destroyed by an act of God.
>
> Attrition, or amortization, contemplates the eventual elimination of nonconforming uses by requiring the termination of such uses within or at the

6

K&D 011666

expiration of a specified period of time. The **Atlantic Beach ordinance contained no specific time period for ending nonconforming uses.**

Abandonment occurs when the landowner intentionally and voluntarily foregoes further nonconforming use of the property. **Neither attrition nor abandonment occurs where a nonconforming use is interrupted or discontinued involuntarily by compulsion of governmental action.** Temporary cessation of a nonconforming use or the temporary vacancy of buildings used for the nonconforming use does not operate to effect abandonment of the nonconforming use. Accordingly, an involuntary cessation of the nonconforming use of a premises for the sale of alcoholic beverages due to the loss of a beverage license in administrative disciplinary proceedings does not constitute abandonment and terminate the grandfathered status of such nonconforming use of such premises.

**There is no evidence in the record indicating that appellants, as owners of the property in question, ever intended to abandon their nonconforming use. On the contrary, appellants <u>did all they could to continue such use</u> on the premises <u>while the city refused to certify that a permitted use of the property included the retail sale, service, and on-premises consumption of alcoholic beverages</u>. Appellants attempted to assist in the transfer of Hoj's license and, failing that, attempted to get a new license in their own or a new tenant's name, but were thwarted each time by the city's wrongful refusal to recognize a continuation of the nonconforming use. We hold that the city illegally withheld certification that the nonconforming use of the premises could be continued by appellants under these circumstances."** (emphasis added, internal citations omitted).

<u>Hobbs</u> and <u>Lewis</u> therefore hold that it is the operation of the use and not the ownership that matters in the context of whether a grandfather-exception applies.

**Issue-** Is the property "grandfathered" from the "Adult Entertainment or Service Facility" distance requirements that are now applicable to "Dancing Entertainment Establishments"?

There are two initial issues in this situation:

1. Was the property used for a Dancing Entertainment Establishment prior to March 2014?; and

2. Was that use abandoned or was it stopped due to some governmental action?

7

K&D 011667

The answer to the first question appears to be "Yes" as from all the information I have been provided this property was used as a Dancing Entertainment Establishment and served alcohol for on-premises consumption prior to the change in the ordinance code.

As to the second, the case law does not place a time limitation on when a use is "abandoned" and instead analyses the intent of the owner/user of the property. The Ordinance Code places a six (6) month time period on abandonment of the use a bright-line for loss of a grandfather-exception.

The Certificate of Use application that was denied by the City was for use as a restaurant - this could hurt the argument that the intent was to continue the use as a "Dancing Entertainment Establishment." What helps is the City's Planning Department specifically wrote on that application that it was not an application for a restaurant, but was an application for a "Dancing Entertainment Establishment." That application and the City's notes on the document will likely play a key role in any litigation.

The City will likely argue that its ordinance code requires a Certificate of Use for any name change; which is correct. However, prior District Court holdings require that the City issue the Certificate of Use if the non-conforming use was used as the time of the ordinance change and the discontinuation of the use was either temporary and the intent was to continue the use or the discontinuation was due to governmental action.

Of course, the use cannot be expanded beyond the initial square footage and the establishment would have to comply with all other applicable laws. Moreover, the special exception for the service of alcohol would still need to be approved by the planning commission on remand or by the LUZ Committee on appeal.

8

K&D 011668

EXHIBIT D

EXPERT REPORT – CP FOOD AND BEVERAGE, INC. VS RYAN CARLSON ET ALL, EIGHTH JUDICIAL DISTRICT COURT CLARK COUNTY NEVADA

ORIGINAL

Electronically Filed
7/13/2017 3:09 PM
Steven D. Grierson
CLERK OF THE COURT

1  **JUDG**
   GENTILE CRISTALLI
2  MILLER ARMENI SAVARESE
   DOMINIC P. GENTILE
3  Nevada Bar No. 1923
   Email: dgentile@gcmaslaw.com
4  KORY L. KAPLAN
   Nevada Bar No. 13164
5  Email: kkaplan@gcmaslaw.com
   410 South Rampart Boulevard, Suite 420
6  Las Vegas, Nevada 89145
   Telephone: (702) 880-0000
7  Facsimile: (702) 779-9709
   *Attorneys for Plaintiff/Counter-Defendant*

8

9              **EIGHTH JUDICIAL DISTRICT COURT**

10                 **CLARK COUNTY, NEVADA**

11  CP FOOD AND BEVERAGE, INC. (d/b/a "Club      CASE NO. A-14-709594-C
    Paradise"),                                  DEPT. XXI
12                           Plaintiff,

13  vs.

