UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

Case No. 3-24-CV-575-WWB-MCR

LAVERANUES COLES and TROUBLE
LIVIN LIFE, LLC, a Florida Limited Liability
Company,

       Plaintiffs,

v.

KONICEK & DILLON, P.C., an Illinois
Professional Corporation, and AMIR
TAHMASSEBI, ESQ.,

       Defendants.

_____/

**DEFENDANTS KONICEK & DILLON, P.C. AND
AMIR TAHMASSEBI, ESQ.'S MOTION TO EXCLUDE PLAINTIFFS'
EXPERT DAVID SHINDEL AND HIS OPINIONS, REPORTS AND
TESTIMONY AND INCORPORATED SUPPORTING MEMORANDUM OF LAW**

       Defendant Konicek & Dillon, P.C. and Defendant Amir Tahmassebi, Esq. (collectively "Defendants"), pursuant to Federal Rules of Civil Procedure 26 and 37, Federal Rule of Evidence 702, *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993), this Honorable Court's Scheduling Order (D.E. 22) and its Endorsed Order (D.E. 52), move to exclude Plaintiffs' expert, David Shindel, CPA with Shindel, Rock & Associates (collectively, "Shindel"), as well as Shindel's expert opinions, reports and testimony.  In support thereof, Defendants state:

## Summary of Argument

Plaintiffs alleged that Defendants' actions were the "but for" cause of Plaintiffs' failing to prevail on their claims that the City of Jacksonville's four zoning ordinances (which set forth limitations on the operation of adult entertainment establishments) violated 42 U.S.C. §1983 (both facially and as-applied) as well as not prevailing on their claim for a "lost business opportunity" regarding their restaurant, bar, and bikini bar.[1] The City of Jacksonville maintained that these four zoning ordinances prohibited Plaintiffs' operation of Plaintiffs' combination restaurant, bar, and bikini bar on the property Plaintiffs leased at 5800 Phillips Highway (the "Property"). The City of Jacksonville denied Plaintiffs' two sets of applications for special exceptions to three of the four zoning ordinances.

Plaintiffs' expert, Shindel, opines that Plaintiffs' lost business opportunity was $2.5 million as of May 2014. However, Shindel's valuation is neither relevant nor reliable for several reasons:

1) Defendants were not retained by Plaintiffs until November 26, 2014, and Plaintiffs admitted continued operation of the business until the end of 2017, with the Property lease ending on January 16, 2018.

2) The information Plaintiffs provided regarding the actual operation of the bikini bar, the restaurant, and the bar on the Property between November 20, 2013,

---

[1] Florida does not recognize a distinct cause of action for "lost business opportunity", but instead this is a type of damages. *See generally Montage Group, Ltd. v. Athle-Tech Computer Sys., Inc.,* 889 So.2d 180, 188 n.8 (Fla. 2d DCA 2004); *T.D.S. Inc. v. Shelby Mut. Ins. Co.,* 760 F.2d 1520 (11th Cir. 1985); *Mana v. Cho,* 147 So.3d 1098, 1100 (Fla. 3d DCA 2014); *Zherka v. Amicone,* 634 F.3d 642, 646 (2d Cir. 2011); *Eliason v. City of Rapid City,* 417 F.Supp.3d 1190, 1210 (D.S.D 2019). As such, Plaintiffs only potentially viable claims are pursuant to the 42 U.S.C. §1983.

and January 26, 2018 was *de minimis* and insufficient to allow for Shindel's opinion.

3) At all times, four separate zoning ordinances prohibited the operation of Plaintiffs' hoped-for bikini bar on Property while it was leased.

4) Plaintiffs provided Shindel information confirming that at no time did the business earn a profit.

5) Although Shindel asserts use of the yardstick method, his purported yardstick is a publicly traded company which operated 44 clubs in geographically disparate locations with facially apparent different business modes that are incomparable to Plaintiffs' single location restaurant, bar, and the never lawfully operated bikini bar, along with websites purportedly advertising adult entertainment establishments for sale.

6) Given the *de minimis* information about actual operation results in Shindel simply assuming information about Plaintiffs' business, and then assuming Plaintiffs' business would replicate the publicly traded company's operations.

In sum, Shindel's opinions as to Plaintiffs' alleged "loss in the value of the business" are factually baseless and pure speculation about a hoped-for business. As such, the *Daubert s*tandard requires the exclusion of any testimony from Shindel and the striking of his Rule 26 Report (D.E. 38-2).

### I. LEGAL STANDARD

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence. *See Sanchez-Knutson v. Ford Motor Co.,* 181 F. Supp. 3d 988, 991-92 (S.D. Fla. 2016). "Rule 702 and the Supreme Court's decisions in *Daubert*… and its progeny

make clear that district courts act as gatekeepers, excluding evidence unless it is reliable and relevant." *Hughes v. Kia Motors Corp.*, 766 F.3d 1317, 1328 (11th Cir. 2014). This judicial gatekeeping function "ensure[s] that speculative, unreliable expert testimony does not reach the jury under the mantle of reliability that accompanies the appellation of 'expert testimony.'" *Id.* at 1328-29. Further, "[t]he burden of laying the proper foundation for the admission of expert testimony is on the party offering the expert, and the admissibility must be shown by a preponderance of the evidence." *Id.*

Thus, Rule 702 allows Shindel to testify only if he is qualified as an expert by "knowledge, skill, experience, training, or education" and Plaintiffs demonstrate that it is more likely than not that:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

*See* Rule 702, Fed. R. Evid.

