UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

Coles, et al. v. Konicek & Dillon, P.C., et al
Case No. 3-24-CV-575-WWB-MCR

_____

# **<u>EXHIBIT A</u>**

August 14, 2025 Deposition Transcript of David Shindel

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA,

JACKSONVILLE DIVISION


CASE NO.: 3-24-CV-575-WWB-MCR


LAVERANUES COLES and TROUBLE

LIVIN LIFE, LLC, a Florida Limited Liability

Company,

    Plaintiffs,

v.

KONICEK & DILLON, P.C., a Illinois

Professional Corporation, and AMIR

TAHMASSEBI, Esq.,

    Defendants.

_____/



DEPOSITION OF DAVID SHINDEL

AUGUST 14, 2025

10:06 P.M. - 12:38 P.M.

VIA Zoom


Reported by Meghan Hughes, Court Reporter

Notary Public, State of Florida



```
 1   APPEARANCES:

 2

 3   On behalf of the Defendant:  (Via Zoom)

 4       JOHN OSGATHORPE, ESQ

 5       Taylor Day Grimm & Boyd

 6       50 North Laura Street, Suite 3500

 7       Jacksonville, Florida 32202

 8       904-356-0700

 9       Jdo@taylordaylaw.com

10

11

12   On behalf of the Plaintiff:  (Via Zoom)

13       CHARLES BENNARDINI, ESQ

14       Katzman Wasserman Bennardini Rubinstein

15       7900 Glades Rd Ste 140

16       Boca Raton, FL 33434-4104

17       561-477-7774

18       Cjb@kwblaw.com

19

20   Also Present:

21   Matthew Crouse, Videographer

22   Amanda Sane, Witness's assistant

23

24

25
```



1                    I N D E X

2                      - - -

3

4    WITNESS:                              PAGE

5    David Shindel

6    DIRECT EXAMINATION BY MR. OSGATHORPE      6

7    CROSS-EXAMINATION BY MR. BENNARDINI       92

8

9                      - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1  paragraph, and I believe it is the second

2  full sentence in the first paragraph.  And if

3  I've understood correctly, that sentence

4  provides that you were retained to analyze

5  and quantify the economic damages sustained        10:21AM

6  by Mr. Coles as a result of the closure of

7  Trouble Livin Life, the adult nightclub on

8  the property in May 2014, which you attribute

9  to the wrongful acts of Defendants.

10         Have I understood that correctly?        10:21AM

11     A.    Yes.

12     Q.    And so if -- again, sir,

13  obviously some of these questions are a

14  little bit simplistic, but I want to make

15  sure that I fully understand your opinions.        10:21AM

16  So it's your opinion that Coles sustained

17  $2.5 million in economic damages to his

18  business operations on the property because

19  it was forced to close in May of 2014?

20     A.    That is my understanding, yes.        10:22AM

21     Q.    Okay.  And to your understanding,

22  the sole cause of Coles's business operations

23  on the property being forced to close in May

24  of 2014 were the alleged wrongful acts of the

25  Defendants?                                        10:22AM



1        A.      That is correct.

2                MR. BENNARDINI:  Objection to

3        the form.

4                You can still answer.

5                THE WITNESS:  Okay.  Yes, that        10:22AM

6        is correct.

7    BY MR. OSGATHORPE:

8        Q.      Are you aware of any other causes

9    for Coles's loss of the business operations

10   at the property in May of 2014 besides the        10:22AM

11   alleged wrongful acts of the Defendants?

12               MR. BENNARDINI:  Objection to

13       the form.

14               THE WITNESS:  That is my

15       understanding, yes.                            10:22AM

16   BY MR. OSGATHORPE:

17       Q.      I read through your report, sir,

18   and if I understood it correctly, you have

19   not provided an opinion about the economic

20   damages to Coles's business operations at the     10:23AM

21   property at any other date other than the

22   May 2014 date, correct?

23       A.      As of date of closure, that is

24   our calculation of the lost opportunity, yes.

25       Q.      And the date of closure is the        10:23AM



1  permits, licenses, and zoning variances and

2  waivers are required from the city of

3  Jacksonville ("the city").  Mr. Coles signed

4  a lease for the building on November 20,

5  2013, for five years.  After signing a lease,        10:25AM

6  Mr. Coles started renovations on the building

7  in order to open the business.  During

8  renovations, Mr. Coles was also waiting for

9  the city of Jacksonville to approve the

10  licenses required to operate a business.           10:25AM

11  After renovations were complete and the

12  various permits, licenses, and zoning

13  variances were still pending approval, Mr.

