UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

Coles, et al. v. Konicek & Dillon, P.C., et al
Case No. 3-24-CV-575-WWB-MCR

---

# **EXHIBIT B**

July 1, 2025 Deposition Transcript of Laveranues Coles

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

CASE NO: 3-24-CV-575-WWB-MCR

LAVERANUES COLES and TROUBLE
LIVIN LIFE, LLC, a Florida Limited
Liability Company,

    Plaintiffs,

vs.

KONICEK & DILLON, P.C., a Illinois
Professional Corporation, and AMIR
TAHMASSEBI, Esq.,

    Defendants.

                                /

VIDEO-RECORDED DEPOSITION OF
LAVERANUES COLES
{Pages 1 - 107}

Tuesday, July 1, 2025
9:06 a.m. - 11:46 a.m.
Taylor Day Law Firm
50 North Laura Street
Suite 3500
Jacksonville, Florida  32202

Stenographically Reported By:
Deanne M. Moore, RMR, CRR, FPR, FPR-C

1                          APPEARANCES

2    On Behalf of the Plaintiffs:

3        KATZMAN, WASSERMAN & BENNARDINI, P.A.
         7900 Glades Road
4        Suite 140
         Boca Raton, Florida  33434
5        (561) 477-7774
         smk@kwblaw.com
6        BY:  STEVEN M. KATZMAN, Esquire

7

     On Behalf of the Defendants:
8
         TAYLOR, DAY GRIMM & BOYD
9        50 North Laura Street
         Suite 3500
10       Jacksonville, Florida  32202
         (904) 356-0700
11       jdo@taylordaylaw.com
         BY:  JOHN D. OSGATHORPE, Esquire

12

13

14

15

16   ALSO PRESENT:

17   Dane Unkelbach, Video-Technician, U.S. Legal Support,
     Inc.

18

19

20

21

22

23

24

25

1                    INDEX OF PROCEEDINGS

2                                              PAGE
Deposition of LAVERANUES COLES
3
Direct Examination by Mr. Osgathorpe            6
4  Certificate of Oath                        104
   Certificate of Reporter                    105
5  Witness Notification Letter                106
   Errata Sheet                               107
6

7

8

9

10

11                      EXHIBITS

12  Number              Description                Page

13  Exhibit 53          Lease Agreement             15

14  Exhibit 54          Notice of Termination       28
                        Of Lease
15
    Exhibit 55          1/26/2017 Email             84
16

17

18

19

20

21

22

23

24

25

1     Q    And it appears to me it's a handwritten date,

2  but it appears to be November 20th of 2013.  Does that

3  agree with what you're reading?

4     A    Yes, sir.

5     Q    Okay.

6         MR. KATZMAN:  And just to be clear, you're now

7      asking him when he signed it.  He'd answered earlier

8      about when the term of the lease began.

9  BY MR. OSGATHORPE:

10     Q    You signed this lease agreement on

11  November 20th, 2013, correct?

12     A    It appears, sir.

13     Q    Okay.  And the lease term sets forth

14  January 1st of 2014 to December 31st of 2018, correct?

15     A    Yes, sir.

16     Q    And when you first signed this lease, you

17  signed it as both the tenant and guarantor, correct?

18     A    Yes, sir.

19     Q    All right.  And the lease -- the lease

20  agreement in -- that we've marked as Exhibit 53,

21  paragraph -- or section 2 sets forth a -- the amount you

22  must pay in rent per month for year 1, year 2, year 3,

23  year 4 and year 5, correct?

24     A    Yes, sir.

25     Q    What was the condition of the property when you

1    Q    Okay.  You don't have a recollection of a -- of

2  the lease -- of the first amendment to the lease that's

3  different than the one you have in front of you,

4  correct?

5    A    I don't -- I don't understand what you're

6  asking.

7    Q    Sure.  You don't remember another first

8  amendment to the lease other than the one you have right

9  now, do you?

10    A    No, sir, not that I know of.

11    Q    Okay.  If you'll look down at number 3,

12  section 3, special provisions, that reads, "Landlord

13  shall no longer be responsible to reimburse tenant for

14  the interest expense incurred on a monthly basis due to

15  the financing of the liquor license if the condemnation

16  of the building is not lifted on or prior to

17  January 1st, 2014."

18          Did I accurately read that sentence, sir?

19    A    Yes, sir.

20    Q    Okay.  When it speaks of "condemnation," you

21  said the building was in bad shape, was it condemned?

22    A    I believe so.

23    Q    Okay.  What were the reasons for the building

24  being cond- -- condemned at the time you signed the

25  first amendment to the lease?

 1    A    It's been a long time, I can't recall, but

 2  there was several issues with the building.

 3    Q    Do you remember any of the issues with the

 4  building at that time?

 5    A    If I'm not mistaken, something was in a closet

 6  or something that had to be fixed.  Again, I had a

 7  contractor on the job, so they handled a lot of that

 8  stuff.  They pointed it out to me, but I wouldn't know

 9  exactly what it was.  I'm not a contractor.  I

10  can't . . .

11    Q    But the building was in sufficient bad --

12  sufficiently bad shape that it was condemned at the time

13  you entered into the lease agreement on November 27,

14  2013?

15    A    Yes, sir.

16    Q    It -- section 3 mentions the liquor license.

17  Had you purchased a liquor license to operate a business

18  on the property at the time you entered into this first

19  amendment to the lease?

20    A    Yes, sir.

21    Q    It says "finance."  Did you finance it?

22    A    Yes, sir.

23    Q    How much did you pay for that liquor license?

24    A    When you finance it, you don't pay for it.  You

25  put down a deposit on it, and then you pay monthly on

1    A    It's the dancing and entertainment license,

2  sir.

3    Q    So after you got your dancing and entertainment

4  license for the property, you began operating a bikini

5  bar on the property?

6    A    Yes, sir.

7    Q    Okay.  How long did you operate the bikini bar

8  on the property?

9    A    That would be an Amir -- because he has

10  everything.  I gave everything to Amir.

11    Q    Okay.  You don't have any independent

12  recollection?

