UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

Coles, et al. v. Konicek & Dillon, P.C., et al
Case No. 3-24-CV-575-WWB-MCR

_____

# **EXHIBIT E**

February 4, 2025 Deposition Transcript of Robert H. Buchanan

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

CASE NO. 3:24-cv-575-WWB-MCR

LAVERANUES COLES and
TROUBLE LIVIN LIFE, LLC,
a Florida Limited Liability
Company,
    Plaintiffs,
vs.
KONICEK & DILLON, P.C.,
an Illinois professional
corporation, and
AMIR TAHMASSEBI, ESQ.,

    Defendants.
_____/

VIDEOTAPED DEPOSITION OF

ROBERT H. BUCHANAN, J.D., ASA, CFP

Tuesday, February 4, 2025
9:25 a.m. - 11:52 a.m.
LOCATION:
Magna Legal Services
Regus - Miracle Mile Plaza
Suite 300
601 21st Street
Vero Beach, FL 32960

Reported remotely by:
Kristen Camfield, RPR, FPR
Magna Legal Services
866-624-6221
www.MagnaLS.com



```
 1   APPEARANCES:
 2   On behalf of the Plaintiffs:
 3        CHARLES J. BENNARDINI, ESQUIRE
          KATZMAN WASSERMAN BENNARDINI & RUBINSTEIN
 4        Boca Corporate Plaza, Suite 140
          7900 Glades Road
 5        Boca Raton, FL 33434
          Phone:  561.477.7774
 6        Email: cjb@kwblaw.com
 7   On behalf of the Defendants:
 8        JOHN OSGATHORPE, ESQUIRE
          TAYLOR DAY GRIMM & BOYD
 9        Suite 3500
          50 North Laura Street
10        Jacksonville, FL 32202
          Phone:  904.356.0700
11        Email:  jdo@taylordaylaw.com
12   Also present:
13        Chris Gendron, Videographer
14
15
16
17
18
19
20
21
22
23
24
25
```



```
 1                       -   -   -
                       I N D E X
 2                       -   -   -
 3
 4   WITNESS:  ROBERT H. BUCHANAN, J.D., ASA, CFP
 5   DIRECT EXAMINATION BY MR. BENNARDINI:             5
     CROSS EXAMINATION BY MR. OSGATHORPE:             74
 6   REDIRECT EXAMINATION BY MR. BENNARDINI:          95
     RECROSS EXAMINATION BY MR. OSGATHORPE:           98
 7
 8
 9                       -   -   -
                     E X H I B I T S
10                       -   -   -
11   EX  1   BUCHANAN EXPERT REPORT IN CITY OF JAX CASE    8
     EX  2   BUCHANAN FEDERAL COURT SUBPOENA              11
12   EX  3   BUCHANAN/TAHMASSEBI EMAIL RE: DRAFT ENGAGEMENT 18
     EX  4   12/11/16 PCE/KONICEK & DILLON AND COLES      19
13           ENGAGEMENT LETTER
     EX  5   COLES/PCE RETAINER CHECK                     27
14   EX  6   PCE EMAIL STRING K&D 000013-K&D 000016       28
     EX  7   8/30/17 PCE/TAHMASSEBI EMAIL STRING RE:      31
15           TRANSITION PLANNING K&D 000617-K&D 000618
     EX  8   8/14/17 PCE/TAHMASSEBI LETTER RE: ADDENDUM TO 34
16           ENGAGEMENT LETTER
     EX  9   4/16 IBISWORLD INDUSTRY REPORT OD4409        39
17           STRIP CLUBS
     EX 10   2/14 U.S. STRIP CLUBS INDUSTRY REPORT        39
18   EX 11   SCHEDULE OF INFORMATION RELIED UPON          40
     EX 12   CALCULATION OF DAMAGES PCE DOCUMENT          71
19   EX 13   5/31/14 TROUBLE LIVIN LIFE WORKING PAPERS    72
     EX 14   6/30/14 TROUBLE LIVIN LIFE WORKING PAPERS    72
20
21
22
23
24
25
```