14  RYAN CARLSON, an individual; JOHN
    CARCILLI, an individual; RICARDO TABARES
15  a/k/a RICARDO TAVAREZ, an individual;
    GIOVANNA CHICO, an individual; BIBI
16  RAMBHARAN, an individual; and CYNDI
    SELLERS a/k/a CYDNI SELLERS, an individual,
17
                             Defendants.
18

19  BIBI RAMBHARAN and GIOVANNA CHICO,

20                           Counter-Claimants,

21  vs.

22  CP FOOD AND BEVERAGE, INC.; DOE 1
    THROUGH 10 INDIVIDUALS; and ROE 1
23  THROUGH 10 CORPORATIONS,

24                           Counter-Defendants.

25                          **JUDGMENT**

26      Plaintiff/Counter-Defendant CP FOOD AND BEVERAGE, INC. ("Plaintiff"), having

27  made an application with supporting exhibits for judgment against Defendants Ryan Carlson,

28

Gentile Cristalli
Miller Armeni Savarese
Attorneys At Law
410 S. Rampart Blvd., #420
Las Vegas, Nevada 89145
(702) 880-0000

                              1 of 2

1  Ricardo Tabares a/k/a Ricardo Tavarez, Bibi Rambharan, and Giovanna Chico, and the Court

2  having found that Defendants were jointly and severally liable, and good cause appearing

3  therefore:

4      **IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that judgment is awarded

5  in favor of Plaintiff and against Ryan Carlson, Ricardo Tabares a/k/a Ricardo Tavarez, Bibi

6  Rambharan, and Giovanna Chico, jointly and severally, in the principal sum of $1,727,820.62,

7  which when trebled pursuant to NRS 207.470(1), judgment awarded totals $5,186,461.86;

8      **IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that Plaintiff be

9  awarded pre-judgment interest on the principal in the amount of $206,440.13;

10     **IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that Plaintiff be

11 awarded loss of value to club in the sum of $1,950,000.00; and

12     **IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that post-judgment

13 interest will accrue on the total judgment from entry of this judgment at the statutory rate per

14 annum, until the judgment is paid in full.

15     IT IS SO ORDERED this 30th day of June, 2017.

16

17     _____

18     ~~HONORABLE VALERIE ADAIR~~
       EIGHTH JUDICIAL DISTRICT COURT JUDGE
       Hon. Elissa F. Cadish

19 Prepared By:

20 GENTILE CRISTALLI
   MILLER ARMENI SAVARESE

21

22 _____ #14254
   DOMINIC P. GENTILE     FOR:
23 Nevada Bar No. 1923
   KORY L. KAPLAN
24 Nevada Bar No. 13164
   410 South Rampart Boulevard, Suite 420
25 Las Vegas, Nevada 89145
   Telephone: (702) 880-0000
26 Facsimile: (702) 779-9709
   *Attorneys for Plaintiff/Counter-Defendant*

27

28

Gentile Cristalli
Miller Armeni Savarese
Attorneys At Law
410 S. Rampart Blvd., #420
Las Vegas, Nevada 89145
(702) 880-0000

2 of 2

June 23, 2017

**Memorandum;**
From – David Shindel
To – Sam Cecola
Re: C.P. Food and Beverage, Inc. D/B/A Club Paradise
    Loss in Value, June 5, 2014 Closure of Business

A) Background:

I am a partner in the accounting firm of Shindel Rock and Associates, P.C. In that regard, I represent C.P. Food and Beverages, Inc. I prepare required tax returns and provide consulting services, including litigation support.

C.P. Food and Beverages, Inc. operated as an adult entertainment business in Las Vegas, Nevada thru June 6, 2014 when the business was shut down due to illegal activities conducted by various employees and entertainers. The shareholders have asked me to provide an analysis of the value of C.P. Food and Beverage, Inc. prior to the closure of business in June, 2014. No longer a going concern, the business assets were sold on December 31, 2014 for $2,000,000.

In addition to being licensed as a C.P.A. I am also certified both as a valuation analyst and as a master analyst of financial forensics.