As such, Rule 702 and *Daubert* requires three discrete inquiries to determine the admissibility of expert testimony: (1) Shindel's qualifications, (2) the relevance of Shindel's opinion, and (3) the reliability of Shindel's opinion. *See Hughes*, 766 F.3d at 1329; *Yellowpages Photos, Inc. v. YP, LLC*, No. 8:17-CV-764-T-36JSS, 2019 WL 6033084, at *3 (M.D. Fla. Nov. 14, 2019). Plaintiffs have the burden of satisfying each of

these three elements by a preponderance of the evidence. *See Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292 (11th Cir. 2005).

## II. ARGUMENT

### A. Shindel's Opinion As To Plaintiffs' Alleged Lost Business Opportunity in May 2014 Is Not Relevant

Shindel's report and testimony purports to "analyze and quantify the economic damages, if any, sustained by the Plaintiffs as a result of the closure of Trouble Livin Life, LLC, a[n] adult night club, located at 5800 Phillips Highway… in *May 2014*." D.E. 38-2, p. 562 (emphasis added). Shindel premises his opinion on the assertion that Plaintiffs' operation of the business at the Property ceased in May 2014. *See* D.E. 38-2, p. 567; Deposition of David Shindel (August 14, 2025) ("Shindel's Deposition),[2] p. 17:12-21; 18:17-24; 21:3-6.[3]  Plaintiffs are uncertain as to the precise date in early 2014 when they purportedly stopped operating the bikini bar aspect (which they briefly operated in violation the City's zoning ordinances) of Plaintiffs' combination restaurant, bar, and bikini bar business on the Property. *See* Deposition of Laveranues Coles (February 4, 2025) ("Coles' Deposition"),[4] p. 42:18 – 43:3. Yet it is undisputed that at no time after May 22, 2014, did Plaintiffs operate the bikini bar aspect of Plaintiffs' business on the Property because on that date the City of Jacksonville denied Plaintiffs' first applications for special exceptions to three of the four zoning ordinances that prohibited Plaintiffs' operation of the combination restaurant, bar, and bikini bar business on the Property. At that time,

---

[2] The cited portions of Shindel's Deposition are attached hereto as Exhibit A.
[3] Shindel was given multiple opportunities at deposition to address his chosen May 2014 valuation date, but remained steadfast – and consistent with his Rule 26 report – that May 2014 was Plaintiffs' date of loss. *See* Shindel's Deposition, p. 17:12-21; 18:17-24; 20:22-21:6.
[4] The cited portions of Coles' Deposition are attached hereto as Exhibit B.

Plaintiffs had not applied for a special exception to the fourth zoning ordinance that prohibited Plaintiffs' operation of the restaurant, bar, and bikini bar business on the Property.[5] Based on this circumstance, Shindel concluded that May 2014 was the date of occurrence of Plaintiffs' purported "lost business opportunity," which he based on his understanding of the termination of the restaurant, bikini bar and bar on the property. *See* Shindel's Deposition, p.21:1-6; 22:2-20; 26:10-24.

Yet if Plaintiffs' lost business opportunity occurred in May 2014, then Defendants cannot be the "but for" cause of Plaintiffs loss under the underlying Section 1983 claim or promissory estoppel claim.[6] Defendants were not retained by Plaintiffs until six months later, on November 26, 2014. *See* Deposition of Amir Tahmassebi (April 28, 2025) ("Tahmassebi's Deposition),[7] p. 11:1-3; 49:20-22; 75:11-19 (and Exhibit 15 thereto); Coles' Deposition, p. 41:12-42:25. Simply put, a lawyer cannot commit malpractice six months before he is retained and cannot be the "but for" cause of lost business opportunity damages that occurred six months before he was retained. *See Lane v. Cold,* 882 So.2d 436 (Fla. 1st DCA 2004) ("[I]t is not sufficient to merely show that an attorney-client relationship existed between the parties, it is essential that the plaintiff show that

---

[5] The fourth zoning prohibition was enacted by the City after Plaintiffs' first application for special exceptions to three existing zoning ordinances. The fourth zoning ordinance implemented a new distance requirement between bikini bars and other adult entertainment establishments. *See Coles v. City of Jacksonville*, 769 Fed. Appx. 851 (11th Cir. 2019).

[6] *See generally Larson & Larson, P.A. v. TSE Industries, Inc*., 22 So.3d 36, 39 (Fla. 2009); *Olmstead v. Emmanuel*, 783 So.2d 1122, 1125 (Fla. 1st DCA 2001) *citing Anderson v. Steven R. Andrews, P.A.*, 692 So.2d 237, 240 (Fla. 1st DCA 1997) ("To prevail on a claim of legal malpractice, a plaintiff must establish the existence of three essential elements: (1) that the Defendant attorney was employed by the Plaintiff; (2) that the Defendant attorney neglected a reasonable duty owed to the Plaintiff; and (3) that such negligence was the proximate cause of loss to the Plaintiff").