14  Coles opened a restaurant called Queen of

15  Diamonds, also known as Sharky's Oyster Bar,        10:26AM

16  and a lounge, Sharky's, in the building."

17       Q.    Thank you, sir.  And then the

18  next paragraph, it begins, "Sharky's was

19  opened and operated in late 2013 through May

20  2014," correct?                                      10:26AM

21       A.    Yes.

22       Q.    And that May 2014 date is what

23  you base your opinion on when we were just

24  speaking a moment ago about the closure of

25  the business, correct?                               10:26AM



```
 1        A.    My opinion is based on the

 2   damages from the lost opportunity.

 3        Q.    I understand.  The lost

 4   opportunity as of the business closing in May

 5   of 2014, correct?                              10:26AM

 6        A.    Yes.

 7        Q.    You mention in your report two

 8   different names for the businesses there,

 9   Queen of Diamonds and also known as Sharky's

10   Oyster Bar and Lounge.                         10:27AM

11             Do you know when it was known by

12   either or both?

13        A.    I don't know that detail.

14        Q.    Do you know when it changed --

15   changed names?                                 10:27AM

16        A.    I do not.

17        Q.    Do you know whether it was first

18   Queen of Diamonds and then Sharky's Oyster

19   Bar and Lounge, or vice versa?

20        A.    I do not.                           10:27AM

21        Q.    Are you aware of when Mr. Coles

22   first applied for the zoning exceptions that

23   were needed to operate the bikini bar on the

24   property?

25        A.    I don't have that in my head.  I    10:27AM
```



1   could look it up, but I don't know.

2       Q.   Do you know when those first set

3   of zoning exceptions were denied by the city?

4       A.   Not in -- it's not in my

5   knowledge right now, no.                    10:28AM

6       Q.   Okay.  I'll represent to you that

7   they -- Coles's first set of zoning

8   exceptions -- excuse me, let me state that

9   more accurately.

10          I'll represent to you that        10:28AM

11  Coles's first applications for the zoning

12  exceptions the city was saying he needed to

13  operate the bikini bar on the property were

14  denied on or about May 22nd of 2014, okay?

15      A.   Okay.                             10:28AM

16      Q.   And again, May 22nd of 2014, that

17  corresponds with the May 2014 economic

18  damages date that you referenced in your

19  report, correct?

20      A.   Yes.                              10:28AM

21      Q.   Do you know if Mr. Coles applied

22  for a second set of zoning exceptions at any

23  time?

24      A.   My understanding is that there

25  was a couple of different applications and   10:29AM



```
 1   assist with issues resulting from Mr. Coles's

 2   attempts to operate a bikini bar on the

 3   property?

 4        A.    I don't have those dates at hand,

 5   no.                                              10:33AM

 6        Q.    Do you -- do those dates impact

 7   your opinion as to the economic loss suffered

 8   by Mr. Coles?

 9        A.    No.

10        Q.    Your opinion that Coles and          10:34AM

11   Trouble Livin's business operations on the

12   property were worth two and a half million

13   dollars, did that include the bikini bar, the

14   restaurant, and the bar on the property?

15        A.    Yes.                                  10:34AM

16        Q.    Did the restaurant or bar operate

17   at any time on the property?

18        A.    There was an operation for

19   approximately 5 months, 6 months at the end

20   of 2013, and terminated in May of 2014.         10:35AM

21        Q.    So to your understanding, neither

22   the bar nor the restaurant continued to

23   operate on the property after May of 2014?

24        A.    That's my understanding.

25        Q.    Okay.  Did the bikini bar ever       10:35AM
```



1  operate on the property?

2      A.    It -- it's all the same business,

3  so they would have all operated.

4      Q.    So the bikini bar operated on the

5  property by Trouble Livin Life and Coles,          10:35AM

6  despite Coles and Trouble Livin Life not

7  obtaining the zoning exceptions needed to

8  operate a bikini bar on the property?

9      A.    Yes.

10     Q.    If the restaurant and bar            10:35AM

11 continued to operate on the property after

12 May of 2014, would that impact your opinion

13 about the two and a half million dollars in

14 losses suffered by Trouble Livin Life and

15 Coles?                                           10:36AM

16     A.    No.

17     Q.    Why not?

18     A.    They may have operated -- excuse

19 me -- for a short time afterwards, but at

20 that point, they are not a going concern or a    10:36AM

21 viable business, so it would still result in

22 the same damages.