13    A    No, sir.  It was a long time ago.

14    Q    Why did you stop operating a bikini bar on the

15  property after you obtained your dancing and

16  entertainment license?

17    A    From what I recall they were requesting me to

18  turn my dance and entertainment license back in.

19    Q    Who was requesting that?

20    A    The City of Jacksonville.

21    Q    Okay.  Why were they requesting it?

22        MR. KATZMAN:  Object to the form.

23    A    I -- I would have to know what documentation

24  they had that requested -- those that requested it.  I

25  don't -- again I don't know the legal parameters on why

 1  they wanted it back.

 2      Q    To your understanding, why did the City of

 3  Jacksonville want your dancing and entertainment license

 4  back?

 5      A    I honestly do not know, sir.

 6      Q    At the time -- well, during the time period

 7  when you were operating the bikini bar on the property,

 8  were you also operating a restaurant on the property?

 9      A    Yes, sir, I believe there was a kitchen on the

10  property.

11      Q    At the time you were opening the bikini bar on

12  the property, were you also operating a bar on the

13  property?

14      A    Yes, sir, I believe so.

15      Q    So for a period of time you operated both a

16  bikini bar, a restaurant -- let me ask you a better

17  question.

18          For a period of time you operated both a bikini

19  bar, a restaurant and a bar serving alcohol on the

20  property, correct?

21      A    All three was there, sir.

22      Q    They were -- they -- would that have been in

23  early 2014 that all three were in operation?

24      A    Without anything in front of me to tell me,

25  I -- I would assume so.  But I -- like I said, I gave

1  the documentation to Amir with the dates and the months

2  that I was open because it would have the banking

3  records and stuff there.

4      Q    Did you have a separate bank account for the

5  bikini bar, restaurant and bar while they were open?

6      A    No, sir.  It was all on the same account.  The

7  bikini bar and restaurant and alcohol was all on the

8  same.

9      Q    Was that same account a business account or was

10  it your personal account?

11      A    Oh, no, it was business.  It was Trouble Livin

12  Life.  That's why I say I gave everything to Amir.

13      Q    Where was that business account based?  Was it

14  with a bank or --

15      A    Yes, sir, it was with a bank.

16      Q    What bank was that?

17      A    I don't recall.  It -- I don't want to guess

18  which bank, but again I -- I know I turned all that

19  information over to Amir.

20      Q    When did you turn all that information over to

21  Amir?

22      A    I don't know the exact time, but it was around

23  the time we hired the damage expert the first damage

24  expert.

25      Q    Mr. Buchanan?

1  to Chicago.  He's come and stayed at my house here in

2  Jacksonville.

3      Q    When did -- when did you go to Chicago to hang

4  out with Amir?

5      A    We hung out when I did the Chuhak Tecson.

6      Q    Okay.  And what -- what brought Amir to your

7  house here in Jacksonville?

8      A    I believe him and his wife was somewhere

9  nearby.  I just said come on by so we can hang out.

10     Q    Did you ever have a written business plan for

11  the bikini bar you had intended to open on the property?

12     A    No, sir.

13     Q    Did you ever have a written marketing plan for

14  the bikini bar you intended to open on the property?

15     A    No, sir.

16     Q    Before opening the bikini bar on the property,

17  what research had you done with regard to any kind of

18  zoning exceptions you needed?

19     A    What research?

20     Q    Yes, sir.

21     A    I'm not a zoning lawyer --

22     Q    I understand.

23     A    -- sir, so I wouldn't know about -- the only

24  thing I knew was the property was CCG-2 from what I

25  remember, which is the most intense use, and that you

1  paragraph begins "at this point," was it your

2  understanding that Paul Harden was telling you that

3  Councilwoman Boyer in whose district your bikini bar was

4  being operated was adamantly opposed to granting you the

5  three exemptions you needed to operate the bikini bar,

6  and he was also telling you that even if the city

7  granted you the zoning exceptions, that the Englewood

8  crowd would file an appeal --

9      A    Yes, sir.

10     Q    -- with the -- okay.

11          And that in Paul's opinion, based upon --

12  strictly on the distance requirement alone, he thought

13  that the Circuit Court overturning such exceptions would

14  be successful, correct?

15     A    That's what it says, yes, sir.

16     Q    And that was your understanding of -- of Paul's

17  advice at the time?

18     A    Yes, sir, based on this.

19     Q    And you just testified a few minutes ago -- ago

20  that when you terminated the lease in early 2018, you

21  weren't making any money on the -- on the property,

22  correct?

23     A    I said it wasn't -- it wasn't as profitable.

24     Q    It was not profitable?

25     A    No, sir, I don't -- I don't think it was.  It

1  was just -- I think it was just a restaurant there.

2      Q    And when it was operating, it was just a

3  restaurant, it wasn't profitable?

4      A    I don't believe so, sir.

5      Q    When did it start operating as just the

6  restaurant?

7      A    Once I turned in the dancing and entertainment

8  license.

9      Q    Okay.  And when did that occur?

10     A    You would have to go back and check with city

11 records to see when they got it back.

12     Q    Okay.  Was that approximately mid 2015?

13     A    I wouldn't want to guesstimate, sir.

14     Q    You would agree that you were not allowed to

15 lawfully operate the bikini bar on the property absent

16 the three exceptions, correct?

17         MR. KATZMAN:  Objection to form.

18     A    Based on what I can recall, I had the documents

19 signed that I needed to get the dance and entertainment

20 license, which meant that building, zoning, fire and

21 vice had all signed off on it.

22         And from what I understand, vice had to know

23 that everything was completed before they would give me

24 the dance and entertainment license, so I was under the

25 impression that I was able to operate at that time.

1    Q    Okay.  And Paul -- is it your understanding

2  that Paul is telling you this case of Thompson vs. City

3  of Jacksonville Planning Commission holds that the

4  variance can only be granted if the property is unusable

5  without the variance?

6         MR. KATZMAN:  Objection to form.

7    A    It says it may not be granted unless the land

8  is unusable without the variance.