Page 77

1    A    So our premise was that if the bikini bar were
2 full the other businesses would benefit from those --
3 that business.
4    Q    If the bikini bar was full, then the other
5 businesses would be -- would be fuller?
6    A    Fuller.
7    Q    Okay.
8    A    Right.  If -- I don't recall, again, if there
9 were alcohol sales inside the bikini bar or food sales
10 inside the bikini bar, but it was one building with a
11 door between.  And so if people were hungry, they
12 wouldn't leave and go somewhere else.  They would eat
13 there, whether it was inside the bikini bar or at the --
14 the restaurant in the connecting door.
15    Q    And your $2.7 million assumed the loss of
16 alcohol sales, food sales, as well as cover charges and
17 stage rentals?
18    A    That's correct.
19    Q    Okay.  And your opinions -- in arriving at
20 your $2.7 million opinion, you assumed that the revenue
21 from those four sources would continue in perpetuity?
22    A    That's correct.
23    Q    In the months that the bikini bar was in
24 operation, did it ever turn a profit?
25    A    I don't recall, but I think we have that in


```
 1   the report.
 2       Q    Do you recall if it did or did not?
 3       A    I don't recall.  I don't think it ever made
 4   money.
 5       Q    Okay.
 6       A    In that -- in that four months.
 7       Q    Okay.  What about during the time in which the
 8   restaurant was in operation; did it ever turn a profit?
 9       A    I don't recall.
10       Q    Did you include that -- break that down in
11   that way in your report?
12       A    I believe we did.
13       Q    Okay.  And what about the nightclub; during
14   the time it was in operation, did it ever turn a profit?
15       A    I don't recall.  I don't think it did.
16       Q    Okay.  Did you break that down separately in
17   your report?
18       A    I believe we did that.
19       Q    Okay.  If you did not break down the -- the
20   profitability of the bikini bar compared to the
21   profitability of the restaurant compared to the
22   profitability of the nightclub separately in your
23   report, you don't have an independent recollection or
24   opinion regarding the profitability of each
25   individually, correct?
```



1    A    That's correct.
2    Q    You were previously asked about some of your
3 methodology for arriving at the lost profit
4 calculations.  And not only did you assume that the
5 revenue sources would continue forever in arriving at
6 your lost profit calculations, but you also made the
7 assumption that if the business grew to stability --
8 stabilization I believe you said, correct?
9    A    That's correct.
10   Q    And then you also assumed that if the business
11 grew to profitability, correct?
12   A    That's correct.
13   Q    Okay.  So if I'm understanding your opinions
14 correctly, you took Mr. Coles' recollections of the
15 revenue streams, correct?
16   A    Yes.
17   Q    And then you assumed those revenue streams
18 would continue forever?
19   A    Yes.
20   Q    And then you assumed that those revenue
21 streams would support the businesses, the bikini bar,
22 the restaurant and the nightclub, to a point where they
23 become stable businesses rather than startups?
24   A    That's correct.
25   Q    And then you also assumed that at some point



```
 1   they would arrive at profitability?
 2        A    That's correct.
 3        Q    And then based upon all those assumptions, you
 4   came to the conclusion that the lost business
 5   opportunity was $2.7 million and change?
 6        A    That's correct.
 7        Q    Okay.  Did you ever see a business plan
 8   prepared by Mr. Coles?
 9        A    No.
10        Q    Did you ever see a business plan prepared on
11   behalf of Mr. Coles for any of the three businesses we
12   just identified at the -- at the property on Philips
13   Highway?
14        A    No.  I don't believe so.
15        Q    How about any projections by Mr. Coles, or on
16   Mr. Coles' behalf, regarding the potential profitability
17   of any of the three businesses at the property on
18   Philips Highway, other than yours?
19        A    No.
20        Q    Did you ever see any reports from Mr. Coles,
21   or on behalf of Mr. Coles, regarding any of the three
22   businesses at the Philips Highway property regarding
23   actual staffing, how many dancers were hired, how many
24   servers were hired, cooks, things of that nature?
25        A    No.
```



1     Q    Okay.  What written documentation, other than
2 the credit cards and the bank statements, was Mr. Coles
3 able to provide regarding any of his businesses there at
4 the Philips Highway property?
5     A    None.
6     Q    Did you ask him for more?
7     A    Yes.
8     Q    Was it your sense he was hiding some or
9 keeping some back from you or did he just have none
10 available?
11     A    I don't think they existed.
12     Q    Okay.  Did he have a reason -- did he ever
13 give you a reason why they existed?
14     A    My recollection was the conversations around
15 that topic didn't go very far.  There was a lot of
16 conversation around:
17         This is a cash business.  We don't keep
18         financial records like that.  Everything
19         is from my bank accounts and my credit
20         cards.
21         So there just -- there just were no financial
22 statements.
23     Q    Did -- and you touched on that earlier on in
24 your testimony.
25         The credit card statements you reviewed were



1  Q  What was the term of the lease; do you recall?
2  A  I don't recall.
3  Q  Okay. You would agree that the business would
4  not be able to continue in operation there at the
5  Philips Highway property after the lease term ran?
6  A  Yes.
7  Q  Okay. Do you know when their lease term ran?
8  A  I don't, unless he re-signed or bought the
9  property. There was some discussion at some point of
10 him buying the real estate.
11 Q  Okay. Do you know if he ever paid any money
12 for that or --
13 A  I don't.
14 Q  Okay. Did you ever have any communications
15 with the owner or the landlord of the property at any
16 time?
17 A  We did not.
18 Q  Are you aware that the property -- the
19 building on the property has since been destroyed?
20 A  I am aware of that only because I drove by it
21 on my way to another client.
22 Q  Do you know when it was destroyed, by chance?
23 A  I don't.
24 Q  And we sort of touched on this, so let me be
25 very specific.