My analysis of value, prior to the close of business, is based upon my experience as an expert in this industry. My Curriculum Vitae is attached to this memorandum. I have represented adult cabarets and other related businesses since 1981. ShindelRock currently represents over 75 adult cabarets. I have also published the only peer-reviewed article on adult zoning, and I have been involved in numerous litigation matters in all aspects of this industry. I have testified in various court cases as an expert witness. I have also conducted national seminars for club owners and management.

B) Information – Value Per Industry Guidelines:

C.P. Food and Beverage, Inc. was incorporated on April 2, 1973. I have attached a brief summary of the sales, expenses and profits of the business for the three years prior to the shut-down of the business and the subsequent data following the raid. The business was well-managed. The sales volume steadily increased every year from 2011 thru June, 2014.

As a general rule, adult cabarets sell for 3.5 times earnings. Alternatively, they sell for 85% (*see below) percent of gross sales. These two different rules-of-thumb values are directly related. An adult cabaret will generate 25% profits on sales. A buyer will pay 3.5 times profits or 87.5% of gross volume (25% x 3.5 = 87.5%).

C) Loss of value – C.P. Food and Beverage, Inc.

I have analyzed the financial data for C.P. Food and Beverages, Inc. for the two calendar years prior to closure (2012 and 2013) and the 2014, time period thru date of closure. A copy of my analysis is attached to this memorandum. The sales volume increased every year as follows:

| | |
|---|---|
| 2012 sales volume | $4,529,000 |
| 2013 sales volume | 4,983,000 |
| 2014 sales volume (thru June 6, 2014 = $2,517,000) annualized | 5,815,000 |

| | |
|---|---|
| Three year total | $15,327,000 |
| | ========== |
| Average sales volume per year   ($15,327,000/3) | $5,109,000 |
| | ========== |
| Indicated value – industry guideline @ 85% of volume<br>                    ($5,109,000 x 85%) | $4,343,000 |
| Actual sale price – no longer as a going concern | 2,000,000 |
| | _____ |
| **Loss in value due to closure of business, June 6, 2014** | **$2,323,000** |
| | ========== |

\*Note: On May 23, 2011 I prepared a comprehensive analysis of cabarets sold and listed for sale
in the United States.  This analysis indicates that the average selling price of an adult cabaret is
1.45% of gross sales.  The industry has experienced a reduction of profits, overall since this
analysis was prepared.  The current transactions on the secondary market for adult cabarets in
the United States is currently an average of 85% of sales volume.  A copy of my analysis is
attached to this memorandum.

Attachments:
Analysis of C.P. Food and Beverage, Inc. financial data 2012 – 2016
Analysis of clubs sold and for sale as of May 23, 2011
Curriculum Vitae of David Shindel and cases involving witness testimony

EXHIBIT E

2009 INDUSTRY SALE INFORMATION

2009 Industry Sales Information                                                                                   Exhibit E