[7] The cited portions of Tahmassebi's Deposition are attached hereto as Exhibit C.

the relationship existed with respect to the acts or omissions upon which the malpractice claim is based."); *Kates v.* Robinson, 786 So.2d 61 (Fla. 4th DCA 2001) (Florida law requires that an attorney-client relationship must have existed with respect to the specific acts or omissions upon which the malpractice claim is based).

Further, the controlling case law makes clear that when complete destruction of a business is claimed, then the valuation of that business must be as of the date of destruction, which is considered the date of loss. *See City of Key West v. Duck Tours Seafari, Inc.*, 972 So.2d 901, 903 (Fla. 3d DCA 2007) ("'[i]f a business is completely destroyed, the proper total measure of damages is the market value of the business on the date of the loss', not lost profits.") (*quoting Sostchin v. Doll Enters., Inc.*, 847 So.2d 1123, 1128 n.6 (Fla. 3d DCA 2003)); (*Polyglycoat Corp. v. Hirsch Distributors, Inc.,* 442 So.2d 958 (Fla. 4th DCA 1983); *In re Sherwood Investments Overseas Ltd., Inc.*, 6:15-cv-1469-Orl-40TBS, 2016 WL 5719450 at *9 (M.D. Fla. Sept. 16, 2016).

Here the evidence is clear that Plaintiffs' business on the Property was a combination restaurant, bar, and bikini bar and it was that combination that triggered the applicability of at least some of the prohibitive zoning ordinances. *See* Coles' Deposition, p. 42:6-21. Yet Shindel seeks to separate the bikini bar aspect from the restaurant and bar aspects.[8] As discussed above, if the bikini bar aspect was a separate business that was destroyed as of May 2014, then the destruction occurred six months before Defendants were retained, and Shindel's opinion and valuation is irrelevant to the legal

---

[8] *See* Shindel's Deposition, p. 27:10-16 (testifying that if the restaurant and bar continued to operate on the property after May 2014, that would have no impact on his opinion).

malpractice claims against Defendants and therefore cannot be permitted to be presented to the jurors.[9]

Further, Plaintiffs have already admitted that they continued to operate the restaurant, or the bar and restaurant, until sometime in 2017. *See* Plaintiffs' October 29, 2024 Response to Defendants' Request for Admissions #4, #6, #8, and #10 (admitting "Coles and/or Trouble Livin Life LLC did operate the subject property as a restaurant without alcohol in…" 2014 through 2017), attached hereto as Exhibit D.[10] Further, Trouble Livin retained the Lease on the property until January 26, 2018. *See* Coles' Deposition, p. 16:12-15. Therefore, Plaintiffs' business on the leased Property – the combination bikini bar, restaurant, and bar – was not destroyed in May 2014, but continued for approximately 3 ½ years after Shindel's May 2014 valuation date. As such, under the case law, Plaintiffs' date of loss for the purported lost business opportunity would be the end of 2017 or January 26, 2018.

In this circumstance, Shindel's opinion about the loss occurring in May 2014 is simply inaccurate based on the application of the case law, Plaintiffs' admissions, and Mr. Coles' testimony. Therefore, Shindel's opinion as to the "lost business opportunity" as of May 2014 is irrelevant, improper, and must be excluded.

Simply put, Plaintiffs' expert witness calculating damages based on a date of loss that is six months before Defendants were retained, which is approximately 1 ½ years

---

[9] Additionally, Plaintiffs' fundamental allegation is that Defendants' professional negligence occurred in December 2015. *See* Plaintiffs' Amended Complaint, ¶16 (D.E. 8).
[10] *See Fraser Yachts Florida, Inc. v. Milne*, Case No. 05-21168, 2007 WL 9701646 (S.D. Fla. Mar. 7, 2007) at *1 ("A response to a Rule 36 admission request is legally tantamount to sworn evidence that binds a party in the proceeding."); *Tate v. Farmland Indust., Inc.,* 268 F.3d 989, 998-99 (10th Cir. 2001) (A fact that has been so admitted is thus deemed conclusively established) (dissenting).

before Defendants' alleged December 2015 malpractice purportedly occurred, that is based on inaccurate assertions as to when the complete destruction of the business occurred, requires striking the expert, his report, and his testimony because they would be inaccurate, irrelevant, and would not assist the jurors, but instead would tend to confuse the jurors. *See Susan Fixel, Inc. v. Rosenthal & Rosenthal*, 921 So.2d 43, 47 (Fla. 3d DCA 2006) ("If a business is completely destroyed, the proper total measure of damages is the market value of the business *on the date of the loss*.") (*quoting Montage Group, Ltd. v. Athle–Tech Computer Sys., Inc*., 889 So.2d 180, 195 (Fla. 2d DCA 2004).