23     Q.    Why would the restaurant and bar

24 or both not be a viable concern after May of

25 2014?                                            10:36AM



1  information or materials showing the amount

2  of cover charges received while the bikini

3  bar, restaurant, and bar were in operation on

4  the property in 2014?

5      A.   I did not.                         10:43AM

6      Q.   So it's fair to say you have no

7  information indicating or from which you

8  could determine whether -- while the bikini

9  bar, restaurant, and bar were in operation in

10  May of 2014, if they ever generated a profit   10:44AM

11  on any month or in aggregate during that time

12  period?

13      A.   There are some financial reports

14  in Mr. Buchanan's data that appear to show

15  losses.                                     10:44AM

16      Q.   Did you do any independent review

17  other than relying upon the financial reports

18  of Mr. Buchanan?

19      A.   From those early months?

20      Q.   Yes, sir.                         10:44AM

21      A.   No.

22      Q.   So whether or not the bikini bar,

23  restaurant, and bar ever had a profit while

24  in operation in 2014, you would defer to Mr.

25  Buchanan on that?                          10:45AM



      1        A.     I believe I have possession of

      2   it.

      3        Q.     Have you -- sorry, go ahead.

      4        A.     For my purposes, for a lost

      5   business opportunity that I was asked to          11:05AM

      6   quantify, those types of issues I looked at,

      7   but they're not really relevant for my

      8   purpose.

      9        Q.     So for your purpose, when Mr.

     10   Edinger opined that the zoning exceptions         11:05AM

     11   could have been potentially obtained for the

     12   operation of the bikini bar on the property,

     13   this is not relevant?

     14        A.     As a forensic expert in damages,

     15   we quantify the loss.  We don't establish the     11:06AM

     16   fact.  So the fact of damage is beyond the

     17   scope of my engagement.

     18        Q.     Well, the loss, if I understand,

     19   you've quantified it at two and a half

     20   million dollars for the operation of the          11:06AM

     21   bikini bar, correct?

     22        A.     That is correct.

     23        Q.     You have no information that that

     24   bikini bar ever operated at a profit,

     25   correct?                                          11:06AM



 1      A.    I don't believe it operated as a

 2 going concern.  It may have made a few bucks

 3 during that time.

 4      Q.    It was not a going concern as of

 5 the end of May 2014, correct?                    11:07AM

 6      A.    Yes.

 7      Q.    But between the time it opened as

 8 a bikini bar and May of 2014, other than

 9 information that might be reflected in Mr.

10 Buchanan's report, do you have any               11:07AM

11 information that shows that the bikini bar

12 operated on the property was ever profitable?

13           MR. BENNARDINI:  Objection to

14      the form.  Asked and answered.

15           THE WITNESS:  Again, these types      11:07AM

16      of businesses -- and, in fact, if you

17      read, I believe, strip club industry

18      reports or IBIS, they talk about 6 to

19      9 months to develop a business.  And

20      from my own experience, it takes a          11:07AM

21      while to develop the relationships and

22      training and protocols to create a

23      viable entity.

24 BY MR. OSGATHORPE:

25      Q.    So if I understood you correctly,     11:08AM



 1  to create a viable adult entertainment

 2  establishment, it takes 6 to 9 months to

 3  essentially get it up and going?

 4      A.    For new start-ups, that's an

 5  average measurement, yes.                    11:08AM

 6      Q.    And this bikini bar operated on

 7  the property by Mr. Coles was a new start up,

 8  correct?

 9      A.    Yes.

10      Q.    So if I've understood you         11:08AM

11  correctly, sir, you have some basic revenue

12  numbers for this new start up but no real

13  operating cost information for this new start

14  up during the time it was operating, correct?

15      A.    That is correct.                  11:08AM

16      Q.    And based on your experience, the

17  new start up takes 6 to 9 months to become a

18  viable business operation, correct?

19      A.    That's the general business and

20  industry parameters.  Different businesses    11:09AM

21  can obviously change that, but as a general

22  rule, that's reasonable.

23      Q.    For the adult entertainment

24  business, the general rule that has been your

25  experience is 6 to 9 months before it can     11:09AM



1   become a viable business?

2       A.    I agree with the data in that

3   report.

4       Q.    So, again, at the time, your

5   report values this business at two and a half     11:09AM

6   million dollars, the bikini bar, restaurant,

7   and bar in operation on the property was not

8   a viable business?