9    Q    Based upon this December 4th, 2015, email from

10 Paul, was it your understanding that the City of

11 Jacksonville was not going to grant you the zoning

12 exceptions that you were seeking to operate your bikini

13 bar?

14    A    Based on this, he said he did not think they

15 would likely obtain relief, which I believe he's saying

16 no.

17    Q    Okay.  And as of December 4th, 2015, the

18 property was just being operated as a -- as a restaurant

19 and bar, correct?

20    A    I would assume so, sir.

21    Q    You had already had to give back your -- your

22 license to operate the bikini bar on the property?

23    A    I believe so, sir.

24    Q    Okay.  So as of December 4th, 2015, the

25 property and the businesses that were being operated on

1  it were not profitable?

2      A    I don't think so, sir.  I would have to look at

3  the numbers again to be totally accurate, but I don't --

4  I wouldn't think it was making the money it was making

5  when I first had the dancing and entertainment license.

6      Q    So why did you decide to file the lawsuit in

7  federal court against the city in December of 2015?

8      A    Under guidance of Amir Tahmassebi.

9      Q    Okay.  What did Amir tell you to do?

10     A    He said he was going to file a lawsuit.

11     Q    Okay.  Did you say, Okay?

12     A    Yes, sir.

13     Q    Okay.  Why did Amir say he was going to file a

14  lawsuit?

15     A    He felt like it was a good case, so he said he

16  was going to file a lawsuit.

17     Q    Did you think it was a good case?

18     A    Yes, sir, I trusted Amir.

19     Q    I understand.  But did you think it was a good

20  case?

21     A    Yes, sir.

22     Q    Why did you think it was a good case?

23     A    Because Amir told me it was a good case.

24     Q    Okay.  Did you believe at the time that lawsuit

25  was filed, the City of Jacksonville was not going to

<u>**LEASE AGREEMENT**</u>

**BY THIS AGREEMENT** between SF Rivine LLC hereinafter referred to as **LANDLORD** Laurence Coles hereinafter referred to as **TENANT**, **LANDLORD** leases the following described premises:

> **5800 Phillips Highway**
> **Jacksonville, FL 33064**

1. <u>**TERM.**</u> This **LEASE** shall commence on <u>**January 1, 2014**</u> and shall end on <u>**December 31, 2018**</u>.

2. <u>**RENT.**</u> In Year 1, **TENANT** agrees to pay without demand to **LANDLORD** as monthly rent for the premises the sum of <u>**$12,000.00 per month**</u> plus the Sales Tax of 6.0% for a total of <u>**$12,720.00 per month**</u> on the first (1st) day of each calendar month for the period commencing on January 1, 2014 through December 31, 2014.

   In Year 2, **TENANT** agrees to pay without demand to **LANDLORD** as monthly rent for the premises the sum of <u>**$12,500.00 per month**</u> plus the Sales Tax of 6.0% for a total of <u>**$13,250.00 per month**</u> on the first (1st) day of each calendar month for the period commencing on January 1, 2015 through December 31, 2015.

   In Year , **TENANT** agrees to pay without demand to **LANDLORD** as monthly rent for the premises the sum of <u>**$13,000.00 per month**</u> plus the Sales Tax of 6.0% for a total of <u>**$13,780.00 per month**</u> on the first (1st) day of each calendar month for the period commencing on January 1, 2016 through December 31, 2016.

   In Year 4, **TENANT** agrees to pay without demand to **LANDLORD** as monthly rent for the premises the sum of <u>**$13,500.00 per month**</u> plus the Sales Tax of 6.0% for a total of <u>**$14,310.00 per month**</u> on the first (1st) day of each calendar month for the period commencing on January 1, 2017 through December 31, 2017.

   In Year 5, **TENANT** agrees to pay without demand to **LANDLORD** as monthly rent for the premises the sum of <u>**$14,000.00 per month**</u> plus the Sales Tax of 6.0% for a total of <u>**$14,840.00 per month**</u> on the first (1st) day of each calendar month for the period commencing on January 1, 2018 through December 31, 2018.

3. <u>**OPERATING EXPENSES.**</u> **TENANT** shall be responsible for all expenses incurred on the property including but not limited to property and liability insurance, all property maintenance expenses and repairs (including repair and replacement of the HVAC) and utilities. Notwithstanding, the

1



Δ π EXHIBIT  53
Deponent  Coles
Date  7/1/25  Rptr  dn
WWW.DEPOBOOKPRODUCTS.COM

**EXHIBIT 1**

LANDLORD shall be responsible for real estate property taxes.

4. **SPECIAL PROVISIONS.** The following special provisions, concessions and any addendum shall control any conflicting provisions of this printed **LEASE** form:

TENANT shall take the space in "As-Is" condition
LANDLORD shall provide **TENANT** free rent for January and February 2013 and July 2014.
TENANT shall have the option to purchase the building any during the term of this lease at fair market value. Should LANDLORD receive an offer to purchase from a third party, TENANT shall have ten (10) days to match the offer. If TENANT chooses not to match said offer, the option to purchase shall terminate and no longer be in effect.
If the condemnation of the building is not lifted on or prior to January 1, 2014, LANDLORD shall reimburse **TENANT** the actual amount of the interest expense incurred on a monthly basis due to the financing of the liquor license via a rental credit until the building is no longer deemed condemned..

5. **NON-SUFFICIENT FUNDS.** **TENANT** shall be charged **LANDLORD's** banking costs for each check that is returned to **LANDLORD** for lack of sufficient funds.

6. **SECURITY AND DAMAGES DEPOSIT AND FIRST/LAST MONTH'S RENT.** At execution of this **LEASE**, TENANT will pay to LANDLORD a security deposit of **$15,000.00** which shall represent security for the faithful performance of all terms and conditions herein by **TENANT**. The security deposit shall be returned to **TENANT** within thirty (30) days after end of term of **LEASE** (or any renewal term) minus the costs of any damages to premises, if any.

In addition to security deposit, first month's rent and last month's rent totaling **$0.00** (including sales tax) in certified funds should also be collected with the **TENANT'S** executed lease agreement.