1         With regard to any of the businesses of
2    Mr. Coles at the Philips Highway property, there were no
3    income statements or profit and loss statements?
4         A    That's correct.
5         Q    There were no balance sheets or cash flow
6    statements?
7         A    Correct.
8         Q    Did you ever see any business tax returns?
9         A    We did not.
10        Q    What about any reports for any of those
11   businesses showing accounts receivable or accounts
12   payable?
13        A    No.
14        Q    Inventory lists or lists of tangible or
15   intangible assets?
16        A    No.  We saw -- again, my recollection is we
17   saw some either credit card statements or checks written
18   for furniture at some point.
19        Q    Did you ever see any kind of records regarding
20   payroll?
21        A    No.
22        Q    Did you ever see any kind of records
23   indicating actual numbers of customers that visited any
24   of the businesses during any time period?
25        A    No.



```
 1      A     It's influenced by data -- the IBISWorld
 2   report in particular is smaller companies.  The one
 3   publicly-traded company, we used their information as
 4   well; but the industry reports are not based on the one
 5   publicly-traded company.
 6      Q     I believe you testified earlier that part of
 7   Mr. Coles' marketing efforts were going to be to --
 8   capitalizing on his celebrity, correct?
 9      A     That was our understanding.
10      Q     All right.  And then, if I've understood
11   correctly in reading documents, he was also going to
12   focus more on the African-American customer base; is
13   that -- is that correct?
14      A     That's also our -- was our understanding.
15      Q     Did you see any kind of studies, anything
16   other than his speculation on that, to support his
17   assertions that both his celebrity -- or his celebrity,
18   his connections with the African-American community, or
19   both, would somehow impact his ability to market the
20   business either as a restaurant, bikini bar or just a
21   bar?
22      A     We didn't see anything independent on that.
23      Q     Okay.  It's just his opinion?
24      A     Yes.
25            MR. OSGATHORPE:  That's all the questions I
```



MAGNA
LEGAL SERVICES

Page 97

1  down or on the phone or by -- we didn't have Zoom back
2  then -- or on the phone to prepare for your deposition
3  with the plaintiff's lawyer?
4      A    We may have.  I just don't recall doing it.
5      Q    Okay.  But you certainly don't recall the
6  probing questions you just got?
7      A    I don't recall those questions.
8      Q    All right.  Did you make Mr. Tahmassebi aware
9  that the information you were relying upon, both
10 financially, business background, et cetera, et cetera,
11 all was coming solely from Mr. Coles?
12     A    Yes.
13     Q    And surely, Mr. Tahmassebi knew this was a
14 startup business, right?
15     A    I assume he did.  It's mentioned in our
16 report.
17     Q    Did you make Mr. Tahmassebi aware that Trouble
18 Livin Life, LLC had no balance sheets, profit and loss
19 statements, tax returns or other financial statements
20 for you to review in presenting your report?
21     A    Yes.
22     Q    That everything he used was Mr. Coles'
23 personal banking records?
24     A    Yes.
25     Q    And you made Mr. Tahmassebi aware of that?



1    A    Yes.

2         MR. BENNARDINI:  I have no further questions.

3         RECROSS (ROBERT H. BUCHANAN, J.D., ASA, CFP )

4    BY MR. OSGATHORPE:

5    Q    All the information came from Mr. Coles.  So

6    he was aware that he lacked, for his businesses at the

7    Philips Highway property, financial statements, income

8    statements, bank records?

9    A    Yes.

10        MR. BENNARDINI:  Objection to the form.

11        THE WITNESS:  Sorry.

12        MR. BENNARDINI:  That's okay.

13        THE WITNESS:  Yes.

14   BY MR. OSGATHORPE:

15   Q    In communicating with Mr. Coles about -- about

16   trying to obtain data from him for your business -- for

17   the evaluation you were attempting to do, did you

18   express any concern to him about the lack of financial

19   records?

20   A    Yes.

21   Q    What was his response?

22   A    "This is what we have."

23        MR. OSGATHORPE:  That's all I have.

24        MR. BENNARDINI:  That's it, no more from me.

25   You're free to go, sir.  Yeah.  Read or waive?  You