| Location | Type | Square Footage | Alcohol | Seating Capacity | Number of Dancers - Night | Food Service | Gross Sales | Net Income | Asking Price - Business | Asking Price/Gross sales | Asking Price/Net Income | SOURCE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Kansas | Topless | 4,200 | Liquor | 200 | 2 | None | $200,000 /mo | | $ 250,000 | | | B |
| Wisconsin | Nude | | Liquor | 75 | 3 | Full Kitchen | | | | | | B |
| Wyoming | Nude | 11,000 | Liquor | 470 | 3 | Full Kitchen | $ 1,000,000 | $ 250,000 | $ 1,500,000 | 150% | 600% | B |
| Illinois | Topless | 2,000 | Liquor | 84 | 5 | None | | | $ 550,000 | | | B |
| Ohio | Go-Go Style | 4,500 | No Liquor | 60 | 6 | Full Kitchen | $ 100,000 | | $ 200,000 | 200% | | B |
| Oklahoma | Topless | 3,200 | Liquor | 98 | 6 | Snacks | | | $ 400,000 | | | B |
| DC | Nude | | Liquor | 100 | 6 | Full Kitchen | | | $ 1,200,000 | | | B |
| Illinois | Nude | 5,000 | Liquor | 250 | 6 | None | | | $ 165,000 | | | A |
| Missouri | Topless | 6,000 | Liquor | 160 | 8 | Snacks | | | $ 650,000 | | | A |
| Canada | Nude | 5,000 | Liquor | 200 | 8 | Full Kitchen | $ 900,000 | $ 600,000 | $ 1,500,000 | 167% | 250% | A |
| Florida | Nude | 16,500 | Liquor | 1,200 | 8 | Full Kitchen | | | $ 2,500,000 | | | B |
| Canada | Nude | | Liquor | | 8 | None | | $ 750,000 | $ 1,200,000 | | 160% | A |
| Iowa | Topless | 7,600 | Liquor | 202 | 9 | Full Kitchen | | | | | | A |
| Kentucky | Nude | 3,400 | Liquor | 99 | 10 | Snacks | | | $ 425,000 | | | B |
| Florida | Topless | 3,000 | Liquor | 152 | 10 | None | | | $ 225,000 | | | B |
| California | Nude | 6,000 | No Liquor | 190 | 10 | Full Kitchen | $ 200,000 | $ 150,000 | $ 1,200,000 | 600% | 800% | A |
| Texas | Topless | 6,000 | Liquor | 197 | 10 | Full Kitchen | | | $ 825,000 | | | B |
| Montana | Nude | 6,600 | Liquor | 200 | 10 | Full Kitchen | $ 1,150,000 | $ 250,000 | $ 1,500,000 | 130% | 600% | B |
| Texas | Topless | 5,700 | No Liquor | 250 | 10 | Snacks | | | $ 350,000 | | | A |
| Indiana | Topless | 6,000 | Liquor | 278 | 10 | Full Kitchen | | | $ 500,000 | | | B |
| Texas | Topless | 5,500 | Liquor | 330 | 10 | None | $ 384,000 | $ 73,000 | $ 600,000 | 156% | 822% | B |
| Iowa | Topless | 7,500 | Liquor | 575 | 10 | Full Kitchen | $ 550,000 | $ 175,000 | $ 275,000 | 50% | 157% | B |
| Kansas | Nude | 5,000 | Liquor | 200 | 11 | Full Kitchen | | | $ 350,000 | | | A |
| Canada | Nude | 6,500 | Liquor | 300 | 11 | Full Kitchen | | | | | | A |
| Alaska | Nude | 2,000 | No Liquor | 50 | 12 | None | | | | | | B |
| Florida | Topless | 2,900 | Liquor | 75 | 12 | Snacks | | | $ 1,600,000 | | | B |
| Florida | Topless | 3,000 | Liquor | 100 | 12 | Snacks | $ 300,000 | $ 144,000 | $ 360,000 | 120% | 250% | B |
| New Jersey | Go-Go Style | 3,000 | Liquor | 120 | 12 | Full Kitchen | $ 1,200,000 | $ 500,000 | $ 1,250,000 | 104% | 250% | A |
| Texas | Topless | 5,000 | Liquor | 150 | 12 | Snacks | $ 480,000 | $ 216,000 | $ 450,000 | 94% | 208% | A |
| New York | Topless | 5,500 | Liquor | 200 | 12 | Snacks | | | | | | B |
| Indiana | Topless | 6,500 | Liquor | 250 | 12 | Full Kitchen | $ 780,000 | $ 624,000 | $ 600,000 | 77% | 96% | A |
| Indiana | Topless | 10,000 | Liquor | 250 | 12 | Full Kitchen | $ 400,000 | | $ 700,000 | 175% | | A |
| New Mexico | Topless | 5,000 | No Liquor | 289 | 12 | NP | | | | | | B |
| South Carolina | Nude | 7,000 | No Liquor | 300 | 12 | Full Kitchen | $ 425,000 | | $ 575,000 | 135% | | A |
| Missouri | Nude | 16,000 | Liquor | 500 | 12 | Full Kitchen | | | $ 1,600,000 | | | B |
| Alaska | Nude | 4,000 | No Liquor | 100 | 14 | Full Kitchen | $ 600,000 | $ 300,000 | $ 1,400,000 | 233% | 467% | A |
| Louisiana | Go-Go Style | 5,900 | No Liquor | 100 | 15 | Full Kitchen | $ 800,000 | $ 400,000 | $ 2,000,000 | 250% | 500% | A |
| Southeast US | Topless | 6,200 | Liquor | 150 | 15 | Snacks | $ 875,000 | $ 359,000 | $ 885,000 | 101% | 247% | B |
| Ohio | Topless | 10,000 | Liquor | 150 | 15 | Full Kitchen | $ 750,000 | $ 200,000 | $ 600,000 | 80% | 300% | B |
| Wisconsin | Nude | 4,000 | Liquor | 180 | 15 | Snacks | | | $ 850,000 | | | B |
| West Virginia | Nude | 6,700 | Liquor | 250 | 15 | Full Kitchen | | | $ 300,000 | | | A |
| Illinois | Go-Go Style | 6,100 | Liquor | 375 | 15 | Full Kitchen | $ 600,000 | | $ 1,750,000 | 292% | | A |