**B.** **Shindel's Opinion Based On A Purported Yardstick is Unreliable**

Moreover, Shindel's information underlying his opinions is fatally flawed in several aspects. First, the information from Plaintiffs' business operations is *de minimis*. *See* Deposition of Robert Buchanan (February 4, 2025) ("Buchanan's Deposition"),[11] p. 83:24-84:21, 97:17-24, 98:5-22. Thus, Shindel attempts to overcome this failing by offering a valuation based upon his assertion that Plaintiffs' business was a start-up enterprise without historical operating data. But this is inaccurate, as shown above Plaintiffs' business was a going concern for four years, albeit a business without profit, without a written business plan, without four separate special exceptions to four zoning ordinances that prohibited its operation as a combination restaurant, bar, and bikini bar, as well as without any market or demographic information supporting assumptions Shindel made in formulating opinions. *See* Shindel's Deposition, p. 50:10-15; 56:20-24; 79:23-80:3; and 92:24-93:8; Coles' Deposition, p. 47:10-15; Buchanan's Deposition, p.79:13-81:5. Likewise, there has been no evidence provided for the breakdown of revenue streams for

---

[11] The cited portions of Buchanan's Depositions are attached hereto as Exhibit E.

the business, costs for operation of the business, or profitability (other than acknowledgment that during the 4 years of operation the business was never profitable). *See* Coles' Deposition, p. 64:23-65:4; 74:24-75:5; Shindel's Deposition, p.33:6-21; 48:23-49:3; Buchanan's Deposition, p. 77:23-78:15.

Despite this lack of information, Shindel's damages calculation ultimately hinges on his unsubstantiated *assumptions* that the bikini bar aspect of Plaintiffs' business (a) *would have* charged stage rental fees to 20 entertainers nightly, (b) which entertainers *would have* paid a rate of $250 per night, and (c) that this *would have* continued for 360 days per year into perpetuity.[12] D.E. 38-2 at p. 575; Shindel's Deposition p. 88:14-89:6. However, Shindel acknowledged that he had no information regarding the number of entertainers, much less the number who paid any stage rental fee of any kind, when the business briefly operated (in violation of the zoning ordinances) as a bikini bar in 2014. *See* Shindel's Deposition, p. 90:7-15. Likewise, Shindel acknowledged that he did not know whether the "high grossing" entertainers that Mr. Coles "was in the process of obtaining" ever did any work for Plaintiffs' business and none of those specific entertainers were known to him. *See* Shindel's Deposition, p. 60:17-22; 77:9-12. Instead, Shindel accepted Mr. Coles' hope that Plaintiffs' business would have been able to hire 20 independent contractor entertainers, for every night of the week, and those unknown contractors would pay the business $250 per night to dance on stage in a bikini. *See* Shindel's Deposition p. 89:1-7. Stated more bluntly, both Coles and Shindel engaged in

---

[12] As detailed below, the 2009 Industry Sales Information compiled by Shindel indicates only 19 of 76 businesses identified for sale listed 20 or more entertainers per night. *See* D.E. 38-2, p. 605-606.

pure hopeful speculation about the bikini bar aspect of the business.[13] *See Villalobos v. American Airlines, Inc.*, No. 96-6413-CIV, 1998 WL 1770592 at *2 (S.D. Fla. Nov.13, 1998) ("pure speculation may not serve as the basis for expert testimony"). Moreover, Mr. Coles acknowledged that the business Plaintiffs operated on the Property was *never profitable* between its beginning in November or December 2013 and ending on January 16, 2018. *See* Coles' Deposition p. 64:19-65:4; *see also* Buchanan's Deposition p.77:23-79:1.

Second, since Plaintiffs' four years of business operations were unprofitable and largely undocumented, Shindel purports to use the yardstick approach to justify his $2.5 million valuation opinion of Plaintiffs' alleged lost business opportunity. *See* Shindel's Deposition, p. 50:6-22; 51:13-18; 81:11-17; 93:5-8. The "yardstick method compares the results of operations after the damaging event to *comparable companies* or the industry to indicate what the company's results would have been had the damaging event not taken place." D.E. 38-2, p. 574 (emphasis added). As shown above, Plaintiffs' business was not a start-up and therefore use of the yardstick approach was improper. *See R&R International, Inc. v. Mazen, LLC,* 09-60545-CIV, 2010 WL 3605234 at *9 (S.D. Fla. Sept. 22, 2010) ("When projecting future lost profits for a company with limited financial data… or what some states may consider a 'new business,' under Florida state precedent and Eleventh Circuit case law, a party can employ the 'yardstick' test by comparing the business whose lost profits the party wants to measure to a similar comparable

---

[13] These speculations are solely as to hoped for revenue and fail to address any business costs, including taxes. *See Susan Fixel, Inc.*, 921 So.2d at 46 ("It is as inappropriate to use purely speculative forecasts of future revenue to determine the market value of a business as it is to use such speculative forecasts in determining lost future profits.")

business.") (internal citations omitted).

Nevertheless, even if the yardstick approach to valuation was available, by Shindel's own admission, the financial data and information necessary to value other adult entertainment establishments, such as that Plaintiffs hoped to operate, is not generally available to the public. *See* D.E. 38-2, p. 568. Shindel explained that adult entertainment "club owners are very private and unwilling to share their financial data," and conceded that "this general lack of information presents a challenge to valuators and forensic damages experts." *Id.* Further, Shindel acknowledged that, at least in part, his opinions relied on information from his own clients, but he refused to identify his clients or that information at deposition citing his clients' confidentiality. *See* Shindel's Deposition, p. 73:16-20; 74:4-6. Shindel's acknowledged reliance on information from his own clients that he would not disclose warrants striking his opinion and prohibiting him from testifying. *See* Rule 26(a)(2)(B)(ii), Fed. R. Civ. P. ("Unless otherwise stipulated or ordered by the court, [expert] disclosure must be accompanied by a written report…[t]he report must contain:…the facts or data considered by the witness in forming them.")