9       A.    It was not a going concern.  It

10  was an insipient business.                        11:09AM

11      Q.    Help me with "insipient."  What

12  do you mean by insipient?

13      A.    It was a start up in development.

14  It was a start upstage business, not yet

15  fully developed.                                  11:10AM

16      Q.    Nevertheless, you assigned it a

17  two and a half million dollar valuation?

18      A.    That is correct.

19      Q.    So a business that was not

20  profitable and was still insipient, and for       11:10AM

21  which you have no cost data and for which Mr.

22  Coles was still developing the half a dozen

23  criteria you identified which were needed for

24  as successful adult entertainment business,

25  nevertheless the business was worth two and a     11:11AM



1  "comparative businesses."  Do you have any

2  comparative businesses that you relied upon

3  in arriving at your opinion which were bikini

4  bars in Jacksonville?

5     A.    No.                                    11:30AM

6     Q.    In arriving at your opinions, did

7  you have any comparative businesses that were

8  restaurants in Jacksonville?

9     A.    No.

10    Q.    Bars in Jacksonville?                   11:30AM

11    A.    No.

12    Q.    A combination of bikini bar,

13  restaurant, and bar in Jacksonville?

14    A.    No.

15    Q.    How about a comparative business       11:30AM

16  in Jacksonville that, if I've understood Mr.

17  Coles's testimony, had a specific focus on

18  the African-American community?

19    A.    No.

20    Q.    Did you have any comparative           11:31AM

21  businesses that you relied upon in

22  Jacksonville or elsewhere that focused on the

23  African-American community?

24    A.    No.

25    Q.    Do you have any comparative            11:31AM



1   that was a business plan, as I understand it,

2   from Mr. Coles.

3       Q.    I understand that was his

4   business plan, but, I mean, he -- to be fair,

5   he could have a business plan that was          11:35AM

6   looking into bringing in African-American

7   dancers from Vegas and that would have been

8   no different, correct?  I mean, it was all

9   aspirational, wasn't it?

10      A.    No.  I mean, he had relationships     11:35AM

11  with entertainers that were high grossing,

12  high producing entertainers that he was in

13  the process of obtaining and had access to.

14  Both as a black person and as a professional

15  athlete, he had the notoriety to arise a very   11:36AM

16  competent, efficient business plan.

17      Q.    Those high end entertainers that

18  you've identified, did any ever work at --

19  even for a weekend, the bikini bar which he

20  operated in Jacksonville on the property in     11:36AM

21  2014?

22      A.    I don't know that detail.

23      Q.    Certainly didn't have contracts

24  with anyone, as we've talked about earlier,

25  correct?                                        11:36AM



1      A.      That's my understanding, yes.

2      Q.      And you identified a moment ago

3   the clubs for sale.  I mean, I can offer to

4   sell my 2012 4Runner for any price I want.

5   That doesn't mean it's worth that, correct?          11:37AM

6      A.      I have assimilated lists of all

7   the adult clubs for sale and the data as to

8   how they operate, the number of entertainers

9   both in 2009 and 2017.  Those are the

10  industry data, so I have -- I have that              11:37AM

11  database that I've created.

12     Q.      I understand you've created a

13  database, and that's the data that's

14  available, but is your position that a bikini

15  bar, a fully nude bar, or a topless bar,             11:37AM

16  regardless of the size, regardless of the

17  town, the relevant profit margin and cost

18  profiles are substantially similar?

19     A.      No.

20     Q.      Okay.  So what I'm trying to               11:38AM

21  understand, sir, is the businesses which are

22  substantially similar to the one Mr. Coles

23  not operated, but anticipated to operate it,

24  what are those businesses that you relied

25  upon?                                                11:38AM



```
 1      A.     There's a host of data that is

 2   both in my report and a rebuttal that include

 3   the acquisition of nine clubs by Rick's from

 4   VCG that are consistent with and used by my

 5   models.  There is a very similar case called      11:38AM

 6   HDV Greektown in Detroit that was essentially

 7   the same reality of what we're dealing with,

 8   and that's based on, I believe, six Hustler

 9   Clubs.

10          There's also the data in IBIS            11:38AM

11   reports that are consistent, the data in the

12   strip club industry, and I've served as a

13   damages expert in a club in Las Vegas that

14   was shut down.  I've served as a -- there was

15   an insipient club, it was operating but not      11:39AM

16   as a going concern, in Western Massachusetts

17   called Hellesant [phonetic] that was

18   destroyed and was grandfathered, so it

19   couldn't reopen, and the future was based on

20   an MGM Casino opening across the street.  So      11:39AM

21   the current and existing model was basically

22   a non-existent club, the value was for future

23   that I then calculated for damages purposes.

24          There's also a webinar in

25   February of 2020 conducted by myself and a       11:39AM
```



1   national valuation expert named Ron Burkhart,

2   and he had valued six clubs, adult clubs,

3   along with some adult real estate, and his

4   discussion during that webinar is consistent.