7. **QUIET ENJOYMENT.** LANDLORD covenants that on paying the rent and performing the covenants herein contained, **TENANT** shall peacefully and quietly have, hold and enjoy the premises for the agreed term.

8. **USE OF PREMISES.** The premises shall be used and occupied by **TENANT** exclusively for commercial use. **TENANT** shall comply with all the sanitary laws, ordinances, rules and orders of appropriate governmental authorities affecting the cleanliness, occupancy and preservation of the premises, and the sidewalks connected thereto, during the term of this **LEASE**.

9. **CONDITION OF PREMISES.** **TENANT** stipulates that he has examined the

2

premises, as well as the entire property including, but not limited to, all buildings, and improvements, and that they are, at the time of the **LEASE**, in good order, repair, and a safe, clean condition. **TENANT** has inspected the premises and building and states that the premises are in satisfactory condition and free of defects. **TENANT** hereby accepts the premises and building in "as is" condition.

10. <u>**ASSIGNMENT AND SUBLETTING.**</u> Without the prior written consent of **LANDLORD**, **TENANT** shall not assign this **LEASE**, or sublet the premises, or any part thereof. Consent by **LANDLORD** to one assignment or subletting shall not be deemed to be consent to any subsequent assignment or subletting. An assignment or subletting without prior written consent of **LANDLORD**, or an assignment of subletting by operation of law, shall be void and shall, at **LANDLORD'S** option, terminate this **LEASE**.

11. <u>**ALTERATIONS AND IMPROVEMENTS.**</u> **TENANT** shall make no alterations to the premises, or make other improvements on the premises without the prior written consent of **LANDLORD**. All fixtures, except those removable without damage to the premises and movable personal property, shall, unless otherwise provided by written agreement between **LANDLORD** and **TENANT**, be deemed owned by **LANDLORD** and remain on the premises at the expiration or sooner termination of this **LEASE**. Such fixtures may be erected only with the prior written consent of the **LANDLORD**. At the end of the lease term, **TENANT** shall be entitled to remove (or at the request of **LANDLORD** shall remove) such fixtures, and shall restore the premises to substantially the same condition of the premises at the commencement of this **LEASE**.

12. <u>**DAMAGE TO PREMISES.**</u> If the premises, or any part thereof, shall be partially damaged by fire or other casualty not due to **TENANTS** negligence or willful act or that of his employee, family, agent or visitor, the premises shall be promptly repaired by the **LANDLORD** and there shall be an abatement of rent corresponding with the time during which, and the extent to which, the premises are wholly untenable in excess of ten business days; provided that in the event of damage by fire or other casualty in the amount of more than Ten Thousand ($10,000.00) Dollars, **LANDLORD** shall have the option of not rebuilding or repairing, in which event the term of this **LEASE** shall end and the rent shall be prorated up to the time of the damage.

13. <u>**DANGEROUS MATERIALS.**</u> Any item of a dangerous, inflammable, or explosive character stored on premises shall be stored at the appropriate temperature and the appropriate manner.

14. <u>**INSURANCE.**</u> **TENANT** agrees to maintain liability insurance with a minimum coverage amount of $1,000,000.00 Proof of such coverage must be provided to **LANDLORD** upon request and **LANDLORD** shall be listed as

an additional insured.

TENANT waives its right to recover damages against LANDLORD (and their respective officers, directors, shareholders, partners, joint ventures, employees, agents, customers, invitees or business visitors) for any loss or damage arising from any cause covered by any casualty insurance required to be carried by TENANT pursuant to this Lease.

**15. LANDLORD LIABILITY.**

**(i)** The term LANDLORD as used in this LEASE shall mean only the owner or mortgagee in possession for the time being of the property of which the premises are a part. In the event of sale of the property and/or premises or an assignment of this LEASE, the selling or assigning LANDLORD shall be and is hereby entirely freed and relieved of all obligations of LANDLORD under the LEASE. Notwithstanding the foregoing, LANDLORD shall remain liable for any and all obligations that were fully matured and accrued prior to the sale/assignment date.

**(ii)** LANDLORD shall not be liable to TENANT or its, agents, employees, invitees, licensees and permitees, for any and all claims or damages based on the negligence or gross negligence of LANDLORD, its agents or servants or otherwise relating in any way from or in any fashion arising from, connected with or resulting from occupancy and use of the premises and/or property, including, but not limited to, claims or damages due to personal injury, loss or impairment of personal property and loss of revenue, income or profits.

**(iii)** In the event that LANDLORD is found liable for any damages to TENANT as a result of a breach of this LEASE or for any other matter related to the use and occupancy by TENANT of the premises and/or property, the liability of LANDLORD to TENANT or any other party claiming through TENANT or this LEASE or shall be expressly and completely limited to the enforcement of such liability against the interest of LANDLORD in the property only. TENANT and all other parties claiming through this LEASE or otherwise hereby agree that no enforcement or collection action or remedy shall be instituted, maintained or enforced against any assets of LANDLORD, except the property.

**(iv)** In no event, shall LANDLORD be liable to TENANT for any indirect, special, consequential, incidental, punitive or exemplary damages in connection with the performance or breach of the Lease or in any way related to the use and occupancy by TENANT of the premises and/or the property including, but not limited to, damages for loss profits, income or revenue.