2009 Industry Sales Information                                                                                      Exhibit E

| Location | Type | Square Footage | Alcohol | Seating Capacity | Number of Dancers - Night | Food Service | Gross Sales | Net Income | Asking Price - Business | Asking Price/Gross sales | Asking Price/Net Income | SOURCE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ohio | Topless | 12,600 | Liquor | 500 | 15 | Full Kitchen | | | $ 575,000 | | | B |
| DC | Nude | | Liquor | | 15 | NP | | | $ 1,800,000 | | | B |
| Georgia | Nude | 5,000 | Liquor | 250 | 20 | Full kitchen | $ 600,000 | $ 180,000 | $ 500,000 | 83% | 278% | A |
| New York | Topless | 14,000 | Liquor | 300 | 20 | Full Kitchen | $ 1,500,000 | $ 300,000 | $ 4,100,000 | 273% | 1367% | B |
| Alabama | Topless | 8,000 | Liquor | 300 | 20 | None | | | $ 2,500,000 | | | A |
| California | Topless | 8,400 | Liquor | 400 | 20 | Full Kitchen | $ 1,200,000 | $ 200,000 | $ 4,500,000 | 375% | 2250% | B |
| Illinois | Nude | 7,200 | Liquor | 400 | 20 | Snacks | $ 600,000 | $ 500,000 | $ 1,450,000 | 242% | 290% | A |
| New Jersey | Go-Go Style | 5,450 | Liquor | 400 | 20 | Full Kitchen | | | $ 2,200,000 | | | A |
| Missouri | Topless | 28,000 | Liquor | 500 | 20 | Full Kitchen | $ 500,000 | $ 150,000 | $ 1,600,000 | 320% | 1067% | A |
| Florida | Topless | 5,000 | Liquor | 165 | 25 | Full Kitchen | $ 1,200,000 | $ 400,000 | $ 1,300,000 | 108% | 325% | A |
| Iowa | Nude | 5,000 | No Liquor | 150 | 30 | Full Kitchen | | | | | | A |
| Tennessee | Topless | 11,000 | No Liquor | 200 | 30 | Snacks | $ 1,500,000 | $ 1,500,000 | $ 1,500,000 | 100% | 100% | A |
| Florida | Nude | 8,500 | No Liquor | 250 | 30 | Full Kitchen | | | $ 950,000 | | | B |
| Arizona | Nude | 3,500 | No Liquor | 300 | 30 | Snacks | $ 1,180,000 | $ 545,000 | $ 1,800,000 | 153% | 330% | B |
| Illinois | Go-Go Style | 6,100 | Liquor | 450 | 30 | Full Kitchen | $ 600,000 | $ 500,000 | $ 1,200,000 | 200% | 240% | A |
| Massachusetts | Nude | 15,000 | Liquor | 700 | 30 | Full Kitchen | | $ 1,200,000 | $ 1,400,000 | | 117% | B |
| Tennessee | Topless | 14,000 | No Liquor | 500 | 40 | Full Kitchen | $ 1,500,000 | | $ 2,200,000 | 147% | | A |
| Ohio | Nude | 6,500 | Liquor | 500 | 50 | Full Kitchen | | | | | | B |
| Rhode Island | Nude | 15,000 | Liquor | 400 | 60 | Full Kitchen | | $ 2,000,000 | $ 9,000,000 | | 450% | A |
| Georgia | Nude | 12,800 | Liquor | 830 | 65 | Full Kitchen | $ 4,800,000 | $ 1,500,000 | $ 7,500,000 | 156% | 500% | A |
| Texas | Topless | 30,000 | Liquor | 600 | 75 | Full Kitchen | | | | | | A |
| Nevada | Topless | 5,000 | Liquor | 240 | NP | Snacks | $ 600,000 | | $ 600,000 | 100% | | A |
| Texas | Nude | 7,000 | Liquor | | NP | None | | | | | | A |
| Alaska | Nude | 3,000 | No Liquor | 50 | | Full Kitchen | | | | | | B |
| Iowa | Topless | 1,918 | Liquor | 78 | | None | | | $ 399,000 | | | B |
| Florida | Other | 16,862 | No Liquor | 100 | | NP | | | | | | B |
| California | Nude | 15,000 | No Liquor | 150 | | NP | $ 1,000,000 | $ 240,000 | $ 1,670,000 | 167% | 696% | B |
| Southeast US | Topless | 6,200 | Liquor | 250 | | Snacks | $ 900,000 | $ 300,000 | $ 1,500,000 | 167% | 500% | A |
| Vermont | Topless | 10,000 | Liquor | 400 | | Full Kitchen | | | $ 350,000 | | | B |
| Florida | Other | 12,500 | No Liquor | 1,383 | | Full Kitchen | | | $ 2,700,000 | | | A |
| Florida | Topless | 6,500 | Liquor | | | Snacks | $ 1,270,000 | $ 500,000 | $ 1,700,000 | 134% | 340% | B |
| Ohio | Topless | 13,000 | Liquor | | | Full Kitchen | | | | | | B |
| Oklahoma | Topless | | Liquor | | | NP | | | $ 600,000 | | | B |