In his effort to identify a purported yardstick to Plaintiffs' business on the Property, Shindel purports to "analyze and quantify economic damages" based upon 2009 industry sales of businesses information mined from "Stripclubs4sales.com" and "stripclubproperties.com", plus the 10K filings from the NASDAQ listed company RCI Hospitality Holdings, Inc. (ticker symbol: RICK) ("RCI") that Shindel testified operated topless bars, bikini bars, and standalone restaurants at 44 unspecified locations in 2014. *See* D.E. 38-2, p. 568; 605; 608; *see also* Shindel's Deposition p. 61:20-65:14. Shindel's reliance on this information is misplaced for several reasons.

**1. RCI Is Not Comparable to Plaintiffs' Businesses on Phillips Highway**

Shindel's opinions rely heavily on comparisons to RCI, which is a publicly traded corporation.[14] Shindel's report acknowledged that RCI operated topless bars, bikini bars, and standalone restaurants at 44 unspecified locations in 2014. *Id.* RCI claims that it is the "only public company that owns and acquires adult nightclubs."[15] RCI asserts that its business strategy involves acquiring existing, well-established adult nightclubs, often from owners looking to retire, and improving operations and cash flows.[16] RCI's filings and investor disclosures explain that the corporation relies on its established management expertise and economies of scale, which RCI asserts it "uniquely" exploits based on the high barriers to entry for its businesses (such as strict licensing, zoning, and other local regulations) which limits competition in the adult nightclub industry. *See* RCI's Investor Feature Presentation, p. 4, 6 and 11. RCI explains that it often acquires the real estate associated with the adult nightclubs which provides additional assets and potential for financing that small operators often do not possess.[17] *Id.* at p. 6.

In contrast, Plaintiffs' business was a privately held Limited Liability Company, instead of a publicly traded Corporation. These two types of entities, by design, have significant distinctions in tax treatments and capital structures. Plaintiffs' leased a single building and property at 5800 Phillips Highway in Jacksonville beginning November 2013

---

[14] Previously known as Rick's Cabaret International, Inc.

[15] *See* RCI Hospitality Holdings, Inc. Investor Feature Presentation (www.rcihospitality.com/investor-relations) at page 4, attached as Exhibit F; RCI Hospitality Holdings, Inc. Form 10K Annual Report (2014), attached as Exhibit G.

[16] *See* RCI Hospitality Holdings, Inc. The RCI Story (www.rcihospitality.com/company/company-profile), attached as Exhibit H.

[17] *See generally*, RCI Hospitality Holdings website (www.rcihospitality.com); Form 10-K Annual Report for Fiscal Year ended September 30, 2014 (own real estate for 34 clubs; properties were collateral for mortgage debt of approximately $36.2 M).

through January 26, 2018, versus RCI's 44 distinct locations. *See* D.E. 38-2 at 566; 568. Plaintiffs had no experience operating a bikini bar (e.g., they opened the business without understanding that several zoning ordinances prohibited the operation of the business, lacked a written business plan or marketing plan) versus RCI's then 31 years of experience in the adult entertainment business.[18] Plaintiffs neither acquired nor sought to acquire property (and the property they leased was "condemned" within one week) versus RCI's business strategy relying substantive on property acquisition. *See* Coles' Deposition, p. 18:11-19:15, and Exhibit 53 thereto. Plaintiffs did not acquire other adult entertainment establishments or have any plans to do so in contrast to RCI's strategy being heavily based on acquisition of other adult entertainment establishments. *See* Form 10-K Annual Report (2014), Growth Strategy at p. 29. Further, Coles testified that at all times when he was operating the business at the Property, he was losing money versus the profitability of RCI. *See* Coles' Deposition p. 64:19-65:4.

When applying the "yardstick method", the Southern District of Florida has explained:

> Under the 'yardstick' test, "the business used as a standard must be as nearly identical to the plaintiff's as possible."…Furthermore, in order to minimize the risk of error, an expert should "[s]elect samples that are truly comparable. To put it another way, care must be taken to be sure that the comparison is one between 'apples and apples' rather than one between 'apples and oranges.'" …Thus, analysis of 'comparable businesses in the area ...' must guide the measure of damages…Absent the requisite showing of comparability, a damage forecast for a new business that predicts either the presence or absence of future profits constitutes an impermissibly speculative and conjectural damage calculation.

---

[18] RCI was founded in 1983 and incorporated in Texas in 1994. As of 2014, RCI had approximately 1,750 employees, approximately 100 were in management positions. *See* Form 10-K Annual Report for fiscal year ended September 30, 2014 at pages 5 and 7.