5           I'd have to look at my notes, if        11:40AM

6   you bear with me just a second.  There was

7   also a club in -- a large club in California

8   that was shuttered because of COVID.  It

9   wasn't operating and I was asked by

10  bankruptcy attorneys to project its unknown    11:40AM

11  future, when it would open and what it would

12  do.  I published that article and I was able

13  to calculate, based on yardsticks, based on

14  external measurements, what that would be.

15  Greektown, Club Paradise, entertainer data...   11:40AM

16  so based on those different sources, plus my

17  own experience, there was quite a bit of data

18  available that I could use for my yardstick

19  permits for the lost opportunity.

20      Q.   Again, I understand you can            11:41AM

21  calculate the -- calculate -- I mean, I was

22  an econ major.  You can calculate the value

23  of anything with enough data.  That doesn't

24  make it accurate.

25          So what I'm trying to chase down,        11:41AM



1   sir, you've put a $2.5 million valuation on a

2   business that's insipient, which was 6 to

3   9 months from being operational, and before

4   it could be operational, it had to obtain

5   several zoning exceptions, and yet,                11:41AM

6   nevertheless, without any cost data, you

7   said, well, that business is worth two and a

8   half million dollars, and I'm trying to

9   understand how you do that, because Rick's is

10  a publically traded entity, correct?              11:42AM

11          MR. BENNARDINI:  Objection to

12      the form.  That was quite a lengthy,

13      argumentative question.

14  BY MR. OSGATHORPE:

15      Q.    Rick's is a publicly traded            11:42AM

16  entity, correct?

17      A.    Rick's is a publically traded

18  entity.

19      Q.    And your opinion relies upon the

20  data about how Rick's operates, correct?          11:42AM

21      A.    It is anecdotal and a reference

22  but Rick's -- excuse me -- bought nine clubs

23  from a company called VCG, that was an

24  independent closed transaction.  We also had

25  a failed start up in HDV Greektown, which is      11:42AM



1  a Hustler Club, and, again, I had some other

2  start-ups, so I had the yardstick

3  measurements for a number of sources.

4      Q.   Did any of those start-ups that

5  you've identified fail to have the necessary        11:42AM

6  zoning exemptions that would allow them to

7  operate?

8      A.   The HDV Greektown failed to

9  operate because of city officials requesting

10 bribes and kickbacks, illegal activity.  So        11:43AM

11 whether that is distinguishable from a city

12 not providing zonings, that's up for you guys

13 to decide, but they both originate from the

14 same clause.

15     Q.   Is there any information or data         11:43AM

16 that you needed from Mr. Coles to arrive at

17 your opinion that he did not provide?

18     A.   No.

19     Q.   Okay.  Looking at your report,

20 page 4, at the bottom, you had the area            11:44AM

21 titled "Discussion."  And you identify that

22 Mr. Coles was a partner in Dream, a Miami

23 nightclub.

24          Do you see that, sir?

25     A.   Yes, I do.                                11:44AM



1    bar, topless, or nude.  There's a trade-off

2    between them, pluses and minuses, that you

3    have to gain and lose, but overall, there's

4    no essential difference.  The profits are

5    similar, the operations are similar.  So          11:54AM

6    between it all, there's no distinction

7    between a bikini, adult club, and a topless

8    or nude adult club.

9         Q.    Did they show you any data that

10   supported their profitability and valuations?     11:54AM

11        A.    No, they did not but, again, I do

12   have couple of -- I had a couple of bikini

13   clubs that I had as clients.  There's nothing

14   inconsistent with bikini clubs vis-à-vis

15   topless or nude.                                   11:54AM

16        Q.    The bikini bars that you had as

17   clients, what were they?

18        A.    My client relationships are

19   privileged.  I'm sorry, I can't always

20   disclose client relationships.                     11:55AM

21        Q.    Did you -- I'm sorry, go ahead.

22        A.    I didn't rely on that data for my

23   yardstick, no.