**16. RULES AND REGULATIONS.**    The following rules and regulations of

4

LANDLORD shall apply, where applicable, to the premises and real property ,

a. Sidewalks, doorways, vestibules, halls, stairways and other similar areas shall not be obstructed by TENANT or used by TENANT for any purpose other than ingress and egress to and from the premises. No rubbish, litter, trash or material of any nature shall be placed, emptied or thrown in those areas. At no time shall TENANT permit TENANT'S employees to loiter in common areas or elsewhere in or about the building or property.

b. Plumbing fixtures and appliances shall be used only for the purposes for which designed, and no sweepings, rubbish, rags or other unsuitable material shall be thrown or placed therein. Damage resulting to any such fixtures or appliances from misuse by TENANT or its agents, employees or invitees shall be paid for by TENANT, and LANDLORD shall not in any case be responsible therefor.

c. TENANT shall not place or maintain upon any exterior door, roof, wall or window of the premises or the property, any sign, awning, canopy or advertising matter of any kind, and will not place or maintain any decoration, lettering or advertising matter on the glass of any window or door of the premises except as previously approved in writing by LANDLORD, in LANDLORD'S sole discretion. TENANT shall not place or maintain any freestanding standard within or upon the common area of the premises or the building or immediately adjacent thereto, without first obtaining LANDLORD'S express prior written consent. LANDLORD and TENANT agree that the only signage TENANT shall be entitled to under this LEASE shall be the building standard signage at door of premises at TENANT'S expense.

d. LANDLORD may provide and maintain on the first floor of the building an alphabetical directory board listing all tenants, and no other directory shall be permitted unless previously consented to by LANDLORD in writing.

e. TENANT shall not place any additional lock or locks on any door in the premises or building without LANDLORD'S prior written consent. A reasonable number of keys to the locks on the doors in the premises shall be furnished by LANDLORD to TENANT at the cost of TENANT, and TENANT shall not have any duplicate keys made. All keys shall be returned to LANDLORD at the expiration or earlier termination of this LEASE.

f. All contractors, contractor's representatives and installation technicians performing work in the building shall be subject to LANDLORD'S prior approval and shall be required to comply with LANDLORD'S standard rules, regulations, policies and procedures, as the same may be revised from time to time. TENANT shall be solely responsible for complying with all applicable laws, codes and ordinances pursuant to which said work

5

shall be performed.

g. Movement in or out of the building of furniture or office equipment, or dispatch or receipt by **TENANT** of any merchandise or materials which require the use of elevators, stairways, lobby areas or loading dock areas, shall be restricted to hours designated by **LANDLORD**. **TENANT** must seek **LANDLORD'S** prior approval by providing in writing a detailed listing of any such activity. If approved by **LANDLORD**, such activity shall be under the supervision of **LANDLORD** and performed in the manner stated by **LANDLORD**. **LANDLORD** may prohibit any article, equipment or any other item from being brought in to the building. **TENANT** is to assume all risk for damage to articles moved and injury to any persons resulting from such activity. If any equipment, property and/or personnel of **LANDLORD** or of any other tenant is damaged or injured as a result of or in connection with such activity, **TENANT** shall be solely liable for any and all damage or loss resulting therefrom.

h. **TENANT** shall not (1) make or permit any improper, objectionable or unpleasant noises or odors in the building, or otherwise interfere in any way with other tenants or persons having business with them; (2) solicit business or distribute or cause to be distributed in any portion of the building any handbills, promotional materials or other advertising; or (3) conduct or permit any other activities in the building that might constitute a nuisance.

i. No animals, except seeing eye dogs, shall be brought into or kept in or about the premises.

j. No inflammable, explosive or dangerous fluid or substance shall be used or kept by **TENANT** in the premises or building. **TENANT** shall not, without **LANDLORD'S** prior written consent, use, store, install, spill, remove, release or dispose of, within or about the premises or any other portion of the property, any asbestos-containing materials or any solid, liquid or gaseous material now or hereafter considered toxic or hazardous under the provisions of 42 U.S.C. Section 9601 et seq. or any other applicable environmental law which may now or hereafter be in effect. If **LANDLORD** does give written consent to **TENANT** pursuant to the foregoing sentence, **TENANT** shall comply with all applicable laws, rules and regulations pertaining to and governing such use by **TENANT**, and shall remain liable for all costs of cleanup or removal in connection therewith.

k. **TENANT** shall not operate or permit to be operated on the premises or building any coin- or token-operated vending machine or similar device (including, without limitation, telephones, lockers, toilets, scales, amusement devices and machines for sale of beverages, food, candy, cigarettes or other goods), except for those vending machines or similar

6

devices which are for the sole and exclusive use of **TENANT'S** employees, and then only if such operation does not violate the lease of any other tenant of the building.

l.  Bicycles and other vehicles are not permitted inside or on the walkways outside the building, except in those areas specifically designated by **LANDLORD** for such purposes.

m.  **LANDLORD** may, from time to time, adopt appropriate systems and procedures for the security or safety of the building, its occupants, entry and use, or its contents. **TENANT, TENANT'S** agents, employees, contractors, guest and invitees shall comply with **LANDLORD'S** reasonable requirements relative thereto.

n.  Before **TENANT** may erect any signs on the Building, **TENANT** must receive Landlords approval.

o.  Canvassing, soliciting and peddling in or about the building is prohibited. **TENANT** shall cooperate and use its best efforts to prevent the same.

p.  At no time shall **TENANT** permit or shall **TENANT'S** agents, employees, contractors, guests or invitees smoke in any common area of the building, unless such common area has been declared a designated smoking area by **LANDLORD.**

17. **MAINTENANCE AND REPAIR.** **TENANT** shall maintain the interior of the premises in good condition and repair during the term of this **LEASE** and any renewal thereof and shall be responsible for all costs of repair within the interior of the premises.

18. **INSPECTION OF PREMISES.** **LANDLORD** and his agents shall have the right at all reasonable times during the term of this **LEASE** and any renewal thereof to enter the premises for the purpose of inspecting the premises and building provided they give at twenty four (24) hours prior notice and said inspection is conducted during business hours.

19. **ACCESS BY LANDLORD TO PREMISES.** **LANDLORD** and his agents shall have the right at all reasonable times during the term of this **LEASE** and any renewal thereof to enter the premises to show the unit to prospective buyers, mortgagees or prospective tenants provided twenty (24) hour notice is given. As provided by law, in the case of an emergency, **LANDLORD** may enter the premises without **TENANT'S** consent.

20. **SURRENDER OF PREMISES.** At the expiration of the **LEASE** term, **TENANT** shall surrender the premises in as good state and condition as they were at the commencement of the **LEASE**, reasonable use and wear

7

thereof, damages by the elements and repairs or replacements required.