Sources:
A  - Stripclubproperties.com
B  - stripclubs4sale.com

Compiled by ShindelRock

EXHIBIT F

PUBLIC COMPANY SALES

**Adult Cabaret Acquisitions**
**Public Company**
**April 2007 through April 2008**

| | Rick's New Orleans Nights 4/24/2007 | VCG Classic Affairs 5/31/2007 | VCG Platinum Maine 9/14/2007 | VCG Jaguar's Ft Worth 9/21/2007 | VCG Platinum Miami 11/2/2007 | VCG LaBoheme Gentlemen's 12/26/2007 | VCG Confidential Club 2/11/2008 | VCG Mega Club Acquisition 3/18/2008 | VCG Jaguar's Dallas 4/15/2008 | Average |
|---|---|---|---|---|---|---|---|---|---|---|
| **Analysis of Purchase Price to Revenue** | | | | | | | | | | |
| Purchase Price | $ 4,900,000 | $ 7,000,000 | $ 4,500,000 | $ 3,700,000 | $ 6,800,000 | $ 5,000,000 | $ 22,000,000 | $ 7,300,000 | $ 6,600,000 | |
| Revenue | 4,000,000 | 5,000,000 | 4,000,000 | 3,000,000 | 5,000,000 | 3,500,000 | 12,000,000 | 3,500,000 | 5,000,000 | |
| Purchase Price/Revenue | 1.23 | 1.40 | 1.13 | 1.23 | 1.36 | 1.43 | 1.83 | 2.09 | 1.32 | 1.45 |
| **Analysis of Purchase Price to EBITA** | | | | | | | | | | |
| Purchase Price | $ 4,900,000 | $ 7,000,000 | $ 4,500,000 | $ 3,700,000 | $ 6,800,000 | $ 5,000,000 | $ 22,000,000 | $ 7,300,000 | $ 6,600,000 | |
| EBITDA | 1,000,000 | 1,300,000 | 1,500,000 | 1,200,000 | 1,700,000 | 1,400,000 | 5,500,000 | 2,100,000 | 2,000,000 | |
| Purchase Price/EBITDA | 4.90 | 5.38 | 3.00 | 3.08 | 4.00 | 3.57 | 4.00 | 3.48 | 3.30 | 3.86 |

| | Purchase Price/Revenue | Purchase Price/EBITDA |
|---|---|---|
| New Orleans 4/27/07 | 1.23 | 4.90 |
| Classic 5/31/07 | 1.40 | 5.38 |
| Platinum Maine 9/14/07 | 1.13 | 3.00 |
| Jaguar's Ft Worth 9/21/07 | 1.23 | 3.08 |
| Platinum Miami 11/2/07 | 1.36 | 4.00 |
| LaBoheme 12/26/07 | 1.43 | 3.57 |
| Confidential 2/11/08 | 1.83 | 4.00 |
| Mega Club 3/18/08 | 2.09 | 3.48 |
| Jaguar's Dallas 4/15/08 | 1.32 | 3.30 |
| | 1.45 | 3.86 |

Sources:
Secruities and Exchange Commission filings for Rick's Cabaret Interanational, Inc. and VCG Holding Corp.
All amounts are rounded.