*R&R International, Inc.,* 2010 WL 3605234 at *10 (internal citations omitted). "[T]he threshold question in any yardstick method valuation is how comparable are the plaintiff, whose profits were lost, and the yardstick company upon whose performance the plaintiff is basing its projections, to permit a legitimate comparison." *See Harris Wayside Furniture Co., Inc. v. Idearc Media Corp*., 06-CV-392-JM, 2008 WL 7109357 at *2 (D. New Hamp. Dec. 22, 2008).

A publicly traded Corporation with multiple subsidiaries, operating 44 bars, bikini bars, and standalone restaurants in multiple states and cities that had approximately $18.34 million in profit on $121.43 million in revenue at the end of 2014 (and a current market capitalization of approximately $267 million) is not comparable to Plaintiffs' business on Phillips Highway that admittedly was never profitable and had unknown revenue. Even when damages are not speculative, a damages opinion may be properly excluded when, as here, the damages opinion lacks comparability and the figures utilized encompass too many variables. *See G.M. Brod & Co., Inc. v. U.S. Home Corp*, 759 F.2d 1526, 1539 (11th Cir. 1985).

As shown above, there are no facts or data which are comparable to Plaintiffs' proposed business. Instead, comparisons are made to a large public company holding operating numerous clubs of varying sizes and in varying locations; to unverified data pulled from websites listing strip clubs for sale; from the self-serving informal business plan of Plaintiffs; and from the generic industry analysis known to Mr. Shindel. Such information does not provide the type of "apples-to-apples" comparison necessary to use the yardstick approach adopted by Shindel in his report. The expert should be excluded.

**2. Industry Sales Information data is unverifiable and insufficient to reliably apply to valuation of Plaintiffs' business opportunity**

In addition to relying on RCI's 10K filings, Shindel's "yardstick" calculation was dependent upon "2009 Industry Sales Information" compiled by Shindel from the websites "Stripclubs4sale.com" and "stripclubproperties.com." D.E. 38-2, p. 574-75;605-606. Preliminarily, these websites' data simply is a listing of the offering price for adult entertainment business in 2009. *See* Shindel's Deposition, p. 85:20-86:19. Shindel offers a two-page summary listing approximately 76 properties (only 9 of which were in Florida), some of which purport to include round figures associated with gross sales, net income and business asking price. D.E. 38-2 at 605-606 (Exhibit E to Shindel's report). These websites do not even purport to set forth the actual purchase price of the identified businesses, or even if the identified businesses were ever purchased. *Id.* Just as with residential real estate, the price at which a building, property, or business is offered for sale may or may not have a rough bearing on the price at which the building, property, or business is actually sold. Shindel attempted to explain this away with a bald statement that the actual purchase price is usually about 10% less than the offer price in the industry. *See* Shindel's Deposition p. 86:11-25. But Shindel's support for this assertion was simply his experience which is insufficient. *See* Shindel's Deposition, p. 87:1-8. *See Baan v. Columbia Cnty.*, 180 So. 3d 1127, 1133 (Fla. 1st DCA 2015) ("Under Daubert, although 'an expert may be qualified by experience,' it does not follow 'that experience, standing alone, is a sufficient foundation rendering reliable any conceivable opinion the expert may express.'") (internal citations omitted). Moreover, Shindel offers no support or indication that this compilation is based on verifiable data. Instead, the 2009 Industry Sales Information fails to identify the individual listed businesses, their precise locations, records of actual revenue, expenses of running the business, any profitability information, or any

myriad of additional details that permit even the most rudimentary veracity or authenticity of the summary to be tested. The websites' data lack any transparency or reliability. It is Plaintiffs' burden to show the data is reliable, but they have not and cannot as Shindel concedes the information reported is not publicly available. D.E. 38-2, p. 568. There is no indication that the compilation included or even considered a review or examination of any detailed financial statements, internal projections, customer contracts, intellectual property details, property ownership, or other critical data that a proper valuation requires. There is no methodology to account for company-specific risks such as dependence on key personnel, customer concentration, pending litigation, or intangible assets such as brand reputation or customer relationships.

Further, Shindel has offered no evidence that the information he compiled had been verified beyond copying it from these two websites, including whether it was substantially current versus out of date, or potentially embellished or wholly fabricated by the entity offering the adult entertainment establishment for sale. Simply put, "[p]resenting a summary of a proffered expert's testimony in the form of conclusory statements devoid of factual or analytical support is simply not enough" to allow the proponent of the expert testimony to demonstrate that it satisfies the *Daubert* requirements. *See Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty.*, 402 F.3d 1092, 1113 (11th Cir. 2005).

Additionally, the information he compiled from the identified websites was information from 2009, which is too attenuated in time to Plaintiffs' purported date of loss of May 2014. D.E. 38-2 at 605-606. It is self-evident that market conditions for any type of business in any city or geographic area can vary substantially between 2009 and May 2014. Shindel fails to demonstrate how the adult entertainment type businesses would be

any different. Thus, the 2009 industry data is not timely with reference to Shindel's identified May 2014 date of loss, much less December 2015 (when Defendants' purported malpractice is alleged to have occurred) or the end of 2017 when Plaintiffs admitted they actually stopped operating the business on the Property, to be sufficiently similar to assist the trier of fact in understanding the value of Plaintiffs' business on the Property.