24        Q.    Okay.  So I want to understand,

25   privately owned bikini bars, what data did         11:55AM



1    you rely upon in arriving -- or in looking at

2    profitability and values?  And by "data," I

3    mean something in writing.

4         A.    Based on my own experience,

5    clients, and the discussions with the three        11:55AM

6    industry experts, there is no distinction

7    between bikinis, topless, and nude, so my

8    data that I relied on was the adult industry,

9    this particular business is identified under

10   statute in Jacksonville as an adult business,     11:56AM

11   so they're all part of the same industry.

12   And there's no distinction in the numbers --

13   significant distinctions amongst the three.

14        Q.    Understood about the three

15   categories, if you will, but what I'm looking      11:56AM

16   at -- and, again, correct me if I've

17   misunderstood your report -- your primary

18   data comparison made the distinction between

19   private and public bikini bars, topless bars,

20   nude bars, correct?                                11:56AM

21        A.    That's not correct.

22        Q.    Okay.  And I apologize for

23   misunderstanding that.  What I understand is

24   you've talked about Rick's a little bit,

25   you've talked about a gentleman who owned 17       11:57AM



1 operated nightclubs.  He had relationships

2 with high performing entertainers, he

3 identified a specific demographic area as a

4 need for this type of club.  He had a very

5 competent business plan.  So almost as an          12:00PM

6 underwriter, the criteria at present for

7 potentially a successful business under that

8 business plan.

9      Q.    Which high performing

10 entertainers did Mr. Coles have relationships    12:00PM

11 with?

12      A.    I don't know their exact names.

13      Q.    In your rebuttal report, sir,

14 which I will attach as, if I'm not -- if I've

15 not lost track, Exhibit 60.                        12:01PM

16           (Whereupon, Exhibit 60 was

17      marked for identification and is

18      attached to the transcript.)

19 BY MR. OSGATHORPE:

20      Q.    Page 2 under the heading numeral       12:01PM

21 II, "Damages calculations versus valuation

22 engagement," you identify three different

23 standards:  The I -- excuse me, the AICPA --

24 three different AICPA standards, correct?

25      A.    Yes.                                    12:01PM



1  damages you've identified, is that over a

2  specific period of time?  Is it assuming that

3  the business would operate for 2 years,

4  4 years, 5 years, something along those line?

5       A.    No.                                    12:03PM

6       Q.    Does it assume that the business

7  would operate in perpetuity?

8       A.    It assumes a going concern for

9  what is known and --

10      Q.    I'm sorry, I didn't hear the end    12:04PM

11 of that.

12      A.    It assumes a going concern for

13 what is known and nulled.

14      Q.    And Mr. Coles's businesses on the

15 property were not going concerns, correct?    12:04PM

16      A.    As of the date of closure, no.

17      Q.    They were not going concerns as

18 of the date of May 2014, correct?

19      A.    That is correct.

20      Q.    Were they ever going concerns       12:04PM

21 thereafter?

22      A.    Not that I'm aware of.

23      Q.    To be going concerns, the

24 businesses on the property that Mr. Coles

25 sought to operate would have to have obtained   12:04PM



1   the zoning exceptions necessary to operate

2   the bikini bar on the property, correct?

3       A.    Correct.

4       Q.    And until those exceptions

5   necessary to operate a bikini bar on the          12:05PM

6   property were obtained, Mr. Coles's

7   businesses on the property could not be going

8   concerns, correct?

9       A.    Correct.

10      Q.    And you -- you don't have an          12:05PM

11  opinion nor the expertise to conclude when or

12  if those zoning exceptions would have been

13  approved with regard to the businesses Mr.