21. <u>HOLDOVER.</u> If **TENANT** maintains possession of the premises for any period after the termination of this **LEASE** ("Holdover Period"), **TENANT** shall pay to **LANDLORD** a lease payment for the Holdover Period double the amount set forth in the following Lease Payments paragraph. Such holdover shall constitute a month to month extension of this **LEASE**.

22. <u>CREDIT</u>  Prior to taking possession of the premises, **LANDLORD** will be given permission to perform a credit check and criminal history check of **TENANT**. If for any reason, the results of these inquiries are unsatisfactory to **LANDLORD**, the lease may be terminated at the discretion of **LANDLORD**.

23. <u>DEFAULT.</u> If **TENANT** fails to comply with any of the material provisions of this **LEASE**, other than the covenant to pay rent, or materially fails to comply with any statutory duties within seven (7) days after delivery of written notice by **LANDLORD** specifying the noncompliance and the intent to terminate the **LEASE** for reason thereof, **LANDLORD** may at its option terminate the **LEASE** and take possession of the premises without prejudicing **LANDLORD'S** right to damages. **TENANT** shall be in default of this **LEASE**, if **TENANT** fails to fulfill any lease obligation or term by which **TENANT** is bound.  Subject to any governing provisions of law to the contrary, if **TENANT** fails to cure any financial obligation including, but not limited to, the payment of rent or any other obligation within 3 days after written notice of such default is provided by **LANDLORD** to **TENANT**, **LANDLORD** may at its option terminate the **LEASE** take possession of the premises to the extent permitted by law and without prejudicing **LANDLORD'S** rights to damages. In the alternative, **LANDLORD** may elect to cure any default and the cost of such action shall be added to **TENANT'S** financial obligations under this **LEASE**. **TENANT** shall pay all costs, damages, and expenses (including reasonable attorney fees and expenses) suffered by **LANDLORD** by reason of **TENANT'S** defaults.  All sums of money or charges required to be paid by **TENANT** under this **LEASE** shall be additional rent, whether or not such sums or charges are designated as "additional rent". Notwithstanding the foregoing, nothing herein shall prohibit **LANDLORD** from pursuing or electing to pursue any remedy available at law in the event **TENANT** breaches any provisions of this **LEASE**.

LANDLORD shall in no event be charged with default in the performance of any of its obligations under the **LEASE** unless and until **LANDLORD** shall have been provided written notice of same and given twenty days to cure. Notwithstanding, no default by **LANDLORD** shall give **TENANT** the right to terminate the **LEASE** or withhold or otherwise abate any Rent, or any sums payable to **LANDLORD** by **TENANT** under this **LEASE**

24. <u>ABANDONMENT.</u> If at any time during the term of this LEASE, TENANT

8

abandons the premises or any part hereof, **LANDLORD** may, at his option, obtain possession of the premises in the manner provided by law, and without becoming liable to **TENANT** for damages or for any payment of any kind whatsoever. **LANDLORD** may, at his discretion, as agent for **TENANT**, relet the premises, or any part thereof, for the whole or any part of the then unexpired term, and may receive and collect all rent payable by virtue of such reletting and, at **LANDLORD'S** option, hold **TENANT** liable for any difference between the rent that would have been payable under this **LEASE** during the balance of the unexpired term, if this **LEASE** had continued in force, and the net rent for such period realized by **LANDLORD** by means of such reletting.  Abandonment shall not occur when **TENANT** is current in its financial obligations. **LANDLORD** may use and take possession of any personal property on the premises upon the occurrence of an abandonment.

25. <u>CERTAIN RIGHTS RESERVED BY LANDLORD.</u>  **LANDLORD** shall have the following rights, each of which **LANDLORD** may exercise without liability to **TENANT** for damage or injury to property, person or business on account of the exercise thereof, and the exercise of any such rights shall not be deemed to constitute an eviction or disturbance of **TENANT'S** use or possession of the premises and shall not give rise to any claim for set-off or abatement of rent or any other claim:

   a.  To change the building's name or street address.

   b.  To install, affix and maintain any and all signs on the exterior and on the interior of the building.

   c.  To decorate or to make repairs, alterations, additions, or improvements, whether structural or otherwise, in and about the building, or any part thereof, and for such purposes to enter upon the premises, and, during the continuance of any of said work to temporarily suspend services or use of facilities, all without affecting any of **TENANT'S** obligations hereunder, so long as the Premises are reasonably accessible and usable.

   d.  To retain at all times, and to use at appropriate instances, keys to all doors within and into the premises.  Notwithstanding the provisions for **LANDLORD'S** access to potions of the premises, **TENANT** relieves and releases the **LANDLORD** of all responsibility arising out of theft, robbery and pilferage.  Upon the expiration of the term or of **TENANT'S** right of possession, **TENANT** shall return all keys to **LANDLORD** and shall disclose to **LANDLORD** the combination of any safes, cabinets or vaults left in the premises.

   e.  To show the premises to prospective tenants at reasonable hours during the last sixty days of **LEASE** for re-occupancy if **TENANT** has not renewed.

  f. To erect, use and maintain pipes, ducts, wiring and conduits, and
appurtenances thereto, in and through the premises at reasonable
locations.

  g. **TENANT** agrees to allow **LANDLORD** to process check by phone
transactions for rental payments.

26. **LIENS OF SALES/EMINENT DOMAIN.** Owner of the property may
encumber the premises by mortgage(s) and/or deed(s) of trust any such
mortgage(s) or deed(s) of trust so given shall be a lien superior to the rights
of **TENANT**. Any sale of the property or any part thereof shall not affect this
**LEASE** or any of the obligations of **TENANT** hereunder, but upon such sale,
owner (and the prior owner of the property) shall be released from all
obligations hereunder and **TENANT** shall look solely to the then owner of the
property for the performance of the duties of "Manager/Owner" hereunder
from and after the date of such sale. In the event that the leased premises is
taken by eminent domain, then **TENANT** shall be entitled to no damages or
any consideration by reason of such taking, except the cancellation and
termination of this **LEASE** as of the date of said taking.