These pitfalls yield inadequate methodologies for expert witness standards required by *Daubert*. An expert opinion that relies on information that is untrustworthy does not qualify as 'the product of reliable principles and methods. *See Gonzalez v. Citizens Property Insurance Corp.*, 273 So.3d 1031, (Fla. 3d DCA 2019) ("An expert opinion that relies upon information that the expert himself testifies is untrustworthy does not qualify as 'the product of reliable principles and methods' under the statute governing expert opinions.") Consequently, this summarized website data does not produce "sufficient facts or data" nor is the opinion derived as a "product of reliable principles and methods."

### 3. Industry analysis and Coles' business plan are likewise unverified and insufficient to reliably apply to valuation of Plaintiffs' business opportunity

Lastly, Shindel considers general industry analysis and the informal "business plan" of Coles in formulating an economic damages opinion. D.E. 38-2, p. 567-571. There is no suggestion that Plaintiffs' business plan was formalized but rather appears to be the wish list and hopes of Plaintiffs for how the business might run. *See* Coles' Deposition, p. 47:10-15 (testifying that he had no written business or marketing plans). The plan lacks any indicia of due diligence, with no detailed financial statements, management reviews, or independent market research and analysis, and there is no financial data or evidence corroborating Mr. Coles' supposed expertise in prior non-adult entertainment night club

ventures in south Florida.

Furthermore, Shindel does no independent analysis of the market in Jacksonville to determine if there was truly a market for a bikini bar catering to African American clientele, as Mr. Coles speculated. *See* Buchanan's Deposition, p. 94:10-24. Additionally, Shindel provides no industry analysis and simply relies upon "various discussions with industry experts," who he did not identify. D.E. 38-2 at 565.

General industry analysis likewise lacks specificity. The information detailed in Shindel's report offers broad overviews. D.E. 38-2 at 567-68; 569-71. A specific business opportunity has unique characteristics. Industry averages for fees, profitability, growth rates or costs may reflect averages rather than actual amounts and quite possibly would not apply to plaintiffs' startup business. Without more, the business plan and generic industry analysis also do not meet the "sufficient facts or data" required, nor does this information support an opinion derived as a product of reliable principles and methods.

### C. <u>Shindel's Opinions Should be Excluded as they are Unsupported and Rely Upon Assumptions</u>

For the reasons outlined above, the foundations of Shindel's opinions are speculative and unreliable. Under Florida law, "[i]t is as inappropriate to use purely speculative forecasts of future revenue to determine the market value of a business as it is to use such speculative forecasts in determining lost future profits." *Susan Fixel, Inc. v. Rosenthal & Rosenthal, Inc.*, 921 So. 2d 43, 46 (Fla. 3d DCA 2006); *Alphamed Pharmaceuticals Corp. v. Arriva Pharmaceuticals, Inc.,* 432 F.Supp.2d 1319, 1339 (S.D. Fla. 2006) ("Under Florida law, the general rule is that anticipated profits of a commercial business are too speculative and dependent upon changing circumstances to warrant a judgment for their loss.")

Indeed, damages based on the value of a business "must be proven with a reasonable degree of certainty before [they are] recoverable. The mind of a prudent impartial person should be satisfied that the damages are not the result of speculation or conjecture." *Brough v. Imperial Sterling Ltd.*, 297 F.3d 1172, 1177 (11th Cir. 2002) (applying Florida law). *See also Petticrew v. Petticrew*, 586 So. 2d 508, 509 (Fla. 5th DCA 1991) ("Speculation and conjecture are inadmissible to prove the value of [a business].")

Therefore, an expert's damages testimony is inadmissible where the assumptions used to support the expert's conclusions are "mere best case scenario predictions" rather than being reasonably certain. *Sun Insurance Marketing Network, Inc. v. AIG Life Ins. Co.*, 254 F. Supp. 2d 1239, 1247 (M.D. Fla. 2003). "[A]n expert's opinion as to lost profits and other damages must be predicated on assumptions which have a reasonable basis in the evidence." *Eastern Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 999 (5th Cir. 1976). The principles for excluding speculative expert testimony on lost profits also apply to expert testimony on business valuations. *See Susan Fixel*, 921 So. 2d at 46 (rejecting argument that lost profit damages principles do not apply to business value damages); *Fidelity Warranty Services, Inc. v. Firstate Ins. Holdings, Inc.*, 74 So. 3d 506, 514-15 (Fla. 4th DCA 2011) (holding trial court properly excluded business valuation expert because income-based valuation opinion was too speculative).

Here, Shindel's valuation of Plaintiffs' damages is unreliable because it is premised on a hypothetical and speculative best-case scenario of the proposed business opportunity without regard to external and contingent events, much less the realities of the business which was admittedly actually operated from the start of 2014 to the end of 2017. As noted above, "Florida law requires that assumptions used to support the

conclusions be reasonably certain, not mere best case scenario predictions." *Sun Ins. Marketing Network*, 254 F. Supp. 2d at 1247 (footnote omitted). *See also, McMahan Securities Co. L.P. v. FB Foods, Inc.*, No. 8:04CV1791-T-24TGW, 2007 WL 704916, at *4-5 (M.D. Fla. Mar. 2, 2007) (holding expert's opinions on damages were impermissibly based on projected future earnings in speculative business plan and noting that business plan was a "best case scenario prediction"); *North Dade Community Development Corp. v. Dinner's Place, Inc.*, 827 So. 2d 352, 353 (Fla. 3d DCA 2002) (finding damages were speculative because projected earning evidence "was little more than an unsupported wish list of what the [plaintiff] hoped would occur in the coming years").