14  Coles sought to operate on the property,

15  correct?                                          12:05PM

16      A.    That is correct.

17      Q.    If Mr. Coles had received the

18  zoning exceptions necessary to operate a

19  business on the property as of the end of

20  2015, would it have been 6 to 9 months for       12:05PM

21  him to undertake the training and other

22  criteria -- excuse me, to complete the

23  training and other criteria that you've

24  identified necessary to operate an adult

25  entertainment business?                           12:06PM



          1      A.    I'm sorry, but you said at the
          2  end of 2015?
          3      Q.    Yes, sir.
          4      A.    Was -- I'm sorry.  I'd have to
          5  make an assumption here that the business was     12:06PM
          6  shuttered and that all the historical
          7  knowledge and training that had taken place
          8  had to start over.
          9          Is that what you're asking me.
         10      Q.    Certainly, sir?                         12:06PM
         11      A.    And then there is a timeframe to
         12  develop as, I guess, I've testified before,
         13  to take a start up business, to have it fully
         14  developed as an operational concern, and that
         15  based on the industry standards and criteria     12:06PM
         16  available, that's usually a 6 to 9-month
         17  period.
         18      Q.    So if the business that Mr. Coles
         19  sought to operate on the property was
         20  shuttered, to borrow your word, from May of      12:07PM
         21  2014 to the end of 2015, there would have
         22  been, based on upon industry standards, a 6
         23  to 9-month training process, start up process
         24  to get the business up to a going concern
         25  from the end of 2015.  Is that accurate?         12:07PM



1   anticipated reasonably would have happened

2   versus what did happen, but for a damaging

3   event.  My data that I use includes national

4   chains of clubs, expert reports that I've

5   done for other adult businesses, some in very          12:23PM

6   similar situations, data from other adult

7   experts such as Mr. Burkhart and the IBIS

8   industry.  So there's a wide range that I

9   utilized for industry data for my yardstick

10  measurement purposes.                                  12:23PM

11       Q.    And the but for event that you've

12  just identified was the closing of the

13  businesses or the stopping of the operations

14  of the businesses in May of 2014, correct?

15           MR. BENNARDINI:  Objection to              12:23PM

16       the form.

17           THE WITNESS:  Yes, that is

18       correct.

19  BY MR. OSGATHORPE:

20       Q.    Okay.  I believe in your                 12:23PM

21  report -- and correct me if I've

22  misunderstood, you've relied on

23  stripclubs4sale.com listings?

24           MR. OSGATHORPE:  It's all one

25       word, by the way, Madam Court Reporter        12:24PM



 1        with the 4 being a numeral.

 2            THE WITNESS:  My report includes

 3        data from two different listings, that

 4        was one of them, and there was a

 5        second one that I can't remember the          12:24PM

 6        name.  And it included two different

 7        measurement years, 2000 I believe 9

 8        and 2017, and those were done for

 9        purposes of adult club litigations.

10   BY MR. OSGATHORPE:                                 12:24PM

11        Q.    Those were listings, not sale

12   prices, correct?

13        A.    Yes, I did a summary of them all.

14   I took what was then known and knowable of a

15   ten percent difference between the actual         12:24PM

16   price and the asking price, and based on

17   that, I believe it's in my documents, I wrote

18   a memo on the overall ratio of sales to

19   asking prices of businesses.

20        Q.    When you say the "ten percent," I      12:25PM

21   want to make sure I understand that.  Based

22   on your analysis, clubs tended to sell ten

23   percent below asking, did I understand you on

24   that?

25        A.    That is my understanding, yes.         12:25PM



1      Q.    And that understanding is based

2    upon, can you direct me specifically to the

3    data that's based upon?

4      A.    There is no specific data that I

5    can produce that isn't privileged, but that      12:25PM

6    is my understanding as an industry expert

7    that clubs sell for about ten percent less

8    than the asking price.

9      Q.    If I recall your report

10   correctly, you made the assumption that there   12:26PM

11   were going to be approximately 20

12   entertainers everyday?

13     A.    That is correct.

14     Q.    And the 20 entertainers, would

15   that include women in bikinis dancing on        12:26PM

16   stage as well as women in bikinis doing table

17   dances?

18     A.    Yes.

19     Q.    Okay.  And that assumption of 20

20   entertainers everyday, where did that number    12:26PM

21   20 come from?

22     A.    I had the discussions with Mr.

23   Coles on what he anticipated the number of

24   entertainers are.  There are indications of

25   that in the IBIS reports in strip club          12:26PM



1    industry, when you look at the national

2    listings of clubs for sale, it talks about

3    how many entertainers and the square footages

4    of clubs.

5              There's also a newspaper article        12:26PM

6    about a club in southern California [as

7    stated], I believe it's in Miami.  You might

8    know it a lot better than I do, called

9    Tootsie's, and it's the largest club in the

10   United States and they have 1000 to 5000        12:27PM

11   dancers.  There's another in Las Vegas that

12   has 800 dancers a night, so between it all,

13   my number is at the low end of that spectrum.

14        Q.    And based upon your conversations

15   with Mr. Coles while the bikini bar was in       12:27PM

16   operation in May of 2014, did he ever have 20

17   entertainers?