27. **RADON GAS.** Pursuant to Florida Statutes, Section 404.056[6], the
following disclosure is required by law: Radon is a naturally occurring
radioactive gas that, when it has accumulated in a building in sufficient
quantities, may present health risks to persons who are exposed to it over
time. Levels of radon that exceed federal and state guidelines have been
found in buildings in Florida. Additional information regarding radon and
radon testing may be obtained from your county public health unit.

28. **AREA MEASUREMENTS.** Any statement of size of the premises or building
set forth in this LEASE or other representation of size of the premises or
building made by LANDLORD and/or its agents including, but not limited to,
any common area factor utilized to calculate the size of the premises is an
approximation which both LANDLORD and TENANT agree is reasonable
and to which TENANT acknowledges that it had the right to inspect and/or
verify prior to executing the LEASE. Accordingly, **TENANT** holds
**LANDLORD** harmless for any discrepancy between the actual size of the
premises and/or building and any statements of size set forth in this Lease or
otherwise. To the extent that there is any difference between the actual size
of the premises and/or building and any statement of size set forth in this
**LEASE** or otherwise neither **TENANT** nor **LANDLORD** shall have the right to
a corresponding revision in rent (either previously paid or due in the future)
whether or not the actual size is more or less. The parties further
acknowledge and agree that the rental amount being charged for the
premises is specific and personal to the actual premises being leased and is
not calculated based on the size of the premises or building.

29. **TENANT INDEMNIFICATION OF LANDLORD.** **TENANT** shall, and does

10

hereby indemnify, defend and hold harmless **LANDLORD**, its partners,
members, principals, and agents from and against all claims, causes of
actions, liabilities, judgments, damages, losses, costs and expenses,
including reasonable attorney's fees and costs through appeals, incurred or
suffered by **LANDLORD**, its partners, members, principals, and agents, and
arising from or in any way connected with the premises or the use or
occupancy thereof or from any acts, omissions, neglect or fault of **TENANT**
or any of **TENANT'S** agents ,employees or invitees., The covenants and
obligations of **TENANT** hereunder shall survive the expiration or earlier
termination of this **LEASE**.

30. LANDLORD'S LIEN.  To secure the payment of all rent and additional rent
due and to become due hereunder, and the faithful performance of all of the
other covenants of this **LEASE** required of **TENANT** to be performed,
**TENANT**, in consideration of the benefits accruing to **TENANT** under this
**LEASE**, hereby gives to **LANDLORD** an express contract lien on and
security interest in and to all personal property, chattels or merchandise
which may be placed in the premises and also upon all proceeds of any
insurance which may accrue to **TENANT** by reason of damage to or
destruction of any such property, provided, however, that so long as
**TENANT** is not then in default hereunder **TENANT** may, from time to time
and without first obtaining **LANDLORD'S** consent, replace any such property
with substitute property, or remove any such property that is or becomes
surplus to the conduct of **TENANT'S** business in and from the premises.  All
exemption laws are hereby waived by **TENANT**.  Upon request of
**LANDLORD**, **TENANT** agrees to promptly execute Uniform Commercial
Code financing statements relating to the aforesaid security interest.
**LANDLORD**, as secured party, shall be entitled to all the rights and
remedies afforded a secured party under said Uniform Commercial Code,
which rights and remedies shall be in addition to and cumulative of the
**LANDLORD'S** liens and rights provided by law or by the other terms and
provisions of this **LEASE**.  Notwithstanding anything to the contrary herein,
**LANDLORD'S** lien rights under Paragraph 31 shall be applicable only in the
event of monetary default by **TENANT**.

31. ATTORNEYS' FEES AND COSTS.  In connection with any litigation arising
out of this agreement relating to an event of default, the prevailing party shall
be entitled to recover all costs incurred, including reasonable attorney's fees.

32. DEFINITIONS. For purposes of this Lease, the term **property** refers to the
land owned by **LANDLORD** including all improvements and structures
thereon of which the premises make up a portion thereof. The term **building**
refers to the aforementioned improvements and structures. The term
**premises** refers to the specific unit or area of the building as described
herein that is being leased to **TENANT**.

33. NOTICE.  Notices under this **LEASE** shall not be deemed valid unless given

11

or served in writing and forwarded by mail, postage prepaid, addressed as
follows:

**LANDLORD:**
Name: _____

Daniel Stuzin, Managing Member

Address:    800 Douglas Suite 500 North Tower
            Coral Gables Florida 33134
Phone:      305-774-0454

**TENANT:**
Name(s):

Address:    _____
            _____
            _____
Phone:      _____
Cell Phone: _____
e-mail:     _____

Such addresses may be changed from time to time by either party by
providing notice as set forth above.

34. **BINDING EFFECT.** The covenants and conditions herein contained shall
apply to and bind the heirs, legal representatives, and assignees of the
parties hereto, and all covenants are to be construed as conditions of this
**LEASE.** Whenever used, the singular number shall include the plural, the
plural the singular, and the use of any gender shall include all genders.

35. **WAIVER OF TRIAL BY JURY.** It is mutually agreed by and between
**LANDLORD** and **TENANT** that the respective parties hereto shall, and they
hereby do, waive trial by jury in any action, proceeding or counterclaim
brought by either of the parties against the other on any matter arising out of
or in any way connected with this **LEASE**, the relationship of **LANDLORD**
and **TENANT** or **TENANT'S** use or occupancy of the premises, or by any
course of conduct or course of dealing. **TENANT** further agrees that it shall
not interpose any counterclaim (or counterclaims in any summary
proceeding) in any action initiated by **LANDLORD** or based upon
nonpayment of rent or other payments required of **TENANT** hereunder.

36. **ENTIRE AGREEMENT/AMENDMENT.** This **LEASE** agreement contains
the entire agreement of the parties and there are no other promises or
conditions in any other agreement whether oral or written. This **LEASE** may
be modified or amended in writing, if the writing is signed by the party
obligated under the amendment.

12

37. <u>SEVERABILITY.</u> If any portion of this **LEASE** shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court finds that any provision of this **LEASE** is invalid or unenforceable, but that by limiting such provision it would become valid and enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited.