Since the proposed business opportunity was entirely uncertain and speculative, and premised on an unrealistic, ill-considered dream, the Court should exclude Shindel's opinions and testimony. *See Tampa Bay Water v. HDR Engineering, Inc.*, 8:08-CV-2446, 2011 WL 3101803, at *6 (M.D. Fla. July 25, 2011) (excluding expert's opinions on damages because expert's "methodology and assumptions were not intended to reflect and do not in fact reflect probable or expected outcomes"); *Sun Ins. Marketing Network*, 254 F. Supp. 2d at 1247-49 (excluding expert's opinion on valuation of plaintiff's business and lost profits because opinion was too speculative); *Whitby v. Infinity Radio Inc.*, 951 So. 2d 890, 898-900 (Fla. 4th DCA 2007) (holding expert testimony on damages was "speculative and conjectural" because it "failed to consider numerous external variables"); *Susan Fixel*, 921 So. 2d at 46 (holding expert's business value damages calculations were too speculative because they relied on too many unknown assumptions).

As set forth above, Shindel also failed to consider relevant facts and documents. In other words, Shindel offers an opinion because he says so, not because he considered

necessary facts. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Cook ex rel. Estate of Tessier*, 402 F.3d at 1111 (citations and internal quotation marks omitted); *see also, Brashevitzky v. Reworld Holding Corp*., 384 F.R.D. 107 (S.D. Fla. 2024). As a result, "a trial court may exclude expert testimony that is 'imprecise and unspecific,' or whose factual basis is not adequately explained." *Id.*

In conclusion, Shindel's valuation of Plaintiffs' business opportunity is too speculative and unreliable because he chose to ignore critical documents and probative facts. Courts "will not award any amount of damages based on an expert's opinion that employs a suspect methodology and relies on admittedly inaccurate data, especially where that opinion is not supported by any evidence in the record." *Environmental Biotech, Inc. v. Sibbitt Enters., Inc.*, No. 203-CV-124-FTM-33SPC, 2008 WL 5070251, at *7 (M.D. Fla. Nov. 24, 2008). The Court should therefore exclude Shindel's opinions and testimony concerning the purported value of Plaintiffs' business opportunity. *See also, Bussey-Morice v. Kennedy*, No. 6:11-CV-970-Orl-36GJK, 2012 WL 8010853, at *3 (M.D. Fla. Dec. 28, 2012) (excluding an expert who provided an opinion on damages because the expert did not have sufficient underlying information to form his opinions).

## III. CONCLUSION

Shindel's proposed opinions fail to satisfy the *Daubert* standard because the opinions are not reliable or relevant, are not based on sufficient facts or data, are not the product of reliable principles and methods, and do not reflect a reliable application of the

principles and methods to the facts of this case. In sum, Shindel's opinions are speculative, and, at best, amount to Shindel's own inadmissible guesswork. Further, the valuation of the business opportunity as of May 2014 is incorrect and/or irrelevant in this matter inasmuch as Defendants were not yet engaged to represent Plaintiffs in their disputes, the date of loss is temporally unrelated to the alleged negligence and fails to account for the continuation of the business and lease on the subject property. It is inconceivable how Shindel's testimony could assist the Court or factfinder. Instead, Shindel's opinion is the type of opinion that *Daubert* is specifically designed to preclude. Consequently, the Court should enter an order excluding Shindel's opinions and testimony from trial.

## <u>CERTIFICATE OF GOOD FAITH CONFERENCE</u>

Pursuant to Local Rule 3.01(g), the undersigned counsel for Plaintiffs certifies that he has conferred with counsel for Plaintiffs who objects to the relief requested in this Motion.

**TAYLOR, DAY, GRIMM & BOYD**

*/s/ John D. Osgathorpe*
JOHN D. OSGATHORPE
Florida Bar No.: 147620
TAYLOR R. MCMAHON
Florida Bar Number: 1030874
Primary Email: jdo@taylordaylaw.com
Primary Email: tmcmahon@taylordaylaw.com
Secondary Email: lad@taylordaylaw.com
Secondary Email: hmaxwell@taylordaylaw.com
50 North Laura Street, Suite 3500
Jacksonville, FL 32202
Phone: 904-356-0700
Fax: 904-356-3224
Attorneys for Defendants

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on the 15<u>th</u> day of October 2025 I electronically filed the foregoing document with the United States District Court for the Middle District of Florida by using the CM/ECF system which will send a notification of such filing to all counsel of record registered in the CM/ECF system.

Steven M. Katzman
Katzman Wasserman
Bennardini & Rubinstein, P.A.
7900 Glades Road, Suite 140
Boca Raton, Florida 33434
Service to: smk@kwblaw.com
Service to: mrm@kwblaw.com
Service to: cjb@kwblaw.com
Counsel for Plaintiffs

*/s/ John D. Osgathorpe*
Attorney