18        A.    I don't know that.

19        Q.    You've also based your opinion

20   upon the club operating 365 days per year,       12:27PM

21   correct?

22        A.    Correct.

23        Q.    Where did the 360 [as stated]

24   days a year operation come from?

25        A.    Mr. Coles.                            12:27PM



 1      Q.    And you've also based your
 2  valuation on the assumption, if I've
 3  understood correctly, that the women in
 4  bikinis would pay 250 per day, correct?
 5      A.    Yeah, if I could, I need to just      12:28PM
 6  correct.
 7      Q.    Sure.
 8      A.    You're using the word
 9  "valuation."  I didn't do a valuation.  I did
10  a damages report based on yardsticks.  Now,      12:28PM
11  to answer your question, Mr. Coles had as a
12  basic number 150, and that could go up to
13  even 500 depending on how many customers are
14  there and special events.
15          If I could, I'm sorry, be a            12:28PM
16  little bit long-winded here.  The majority of
17  adult clubs split entertainer revenues with
18  the entertainers and the club in some
19  fashion.  So typically, clubs not only charge
20  a basic per diem, but they also charge a       12:29PM
21  percentage of the entertainment revenue,
22  which generally is much higher than the
23  numbers Coles is using for entertainer fees.
24          So the numbers were very
25  conservative and the way he was approaching     12:29PM



1    it when I talked to him about that at length

2    was very simple and non-invasive for the

3    dancers and very effective.  So the numbers

4    he's got for dancer fees and number of

5    dancers are not at all aggressive.  If          12:29PM

6    anything, they're conservative.

7         Q.    How many dancers while the bikini

8    bar was in operation in 2014 paid Mr. Coles

9    $250 per day?

10        A.    I don't know that.                   12:30PM

11        Q.    How many dancers while the club

12   was in operation in 2014 paid Mr. Coles any

13   fees?

14        A.    I have no information on the

15   specific details of what happened in 2014.      12:30PM

16        Q.    Tell me about your use of what I

17   see as referenced to the rule of thumb rule,

18   I guess.  How did you use the rule of thumb

19   rule in arriving at your valuations -- excuse

20   me, your economic damages?                      12:31PM

21        A.    That rule of thumb is really a

22   misstatement.  For yardstick purposes, a

23   significant majority of the industry, absent

24   a few exceptions, buy and sell clubs based on

25   that industry standard.  So it's not a rule     12:31PM



1  also Mr. Burkhart, expert in valuations, who

2  had done six clubs and it was consistent with

3  him.

4          So there's a host of different

5  measurements that are consistent with what I       12:33PM

6  have as an industry standard.  So it's not

7  mine, it's how the industry works.

8      Q.    Sir, that's all the questions I

9  have for you.

10          MR. BENNARDINI:  I have a couple       12:34PM

11      of follow up.  Give me a sec, please.

12  CROSS-EXAMINATION

13  BY MR. BENNARDINI:

14      Q.    Good afternoon, Mr. Shindel.  As

15  you know, I'm Charlie Bennardini.  I       12:34PM

16  represent Laveranues Coles and Livin Life.

17  Mr. Osgathorpe asked you some questions about

18  the financial records and financial details

19  used by Mr. Buchanan for the operation -- for

20  the January 2014 operation of the bikini bar       12:34PM

21  from January 2014 through May 2014.  What use

22  would that -- what use would that

23  information -- let me just start over.

24          With respect to that financials

25  looked at by Mr. Buchanan, you did not       12:35PM



1 independently review those, did you, sir?

2     A.    I did not.

3     Q.    And why did you not independently

4 review those?

5     A.    As a start up phase insipient    12:35PM

6 type of business that's not fully functional,

7 it's not relevant for my purposes, so I

8 didn't care about it.

9     Q.    Well, you cared about it, but

10 it's not relevant to your yardstick approach;    12:35PM

11 is that a better way to say it?

12     A.    Yes, thank you.

13     Q.    Now, you've certainly read Mr.

14 Buchanan's report, correct?

15     A.    I did.    12:35PM

16     Q.    You're not relying on Mr.

17 Buchanan's report, are you?

18     A.    I am not.

19     Q.    Your opinions are independent of

20 Mr. Buchanan's opinions?    12:35PM

21     A.    They are.

22     Q.    They happen to be somewhat

23 corroborated, aren't they?

24     A.    Mr. Buchanan came to a slightly

25 higher number for value, but he also    12:35PM