38. <u>CUMULATIVE RIGHTS.</u> The rights of the parties under this **LEASE** are cumulative, and shall not be construed as exclusive unless otherwise required by law.

39. <u>GOVERNING LAW.</u> This **LEASE** shall be construed in accordance with the laws of the State of Florida.

40. <u>SUBORDINATION OF LEASE.</u> This **LEASE** is subordinate to any mortgage that now exists, or may be given later by **LANDLORD**, with respect to the premises.

41. **ESTOPPEL CERTIFICATES:** From time to time, **TENANT** shall furnish to any party designated by **LANDLORD**, within ten days after **LANDLORD** has made request therefor, a certificate signed by **TENANT** confirming and containing such factual certifications and representations as to this **LEASE** as **LANDLORD** may reasonably request.

42. <u>GUARANTEE.</u> <u>Lavernious Coles</u> acknowledges that by signing below he (she) is guaranteeing the performance of the **LEASE** by **TENANT** of all terms and conditions of the **LEASE** therein.

43. <u>COUNTERPARTS.</u> This Lease may be executed in multiple counterparts, and notwithstanding that all of the parties do not execute the same counterpart, each executed counterpart shall be deemed an original, and all such counterparts together shall constitute one and the same Lease binding all of the parties hereto. Signature and acknowledgment pages, if any, may be detached from the counterparts and attached to a single copy of this Lease to physically form one document. Electronic or facsimile copies of this Lease fully executed shall be deemed an original for all purposes, and the parties hereto waive the "best evidence" rule or any similar law or rule in any proceeding in which this Lease shall be presented as evidence.

Executed on this _____ day of _____, 2013.
Signed, sealed and delivered:

Witness: _____

Print Name: _____

LANDLORD: _____ DATE: _____

Witness: _____

**Daniel Stuzin, Managing Member**

13

Print Name: _____

Witness: _____                TENANT: _Lavernious Coles_

Print Name: _____             _____ DATE: _11/26/13_

Witness: _____                Print Name: _____

Print Name: _Elliot Goch_

Witness: _____                GUARANTOR: Lavernious Coles

Print Name: _____             _____ DATE: _11/26/13_

Witness: _____                Print Name: _Lavernious Coles_

Print Name: _Elliot Goch_

14

## FIRST AMENDMENT TO LEASE

This First Amendment to lease is entered into as of November 27, 2013 by and between SF Partners, LLC ("Landlord") and Lavernious Coles ("Tenant")

Whereas, **LANDLORD** and **TENANT** entered into a certain Lease Agreement dated November 20, 2013 for certain premises know as 5800 Phillips Highway, Jacksonville, FL 33064

Whereas, **TENANT** and **LANDLORD** desire to amend the Lease;

Now, therefore, in consideration of the mutual covenants contained herein and other good and valuable consideration, the sufficiency of which are hereby acknowledged, **LANDLORD** and **TENANT** hereby agree that all terms and conditions of the existing Lease and addendums shall remain except as revised below:

1. **TERM:** The **LEASE** shall commence on November 27, 2013 and shall end on December 31, 2018.

2. **RENT: TENANT** hereby agrees to pay to **LANDLORD** rent for the Leased Premises upon the following schedule:

   | Period | Monthly |
   |---|---|
   | 11/27/2013-03/31/2014 | $0.00 |
   | 04/01/20142013-12/31/2014 | $8,500.00 |

   All rental payments from January 1, 2015 through December 31, 2018 shall be based on the Lease Agreement.

   Applicable sales tax will be due in addition to the stated rent payments

3. **SPECIAL PROVISIONS:**
   **LANDLORD** shall no longer be responsible to reimburse TENANT for the interest expense incurred on a monthly basis due to the financing of the liquor license if the condemnation of the building is not lifted on or prior to January 1, 2014

   **LANDLORD** shall contribute $25,000.00 towards the costs associated with roof, electrical and structural repairs. This shall be paid by the **LANDLORD** directly to the contractors as invoiced through the normal course of business

All other terms of the Lease Agreement shall remain in effect.

Executed on this _2_ day of _DECEMBER_, 2013.
Signed, sealed and delivered:

Witness: _Mabul_

Print Name: _Mabel Ramos._

Witness: _____

Print Name: _____

Witness: _____

Print Name: _____

Witness: _____

Print Name: _____

**LANDLORD:** SF Partners, LLC

_____ DATE: _12/2/13_

**Daniel Stuzin, Managing Member**

**TENANT:** Lavernious Coles

_____ DATE: _12/2/13_

Print Name: _Lavernious Coles_

### SECOND AMENDMENT TO LEASE

This Second Amendment to lease is entered into as of December 19, 2013 by and between SF Partners, LLC ("Landlord") and Lavernious Coles ("Tenant")

Whereas, **LANDLORD** and **TENANT** entered into a certain Lease Agreement dated November 20, 2013 for certain premises know as 5800 Phillips Highway, Jacksonville, FL 33064

Whereas, **TENANT** and **LANDLORD** desire to amend the Lease;

Now, therefore, in consideration of the mutual covenants contained herein and other good and valuable consideration, the sufficiency of which are hereby acknowledged, **LANDLORD** and **TENANT** hereby agree that all terms and conditions of the existing Lease and addendums shall remain except as revised below:

The name of the Tenant shall be revised from Lavernious Coles to Trouble Livin Life, LLC.

Executed on this ___19___ day of ___December___, 2013.
Signed, sealed and delivered:

Witness: _____

Print Name: _Elliff Guh_

Witness: _____

Print Name: _____

**LANDLORD: SF Partners, LLC**

_____ DATE: _12/19/13_

**Daniel Stuzin, Managing Member**

Witness: _____

Print Name: _____

Witness: _____

Print Name: _____

**TENANT: Trouble Livin Life, LLC**

_____ DATE: _12/19/13_

Print Name: _Lavernious Coles_

Witness: _____

Print Name: _____

Witness: _____

Print Name: _____

**GUARANTOR: Lavernious Coles**

_____ DATE: _12/19/13_

Print Name: _Lavernious Coles_